Robert A. Naeve (State Bar No. 106095)
rnaeve@jonesday.com
Cary D. Sullivan (State Bar No. 228527)
carysullivan@jonesday.com
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA  92612.4408
Telephone:  +1.949.851.3939
Facsimile:   +1.949.553.7539

Nathaniel P. Garrett (State Bar No. 248211)
ngarrett@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104-1500
Telephone:  +1.415.626.3939
Facsimile:   +1.415.875.5700

Attorneys for Defendant David Yamasaki

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>DAVID YAMASAKI, IN HIS OFFICIAL CAPACITY AS COURT EXECUTIVE OFFICER/CLERK OF THE ORANGE COUNTY SUPERIOR COURT,<br><br>Defendant. | Case No. 8:17-cv-00126 AG (KESx)<br><br>Assigned for all purposes to Hon. Andrew J. Guilford<br><br>**DEFENDANT DAVID YAMASAKI'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[*Statement of Uncontroverted Facts and Conclusions of Law; Declarations of Sara Ochoa, Deborah T. Kruse, Jeff Wertheimer, Alan Carlson, and Cary D. Sullivan; and [Proposed] Judgment filed concurrently herewith*]<br><br>Date:         December 18, 2017<br>Time:        10:00 a.m.<br>Courtroom: 10D<br>Judge:       Hon. Andrew J. Guilford |

TO THE COURT, THE PARTIES, AND ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 18, 2017, at 10:00 a.m., in Courtroom 10D of the United States District Court for the Central District of California, Southern Division, located at 411 West 4th Street, Santa Ana, California, 92701, before the Honorable Andrew J. Guilford, Defendant David Yamasaki, in his official capacity as Executive Officer and Clerk of the Superior Court of California, County of Orange ("OCSC"), will and hereby does move this this Court for summary judgment in favor of OCSC and against Plaintiff Courthouse News Service ("CNS") pursuant to Federal Rule of Civil Procedure 56.

OCSC seeks summary judgment in its favor on CNS's claim for declaratory relief on three alternative bases:

a.      CNS cannot meet its burden of establishing that it has a qualified right of access to new civil unlimited complaints on a basis that is more expeditious than what OCSC currently provides; or

b.      Assuming *arguendo* that CNS could meet its burden of establishing that it has a qualified right of access to new civil unlimited complaints on a basis that is more expeditious than what OCSC currently provides, OCSC's practices are nonetheless constitutional because they satisfy the First Amendment's time, place, and manner test; or

c.      Assuming *arguendo* that CNS could meet its burden of establishing that it has a qualified right of access to new civil unlimited complaints on a basis that is more expeditious than what OCSC currently provides, and further assuming *arguendo* that the time, place, and manner test does not apply, OCSC's practices are nonetheless constitutional because they are narrowly tailored and serve overriding interests.

OCSC's motion for summary judgment is based on this notice of motion and the accompanying memorandum of points of authorities; OCSC's statement of uncontroverted facts and conclusions of law; the declarations of Sara Ochoa,

1   Deborah T. Kruse, Jeff Wertheimer, Alan Carlson, and Cary D. Sullivan; all

2   exhibits submitted in connection with this motion; the Court's files and other

3   records in this action; any argument at the hearing on this matter; and such other

4   matter as this Court deems just and proper.

5          This motion is made following the conference of counsel pursuant to L.R. 7–

6   3, which took place from November 6 to 9, 2017.

7

8   Dated:  November 17, 2017.          Respectfully submitted,

9                                       JONES DAY

10

11                                      By:  /s/ Robert A. Naeve

12                                           Robert A. Naeve

                                        Attorneys for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF.'S NOTICE OF MOTION AND MSJ
Case No. 8:17-cv-00126 AG (KESx)

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................... 2

III.  PROCEDURAL BACKGROUND ........................................................... 6

IV.  ARGUMENT .......................................................................................... 7

    A.  CNS Cannot Satisfy Its Burden Of Establishing A First
        Amendment Violation When OCSC Makes 95.97% Of Civil
        Unlimited Complaints Public Within Eight Business Hours ............... 8

        1.  CNS Cannot Establish A Nationwide "Experience" Of
            Instantaneous Access To New Civil Unlimited
            Complaints. ............................................................................ 8

        2.  "Logic" Does Not Require Courts To Forego A
            Confidentiality Review To Publish Civil Complaints
            Immediately Upon Submission. ............................................... 15

    B.  In The Alternative, OCSC's Practices Are A Reasonable Time
        Restriction On Access. ..................................................................... 17

    C.  OCSC's Practices Would Survive Even Strict Scrutiny. ................... 22

V.  CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Associated Press v. U.S. Dist. Court*,
   705 F.2d 1143 (9th Cir. 1983)............................................................. 14

*Barber v. Conradi*,
   51 F. Supp. 2d 1257 (N.D. Ala. 1999) ................................................ 20

*Barth v. City of Macedonia*,
   187 F.3d 634 (6th Cir. 1999) (unpublished)................................. 18, 22

*Bend Pub. Co. v. Haner*,
   244 P. 868 (Or. 1926) ......................................................................... 15

*Connick v. Myers*,
   461 U.S. 138 (1983) ........................................................................... 20

*Courthouse News Service v. Planet*,
   750 F.3d 776 (9th Cir. 2014).................................................. 11, 18, 19

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975) ........................................................................... 23

*Craig v. Municipal Court*,
   100 Cal. App. 3d 69 (1979)................................................................ 16

*Delaware Coalition for Open Government, Inc. v. Strine*,
   733 F.3d 510 (3d Cir. 2013) ................................................................. 9

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) ..................................................................... 20, 23

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002)................................................................ 9

*Direct-Mail Serv. v. Registrar of Motor Vehicles*,
   296 Mass. 353 (1937) ......................................................................... 14

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*El Vocero de Puerto Rico v. Puerto Rico,*

4

508 U.S. 147 (1993) ............................................................ 9

5

*Ex parte Drawbaugh,*

6

2 App. D.C. 404 (D.C. Cir. 1894) ..................................... 10

7

*Florida Bar v. Went for It, Inc.,*

8

515 U.S. 618 (1995) ......................................................... 19

9

*The Florida Star v. B.J.F.,*

10

491 U.S. 524 (1989) ......................................................... 23

11

*G.K. Ltd. Travel v. City of Lake Oswego,*

12

436 F.3d 1064 (9th Cir. 2006) ......................................... 22

13

*Gannett Co., Inc. v. DePasquale,*

14

443 U.S. 368 (1979) ......................................................... 10

15

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.,*

16

457 U.S. 596 (1982) ................................................... 14, 18

17

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,*

18

452 U.S. 640 (1981) ......................................................... 21

19

*Hill v. Nat'l Collegiate Athletic Assn.,*

20

7 Cal. 4th 1 (1994) ........................................................... 16

21

*IDT Corp. v. eBay, Inc.,*

22

709 F.3d 1220 (8th Cir. 2013) ......................................... 10

23

*In re Crawford,*

24

194 F.3d 954 (9th Cir. 1999) ........................................... 16

25

*In re Reporters Committee for Freedom of Press,*

26

773 F.2d 1325 (D.C. Cir. 1985) ................................. 10, 15

27

*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D),*

28

707 F.3d 283 (4th Cir. 2013) ........................................... 10

**TABLE OF AUTHORITIES**
(continued)

Page

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ................................................................. 18

*Mao's Kitchen, Inc. v. Mundy*,
   209 Cal. App. 4th 132 (2012) ................................................................. 4

*Mapp v. Ohio*,
   367 U.S. 643 (1961) ............................................................................... 1

*N. Jersey Media Grp., Inc. v. Ashcroft*,
   308 F.3d 198 (3d Cir. 2002) ................................................................... 8

*Nat'l Ass'n for the Advancement of Multijurisdiction Practice v.
   Berch*,
   773 F.3d 1037 (9th Cir. 2014) ............................................................. 20

*Oregonian Pub. Co. v. U.S. Dist. Court*,
   920 F.2d 1462 (9th Cir. 1990) ............................................................. 23

*PG Publ. Co. v. Aichele*,
   705 F.3d 91 (3d Cir. 2013) ................................................................... 15

*Phoenix Newspapers, Inc. v. U.S. Dist. Court*,
   156 F.3d 940 (9th Cir. 1998) ............................................................... 18

*Press-Enterprise Co. v. Superior Court*,
   478 U.S. 1 (1986) .......................................................... 7, 9, 15, 17, 22

*Recycle for Change v. City of Oakland*,
   856 F.3d 666 (9th Cir. 2017) ............................................................... 21

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997) ............................................................................. 24

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ..................................................................... 15, 18

**TABLE OF AUTHORITIES**
(continued)

Page

*Sandefur v. Village of Hanover Park, Ill.,*
862 F. Supp. 2d 840 (N.D. Ill. 2012)......................................................21

*Santa Monica Nativity Scenes Comm. v. City of Santa Monica,*
784 F.3d 1286 (9th Cir. 2015)................................................................21

*Savaglio v. Wal-Mart Stores, Inc.,*
149 Cal. App. 4th 588 (2007).................................................................11

*Schmedding v. May,*
48 N.W. 201 (Mich. 1891)......................................................................10

*Seattle Times Co. v. Rhinehart,*
467 U.S. 20 (1984).................................................................................13

*State ex rel. Williston Herald, Inc. v. O'Connell,*
151 N.W.2d 758 (N.D. 1967)..................................................................14

*State v. McMillan,*
38 So. 666 (Fla. 1905)...........................................................................14

*Sullo & Bobbitt, P.L.L.C. v. Milner,*
765 F.3d 388 (5th Cir. 2014)..................................................................11

*Times Mirror Co. v. United States,*
873 F.2d 1210 (9th Cir. 1989)................................................................23

*United States v. Black,*
483 F. Supp. 2d 618 (N.D. Ill. 2007)........................................................8

*United States v. Cianci,*
175 F. Supp. 2d 194 (D.R.I. 2001).........................................................24

*United States v. Doe,*
870 F.3d 991 (9th Cir. 2017)..................................................................17

*United States v. Doherty,*
675 F. Supp. 719 (D. Mass. 1987)..........................................................22

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Guerrero,*
    693 F.3d 990 (9th Cir. 2012) .................................................................................. 18

*United States v. Gurney,*
    558 F.2d 1202 (5th Cir. 1977) .............................................................................. 20

*United States v. Hastings,*
    695 F.2d 1278 (11th Cir. 1983) .......................................................................... 18

*Upton v. Catlin,*
    31 P. 172 (Colo. 1892) ......................................................................................... 13

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .................................................................................. 8, 17, 19

*Westbrook v. Cty. of Los Angeles,*
    27 Cal. App. 4th 157 (1994) ................................................................................ 16

*Wilfong v. Morris Cty. Corr. Facility,*
    2006 WL 3392938 (D.N.J. Nov. 21 2006) ......................................................... 21

### STATUTES

42 U.S.C. § 1983 ............................................................................................................ 6

65 Pa. Stat. Ann. § 67.901 .......................................................................................... 12

Alaska R. of Admin. 37.5(f) ........................................................................................ 12

Ariz. St. S. Ct. R. 123(f)(2) & (4) ............................................................................... 12

Ark. Sup. Ct. Admin. Order 19 .................................................................................. 12

Cal. R. Ct. 2.118(a) ....................................................................................................... 3

Cal. R. Ct. 2.503(a) ....................................................................................................... 3

Cal. R. Ct. 2.571(e) ..................................................................................................... 25

# TABLE OF AUTHORITIES
### (continued)

**Page**

Cal. R. Ct. 3.54 ................................................................................. 4

Cal. Civ. Proc. Code § 340.1(m) ............................................. 4, 24

Cal. Civ. Proc. Code § 1277(b)(3) .......................................... 3, 25

Cal. Election Code § 2166–2166.5 ............................................. 4

Cal. Ins. Code § 1871.7(e)(2) ................................................... 4

Colo. Rev. Stat § 24-72-203(3)(b) ........................................... 12

Hi. R. Ct. Rec. Rule 10.10 ...................................................... 12

Idaho Admin. R. 32(j) ............................................................. 12

Ind. Code § 5-14-3-3(b) .......................................................... 12

Kan. Stat. Ann. § 45-218(d) .................................................... 12

Ky. Stat. § 61.872(5) ............................................................... 12

La. Stat. Ann. § 44.33(B) ........................................................ 12

Me. Sup. Jud. Ct. Admin. Order JB-05-20 § III(A)(1) .............. 12

Miss. Code Ann. § 25-61-5 ...................................................... 12

N.C. Gen. Stat. § 132-6(a) ....................................................... 12

N.D. Admin. R. 41(3)(b)(2) ..................................................... 12

Neb. Ct. R. 1-809(C) ............................................................... 12

Nev. Rev. Stat. § 239.0107 ...................................................... 12

N.M. Stat. Ann. § 14-2-8(D) .................................................... 12

N.Y. Ct. R. § 124.6 .................................................................. 12

# TABLE OF AUTHORITIES
(continued)

**Page**

Ohio Sup. R. 45(B)(1) ........................................................ 12

Okla. Stat. Title 51, § 24A.5(6) ....................................... 12

Ore. Rev. Stat. §§ 192.430, 192.440................................. 12

R.I. Gen. Laws § 38-2-3 .................................................. 12

S.C. Code Ann. § 30-4-30(C) ......................................... 12

Tenn. Code Ann. § 10-7-503(a)(2)(B)............................. 12

Vt. Stat. Ann. § 318(a)..................................................... 12

Wis. Stat. § 19.35(4)(a).................................................... 12

W.V. Code § 29B-1-3(d) .................................................. 12

**OTHER AUTHORITIES**

Admin. Office of the Courts, *Handling Cases Involving Self-Represented Litigants* (Jan. 2007) ........................................ 16

Council for Court Excellence, *Remote Public Access to Electronic Court Records: A Cross-Jurisdictional Review for the Courts*, (April 2017) ...................................................................... 13

Katie Eccles, *The Agent Orange Case: A Flawed Interpretation Of The Federal Rules Of Civil Procedure Granting Pretrial Access To Discovery*, 42 STAN. L. REV. 1577 (1990)............................ 10

Kristine Cordier Karnezis, *Restricting Public Access To Judicial Records of State Courts*, 84 A.L.R.3d 598 (orig. published 1978).................... 13

Lynn E. Sudbeck, *Placing Court Records Online: Balancing the Public & Private Interests,* THE JUSTICE SYS. J. 268 (2006) ................ 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
(continued)

**Page**

Nat'l Ctr. for State Courts, *Best Practices for Court Privacy Policy Formulation* 3 (July 2017).....................................................................25

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        "There is no war between the Constitution and common sense." *Mapp v.*

4 *Ohio*, 367 U.S. 643, 657 (1961).

5        Defendant David Yamasaki is the Chief Executive Officer of the Superior

6 Court of California, County of Orange ("OCSC"), one of the largest and busiest

7 state trial courts in the country.  In a careful attempt to balance the public's interest

8 in access, the litigants' privacy interest in sensitive and protected information, and

9 the court's own interest in ensuring that all court functions are adequately staffed

10 and supported, OCSC has adopted a practice of dedicating several court clerks to

11 reviewing civil complaints for confidentiality before disseminating to the public.

12 OCSC's practices offend neither the federal constitution nor common sense.

13        Plaintiff Courthouse News Service ("CNS")—a news aggregator, which

14 specializes in the proprietary reporting of civil lawsuits to paying law firm clients—

15 argues otherwise, claiming that the First Amendment requires court clerks to make

16 the contents of civil complaints available the moment they are submitted, and

17 before any confidentiality review.  Summary judgement should be entered against

18 CNS's argument for at least three independently-sufficient reasons.

19        *First*, while the First Amendment enshrines a qualified right of access to

20 court documents, OCSC makes all non-confidential civil unlimited complaints

21 available to the public.  Indeed, in 95.97% of all civil unlimited cases, OCSC makes

22 such complaints available to the public within just eight business hours of receipt.

23 Whatever the scope of the First Amendment right of access, there is no

24 constitutional right to access the contents of civil complaints on a more expeditious

25 basis than what OCSC already provides.

26        *Second*, even if the First Amendment were to require courts to publish civil

27 unlimited complaints as soon as they cross the court transom—or at least by the end

28 of the business day on which the complaint is submitted— the intermediate scrutiny

1   time, place and manner test permits courts to reasonably delay access to these

2   complaints so long as, among other things, the court's practices are narrowly

3   tailored to serve a substantial government interest.  Judgement should be entered

4   against CNS in this case because OCSC's practice of reviewing complaints for

5   confidentiality and compliance is narrowly tailored to serve the government's

6   substantial interest in protecting the privacy of litigants.

7     *Third*, courts are permitted to prohibit access to court records entirely—far

8   more than what OCSC does here—if they have an overriding interest based on

9   findings that closure is essential to preserve higher values and is narrowly tailored

10  to serve that interest.  Contrary to CNS's position, this strict scrutiny test does *not*

11  apply in this case because OCSC is not *closing* access to civil unlimited complaint.

12  But even if this more demanding standard applied, the fact that OCSC's practices

13  survive strict scrutiny demonstrates that judgement should be entered against

14  CNS's constitutional claim.

15    CNS insists upon a level of access that ignores and upends access regimes

16  adopted for virtually every state court system in the Union and abrogates over one

17  hundred years of precedent giving court clerks ample discretion to regulate the

18  manner and timing of public inspection of court records.  Neither the constitution

19  nor common sense compels this extreme result.

20  **II.** **STATEMENT OF FACTS**

21    OCSC is one of the largest state trial courts in the country.  (Statement of

22  Uncontroverted Facts ("SUF") ¶ 1.)  Reflecting Orange County's population of

23  more than three million residents, OCSC has 124 judges who are responsible for

24  adjudicating approximately 500,000 new cases filed each year.  (SUF ¶ 2.)  New

25  civil unlimited complaints account for, on average, 57 per day, 266 per week, 1,175

26  per month, and 14,098 per year.  (SUF ¶ 3.)  OCSC receives more civil complaints

27  than any superior court in California other than Los Angeles Superior Court; in

28  2015, OCSC received almost four times more new civil filings than the United

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1    States District Court for the Central District of California.  (SUF ¶¶ 4–5.)

2          In an effort to manage these voluminous filings, OCSC was the first

3    California state court to adopt mandatory e-filing, in 2013.  (Ochoa Decl. ¶ 6;

4    Wertheimer Decl. ¶¶ 3–7.)  E-filing permits litigants to file their pleadings and

5    other documents 24-hours a day, every day of the week.  (SUF ¶ 6.)  By eliminating

6    most paper civil filings, the e-filing system increased access to court documents and

7    the speed with which those documents become available to the public for viewing.

8    (Ochoa Decl. ¶ 14; Wertheimer Decl. ¶ 5.)  Nonetheless, in light of confidentiality

9    and privacy considerations implicated by California law, OCSC does not publish

10   complaints for public view immediately upon receipt.  (SUF ¶ 9.)

11         Rather, OCSC employs five Legal Process Specialists ("LPS") who are

12   tasked with receiving, handling, and reviewing civil complaints for confidentiality,

13   privacy interests, and compliance with filing requirements *before* filing and posting

14   them for public viewing.[1]  (SUF ¶ 11.)  These LPSs also handle other filings as time

15   allows, but they are trained and designated specifically to review and file new civil

16   complaints as they are received, and in the order received, and that is their priority.

17   (SUF ¶ 22.)  This process is designed to comply with California Rule of Court

18   2.118(a), which states that the court "must not accept for filing" complaints that do

19   not comply with certain requirements, and with California Rule of Court 2.503(a),

20   which provides that electronic records "must be made reasonably available to the

21   public in some form," *except* for records "made confidential by law."

22         As is relevant to these proceedings, California statutes and Rules of Court

23   mandate that at least the following classes of civil unlimited complaints be

24   maintained in confidence, primarily to protect litigant privacy rights:

25   • **Name Changes Pursuant to the Safe at Home Program.**  Courts
26     shall keep confidential the legal name of a person who seeks to change

27   ───────────────────
     [1] An additional three LPSs handle the filings in OCSC's complex civil
28   department.  (SUF ¶ 12.)

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

their name and is the victim of domestic violence, stalking, or sexual assault.  Cal. Civ. Proc. Code § 1277(b)(3); Cal. Rs. Ct. 2.575-2.577.

- **False Claims Act Cases.**  Courts must "securely file" and seal for 60 days cases filed by private individuals who sue contractors working for the State of California.  Cal. Rs. Ct. 2.571(e), 2.573(a).

- **Insurance Fraud Cases.**  Cases filed by insurers, or other interested parties, against individuals who commit insurance fraud must be sealed for 60 days.  Cal. Ins. Code § 1871.7(e)(2).

- **Sexual Abuse Involving Minors.**  Complaints involving sexual abuse of a minor filed after the victim turns 26 are not supposed to name any defendant except by "Doe" designation until there has been a showing of corroborative fact as to the charging allegations against that defendant.  Cal. Civ. Proc. Code § 340.1(m).

- **Fee Waivers.**  Litigants who file fee waiver requests, which typically accompany new complaints, must include personal financial information such as income statements that "are confidential" and not to be "disclosed to the public without court order."  *Mao's Kitchen, Inc. v. Mundy*, 209 Cal. App. 4th 132, 149 (2012); Cal. R. Ct. 3.54.

- **Election Voter Registry Cases.**  To protect petitioners, their voter information must be kept off the public registry.  *See* Cal. Elec. Code § 2166–2166.5.

OCSC directs the LPSs responsible for new civil complaints to review whether litigants have properly designated the complaint confidential and to ensure that complaints required to be kept confidential are not made available to the public.  (SUF ¶ 13.)  At the same time the LPS reviews the complaint for confidentiality, the clerk also spends a few additional minutes to finish the filing process.  (SUF ¶ 14.)  LPSs have no practical way of determining whether any particular civil unlimited complaint might be "newsworthy" in the eyes of CNS or any other member of the public, and cannot be expected to identify and more promptly publish such complaints for this reason.  (SUF ¶ 15.)  Instead, LPSs review all complaints in the order received to determine if they can be accepted for filing and made available to the public to the extent permitted by the Rules of Court

or statute.  (SUF ¶ 16.)

The review process adopted by OCSC is required to ensure that complaints containing confidential information are not made public.  (SUF ¶ 17.)  Litigants are directed to assist in protecting confidential information by designating whether their complaint should be sealed or held in confidence.  (SUF ¶ 18.)  Yet litigants (who are often *pro se*) do not always properly designate their complaints as confidential.  (SUF ¶ 20.)  For example, from 2016 to present, OCSC has identified at least 18 cases where confidential complaints or attachments would have been made public but for LPS review.  (SUF ¶ 21.)

The LPSs responsible for reviewing and processing new e-filed complaints dedicate themselves to this task eight hours a day, five days a week—subject to holidays, mandatory rest breaks, and staff meetings.  (SUF ¶ 22.)  On average, they require from 10 to 15 minutes to fully process and review these new complaints before they can be released to the public, via OCSC's computer system, which typically refreshes to reflect new e-filed complaints within 15 minutes after they have been processed and released for public viewing.  (SUF ¶ 23.)

The public may view newly e-filed complaints in two ways.  First, any member of the public can review complaints for free on computer terminals located in the clerk's office, which are available from 8:00 a.m. to 4:00 p.m. every court day.  (SUF ¶ 24.)  The public also can review newly e-filed complaints at any time of day on OCSC's public website.  (SUF ¶ 25.)  If the user wishes to view a complaint on the internet, the cost is $7.50 for the first 10 pages plus $0.07 per additional page up to a maximum of $40.  (SUF ¶ 26.)  Both of these means are equally available to the general public and to the media, including CNS.  (SUF ¶ 27.)

Statistics maintained by OCSC demonstrate that 80.97% of civil unlimited civil complaints e-filed in 2017 were made publicly available within four business hours; 95.97% within eight business hours; and 99.50% within 24 business hours:

| Time Period (2017 to date) | % Published Within 4 Business Hours | % Published Within 8 Business Hours | % Published Within 24 Business Hours |
|---|---|---|---|
| January 2017 | 78.4% | 92.8% | 97.8% |
| February 2017 | 73.5% | 94.9% | 99.1% |
| March 2017 | 81.4% | 95.9% | 99.1% |
| April 2017 | 79.3% | 95.4% | 99.6% |
| May 2017 | 96.6% | 98.7% | 99.8% |
| June 2017 | 66.2% | 94.4% | 99.7% |
| July 2017 | 65.9% | 93.8% | 99.7% |
| August 2017 | 89.1% | 97.9% | 99.8% |
| September 2017 | 89.2% | 98.3% | 100.0% |
| October 2017 through 10/18/2017 | 90.2% | 96.4% | 99.8% |
| **2017 YTD % through 10/18/2017** | **80.97%** | **95.97%** | **99.50%** |

(SUF ¶ 29.)

### III.   PROCEDURAL BACKGROUND

CNS is a for-profit service that specializes in the reporting of civil lawsuits. (SUF ¶ 30.) Of CNS's 2,220 subscribers, 92.2% are lawyers or law firms that pay to receive proprietary reports describing newly-filed civil complaints. (SUF ¶ 31.) These proprietary reports allow recipients to notify existing and prospective clients that a new lawsuit has been filed and to offer representation before the client selects other counsel. (SUF ¶ 32.) CNS also has a website with news stories and commentary that is freely available to the public. (SUF ¶ 33.)

On January 24, 2017, CNS sued OCSC under 42 U.S.C. § 1983, alleging that OCSC violates the First Amendment's right of access to court records by denying access to civil unlimited complaints "until after [they] are processed." ECF No. 1 at 2:20. A week after filing its Complaint, CNS moved for a preliminary injunction to enjoin OCSC "from denying CNS's right of timely access to new [civil] unlimited complaints upon receipt by delaying access until after processing is

complete and to complaints filed after 4 p.m." ECF No. 11–1 at 24:17–19.

On August 7, 2017, this Court denied the injunction motion, holding that CNS is unlikely to succeed on the merits of its claim. ECF No. 56 at 8:20–22. In doing so, the Court noted that "the vast majority of complaints filed in OCSC are publicly available very soon after they're filed"; "[t]he delays that CNS complains of here are minor given the heavy caseload in the OCSC"; and "compared to other cases where courts found delays to be unconstitutional, [the minor delays here] simply do not constitute a First Amendment violation." ECF No. 56 at 7:6–7, 14–15; 8:20–22. As of the time of the Court's ruling, available statistics demonstrated that OCSC made 89.2% of newly-filed civil unlimited complaints available within eight business hours – that number has since risen to 95.97%. (SUF ¶ 28.)

CNS appealed the Court's ruling and sought a stay of this action pending the appeal. ECF No. 58–60. The Court denied CNS's request to stay these proceedings. ECF No. 70. The instant motion follows.

## IV.   ARGUMENT

Summary judgment should be entered in favor of OCSC for three independently-sufficient alternative reasons.

**1.** OCSC does not violate the First Amendment right of access to court records when it makes 95.97% of newly-filed civil unlimited complaints available within eight business hours. To determine whether the plaintiff has a First Amendment right of access at all, courts apply the so-called "experience and logic" test, which asks whether there is a tradition of access and whether access would play a significant role in the functioning of the particular process in question. *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986). There is no tradition within the American judicial system of obligating court clerks to immediately publish civil complaints before the clerk's review, at the risk of exposing an individual's confidential information. Likewise, there is nothing logical about prohibiting clerks from taking 15 minutes to ensure compliance with filing

1   obligations and to protect litigants' sensitive information before electronically

2   publishing the unproven allegations in civil complaints to the world.

3      **2.**  Even if the Founders contemplated that the First Amendment would

4   mandate a right of same-day access to civil unlimited complaints, OCSC has the

5   right to adopt reasonable time, place, or manner restrictions on recognized First

6   Amendment rights.  *See Ward v. Rock Against Racism*, 491 U.S. 781 (1989).

7   OCSC's policy of reviewing civil unlimited complaints for confidentiality and

8   compliance with filing requirements is properly analyzed as a time restriction

9   because it merely *delays*—and does not close—access to court records.  Assessed

10  under the appropriate framework, OCSC's policy of reviewing complaints before

11  publication is permissible because it is narrowly tailored to serve a substantial

12  government interest.

13     **3.**  Finally, and even if CNS has a First Amendment right of same-day access

14  *and* OCSC's practices were assessed under the strict scrutiny traditionally reserved

15  for blanket closures on access of court records, summary judgment still would be

16  warranted because OCSC maintains an overriding interest in protecting confidential

17  information and its practices are narrowly tailored to serve that interest.

18     **A.**  <u>**CNS Cannot Satisfy Its Burden Of Establishing A First**</u>
       <u>**Amendment Violation When OCSC Makes 95.97% Of Civil**</u>
19     <u>**Unlimited Complaints Public Within Eight Business Hours.**</u>

20     CNS, as the party alleging a First Amendment right, bears the burden of

21  establishing that both experience and logic compel OCSC to grant a level of access

22  greater than which it already provides.  *See N. Jersey Media Grp., Inc. v. Ashcroft*,

23  308 F.3d 198, 209 (3d Cir. 2002); *United States v. Black*, 483 F. Supp. 2d 618, 623

24  (N.D. Ill. 2007) (citing cases).  As OCSC now will show, CNS cannot satisfy either

25  of these elements.

26     **1.**  **CNS Cannot Establish A Nationwide "Experience" Of**
            **Instantaneous Access To New Civil Unlimited Complaints.**

27     When a plaintiff claims his First Amendment right of access has been

28

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1   violated, the *Press-Enterprise* test instructs courts to first ask whether there has

2   been a tradition or history of access to the particular proceeding or record.  478 U.S.

3   at 8.  There is no dispute that OCSC provides public access to all civil unlimited

4   complaints, so it is not enough for CNS to rest on the proposition that the First

5   Amendment right of access extends to civil complaints.  The dispute here is a

6   temporal one, and CNS bears the burden of demonstrating that OCSC's practice of

7   making 95.97% of civil unlimited complaints publicly available within eight

8   business hours contravenes the tradition of American courts.  Yet there is no

9   tradition in the United States of granting the public access to a civil complaint as

10  soon as it is submitted, or of compelling court clerks to make the allegations of a

11  civil complaint public before a confidentiality review.

12      The "experience" test considers "whether the place and process have

13  historically been open to the press and general public," because such a "tradition of

14  accessibility implies the favorable judgment of experiences."  *Press-Enterprise*, 478

15  U.S. at 8.  The test "does not look to the particular practice of any one jurisdiction,

16  but instead 'to the experience in that type or kind of hearing throughout the United

17  States.'"  *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150–51 (1993)

18  (citation omitted).  And to satisfy the experience test, "the tradition of openness

19  must be strong."  *Delaware Coalition for Open Government, Inc. v. Strine*, 733

20  F.3d 510, 515 (3d Cir. 2013).  While the Supreme Court has not stated how long a

21  history of access the experience prong requires, courts are "mindful that '[a]

22  historical tradition of at least some duration is obviously necessary, … [or] nothing

23  would separate the judicial task of constitutional interpretation from the political

24  task of enacting laws currently deemed essential.'"  *Detroit Free Press v. Ashcroft*,

25  303 F.3d 681, 701 (6th Cir. 2002) (citation omitted).

26      Early American jurisprudence fails to support an "experience" of public

27  access to civil complaints at all, let alone the moment a complaint crosses the court

28  transom.  Before 1900, all cases involving requests by members of the press to

access court records before trial resulted in "denied access."  Katie Eccles, *The Agent Orange Case: A Flawed Interpretation Of The Federal Rules Of Civil Procedure Granting Pretrial Access To Discovery*, 42 STAN. L. REV. 1577, 1603 (1990); *see also Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 396 (1979) (Burger, C.J., concurring) (in 18th-century litigation, "no one ever suggested that there was any 'right' of the public to be present at … pretrial proceedings"); *Schmedding v. May*, 48 N.W. 201, 202 (Mich. 1891) (declining to find a right of access to complaints which simply "frame the issue to be tried"); *Ex parte Drawbaugh*, 2 App. D.C. 404, 407 (D.C. Cir. 1894) (declining to recognize a right "to inspect and take copies from papers merely filed, but before any action had thereon by the court").

More recently, federal appellate courts have resisted the notion that the First Amendment enshrines a right to access civil judicial records, at least before the underlying record is the subject of a judicial proceeding.  For example, in *In re Reporters Committee for Freedom of the Press*, 773 F.2d 1325 (D.C. Cir. 1985), then-Judge Scalia held for the D.C. Circuit that the public does not have a First Amendment right of pre-trial access to any civil document.  *Id.* at 1325.  Rejecting the plaintiffs' claim of immediate access to summary judgment papers under the First Amendment, the D.C. Circuit found it could not discern a historical practice "preventing federal courts and the states from treating the records of private civil actions as private matters until trial or judgment."  *Id.* at 1336.  Indeed, the court noted its "inability to find *any* historical authority, holding or dictum," mandating public access to pre-judgment records in private civil cases.  *Id.* at 1335–36 (emphasis in original); *see also IDT Corp. v. eBay, Inc.*, 709 F.3d 1220, 1224 (8th Cir. 2013) (rejecting the argument that a First Amendment right of access attaches to a civil complaint before the complaint has been subjected to an adjudication on the merits); *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013) (holding that the First Amendment right of access

does not extend to documents filed with a motion to dismiss); *Savaglio v. Wal-Mart Stores, Inc.*, 149 Cal. App. 4th 588, 596 (2007) (holding that "[t]he public has a First Amendment right of access to civil litigation documents filed in court and used at trial or submitted as a basis for adjudication.").[2]

Indeed, only one federal appellate court has considered the merits of an analogous First Amendment claim, and that court—the Fifth Circuit—squarely rejected it.  In *Sullo & Bobbitt, P.L.L.C. v. Milner*, 765 F.3d 388 (5th Cir. 2014), a law firm sought access within one business day of filing to new criminal misdemeanor citations that had been filed with the state courts.  *Id.* at 391.  Because the plaintiff conceded that the courts ultimately made criminal citations available, the court recognized the question presented was "a temporal one, that is, how quickly must the charging instruments be made available?"  *Id.* at 392 n.3.  The Fifth Circuit rejected the theory that the First Amendment enshrines a right of same-day access, holding that "the district court correctly dismissed appellants' First Amendment claims because they failed to establish a constitutional right to access court records within one business day of their filing."  *Id.* at 392.

The Fifth Circuit's conclusion in *Sullo* is buttressed by the fact that state legislatures across the country have adopted laws that uniformly demonstrate court clerks are entitled to a reasonable amount of time to respond to public requests for access to court records.  Notably, not a single state has adopted a policy of

---

[2] To the extent this issue has been addressed in the Ninth Circuit, the Court has expressly recognized that "[t]here may be limitations on the public's right of access to judicial proceedings, and mandating same-day viewing of unlimited civil complaints may be one of them."  *Courthouse News Service v. Planet* (*Planet I*), 750 F.3d 776, 792-93 (9th Cir. 2014).  In *Planet I*, the Ninth Circuit held that the district court erred when it abstained from hearing CNS's claim that the Ventura Superior Court withheld complaints for "days or weeks" before providing them to the public because CNS alleged a cognizable First Amendment injury caused by the "denial of timely access to newly filed complaints."  *Id.* at 788.  However, the Court expressly declined to rule on the merits of CNS's First Amendment claim.  *Id.* at 792-93.

mandating immediate access to court records.  To the contrary, at least 18 states provide a fixed number of days—typically 3-10 business days, and in certain cases even more—within which a response to a request for access or actual access to civil complaints should be granted.[3]  Other states, including California, provide no fixed timeline and instead adopt a "reasonable" or "as promptly as practical" guideline for responding to a request for access or providing access to civil complaints.[4]  CNS's proposed right of immediate and same-day access to civil complaints is not just novel, but directly contrary to the access tradition of virtually every state in the

---

[3] *See* Del. Policy on Public Access to Records in the Del. Court of Chancery IV(a)(2) (10 working days); Idaho Ct. Admin. R. 32(j) (3 to 10 business days); Kan. Stat. Ann. § 45-218(d) (3 business days); La. Stat. Ann. § 44.33(B) (public records in active use shall be provided within 3 business days); Ky. Stat. § 61.872(5) (3 days); Me. Sup. Jud. Ct. Admin. Order JB-05-20 § III(A)(1) (5-60 working days depending on amount of cases requested); Miss. Code Ann. § 25-61-5 (7 business days); Nev. Rev. Stat. § 239.0107 (5 business days); N.M. Stat. Ann. § 14-2-8(D) (15 days); N.Y. Ct. R. § 124.6 (5 business days); 65 Pa. Stat. Ann. § 67.901 (5 business days); R.I. Gen. Laws § 38-2-3 (public body receiving a request to inspect or copy records must comply within 10 business days, and may have an additional 20 business days due to difficulty in retrieving or copying the records, or if additional time is necessary to avoid an undue burden on the public body); S.C. Code Ann. § 30-4-30(C) (10 business days to notify and 30 calendar day to furnish); Tenn. Code Ann. § 10-7-503(a)(2)(B) (7 business days); Tex. R. Jud. Admin. 12.6(b) (14 days); Utah Jud. Council R. Jud. Admin. 4-202.06(2) (5-10 business days); 1 Vt. Stat. Ann. § 318(a) (files in active use produced "within one calendar week"); W.V. Code § 29B-1-3(d) (5 business days).

[4] *See* Alaska R. of Admin. 37.5(f); Alaska Admin. Bull. No 12 §§ V(B)(1), V(C); Ariz. St. S. Ct. R. 123(f)(2) & (4); Ark. Sup. Ct. Admin. Order 19, § IX(B); Cal. Gov. Code§ 68150(*l*); Colo. Rev. Stat § 24-72-203(3)(b) (allowing that if records are not readily available, response within 3-7 days is reasonable); Fla. R. Jud. Admin. 2.420(m); Hi. R. Ct. Rec. Rule 10.10; Ind. Code § 5-14-3-3(b); Mass. Sup. Jud. Ct.'s Judiciary/Media Steering Comm., Guidelines On the Public's Right of Access to Judicial Proceedings and Records, § V(A); Minn. R. Pub. Access to Records of the Jud. Branch 7(2); Neb. Ct. R. 1-809(C); N.C. Gen. Stat. § 132-6(a); N.D. Admin. R. 41(3)(b)(2); Ohio Sup. R. 45(B)(1); Okla. Stat. tit. 51, § 24A.5(6); Ore. Rev. Stat. §§ 192.430, 192.440; Wis. Stat. § 19.35(4)(a); Wy. R. Governing Access to Ct. Records 4.

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

Union.[5]

These copious state access laws dovetail with a slew of authority making clear that there is a longstanding tradition in this country of providing court clerks with ample discretion to regulate the manner and timing of public inspection of court records.  This uniform precedent bears out that CNS's requested relief requiring OCSC to forego confidentiality review of complaints would run roughshod over traditional principles regulating access to judicial records.

As one treatise observed, many cases hold—"and none have denied"—that "public access to judicial records is subject to reasonable administrative regulations as to the manner of inspection."  Kristine Cordier Karnezis, *Restricting Public Access To Judicial Records of State Courts*, 84 A.L.R.3d 598 (originally published 1978).  Indeed, the Supreme Court itself has recognized that "to the extent that courthouse records could serve as a source of public information, access to that source customarily is subject to the control of the trial court."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 n.19 (1984).  And state courts have similarly recognized the trial court clerk's wide discretion.  *See Upton v. Catlin*, 31 P. 172, 173 (Colo.

---

[5] A 2016 survey of 28 U.S. court jurisdictions reflects that the level of access provided by court systems across the country is inconsistent with CNS's claimed right.  Notably, the survey reflects that (1) a quarter (7 of 28) of the jurisdictions do not provide *any* form of electronic public access to court records; (2) a vast majority of those jurisdictions that provide electronic access (at least 16 of 21) require certain information to be shielded from public access; and (3) at least half of the jurisdictions that shield information (8 of 16) require court staff to play a material role in this process.  (SUF ¶ 34); Council for Court Excellence, *Remote Public Access to Electronic Court Records: A Cross-Jurisdictional Review for the Courts*, 2–4 (April 2017), http://www.courtexcellence.org/uploads/publications/RACER_final_report.pdf.  Further, CNS's proposed right is also inconsistent with its own evidence.  CNS prepared a "Report Card" in 2011 demonstrating that the majority of California Superior Courts do not provide same-day access to civil complaints, some regularly delaying access for up to several weeks after receipt.  (SUF ¶ 35.)  As reflected in the survey and by way of CNS's own concessions, the level of access CNS seeks here far exceeds the level of access customarily provided by U.S. state courts.

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1   1892) (the court clerk has "wide discretion" when it comes to "permitting the

2   examination of the records of his office by those other than employe[e]s thereof.").

3       Unless OCSC abandons its confidentiality review entirely, complying with

4   CNS's demand to provide access to civil complaints immediately (or at least by the

5   end of the business day in which a complaint is submitted) would require OCSC to

6   redirect staff from other essential functions and departments of the court to the task

7   of reviewing and publishing civil complaints.  (SUF ¶ 36.)  This is precisely the

8   type of disruption that an unbroken line of precedent seeks to avoid:  the public is

9   not entitled to inspect court records at their "whim and wish, because this would

10  result in the disruption of the work of the court and of its staff."  *State ex rel.*

11  *Williston Herald, Inc. v. O'Connell*, 151 N.W.2d 758, 763 (N.D. 1967).  Whatever

12  the scope of the public's right to access court records, it does not permit the clerk

13  "to be unduly annoyed by a large force, or by work at unseasonable hours, or by the

14  monopoly of … records to the exclusion of other persons, or interfere with his right

15  to prescribe a reasonable use of the same."  *State v. McMillan*, 38 So. 666, 668 (Fla.

16  1905); *see also Direct Mail Serv. v. Registrar of Motor Vehicles*, 296 Mass. 353,

17  357 (1937) ("No one person can take possession of the [office] or monopolize the

18  record books so as to interfere unduly with the work of the office or with the

19  exercise of equal rights by others, and the applicant must submit to such reasonable

20  supervision on the part of the custodian as will guard the safety of the records and

21  secure equal opportunity.").

22      Further, there is a longstanding tradition of granting court clerks the

23  discretion to adopt "reasonable rules and regulations as to who may inspect the

24  records and where and how such inspection may be made" because "[u]nlimited

25  and unsupervised inspection would … expose certain files which are privileged

26  under the law, to view by persons who are not authorized to see them."  *Williston*

27  *Herald*, 151 N.W.2d at 763; *see also Associated Press v. U.S. Dist. Court*, 705 F.2d

28  1143, 1149 (9th Cir. 1983) (Poole, J., concurring) ("The *Globe* court has made it

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1    crystal clear that neither the First Amendment nor the Sixth gives press, public or

2    the defendant the right to look first, before the court has had an opportunity to judge

3    the nature of questioned documents or other matter.").  Thus, there can be no

4    serious dispute that "tradition" recognizes the court clerk's discretion to limit

5    inspection to "'proper seasons, and on proper application.'"  *Bend Pub. Co. v.*

6    *Haner*, 244 P. 868, 870 (Or. 1926) (citation omitted).

7            That is precisely what OCSC's processes allow.  OCSC makes available to

8    CNS—and to the public—the vast majority of all civil unlimited complaints within

9    one business day.  Whatever the scope of CNS's First Amendment right to access

10   court documents, it does not empower CNS to demand inspection as soon as a

11   complaint is submitted and before a confidentiality review.

12           **2.     "Logic" Does Not Require Courts To Forego A**
             **Confidentiality Review To Publish Civil Complaints**
13           **Immediately Upon Submission.**

14           CNS also cannot satisfy its burden of proving that its claimed right of

15   immediate access to civil complaints is mandated by the "logic" prong of the *Press-*

16   *Enterprise* test, which examines "whether public access plays a significant positive

17   role in the functioning of the particular process in question." *Press-Enterprise*, 478

18   U.S. at 8.  CNS's obligation to satisfy this "logic" prong is "needed, since otherwise

19   the most trivial and unimportant historical practices … would be chiselled [*sic*] in

20   constitutional stone." *In re Reporters Comm.*, 773 F.2d at 1332.  And, because

21   there "are few restrictions on action which could not be clothed by ingenious

22   argument in the garb of decreased data flow," the First Amendment right of access

23   "must be invoked with discrimination and temperance." *Richmond Newspapers,*

24   *Inc. v. Virginia*, 448 U.S. 555, 588 (1980) (Brennan, J., concurring).

25           In assessing whether a right of access would play a significant positive role

26   in the judicial process, courts must also "take account of the flip side—the extent to

27   which openness impairs the public good." *PG Publ. Co. v. Aichele*, 705 F.3d 91,

28   111 (3d Cir. 2013) (quotation marks and citation omitted).  Here, serious and

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1   logical considerations strongly weigh against any judgment that would require

2   OCSC to make civil complaints automatically available before checking first

3   whether confidentiality requirements dictate that it not be made public.

4        Certain litigants have both a federal and state constitutional right to privacy

5   over all or some of the information in complaints filed by or against them.  *See In*

6   *re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999); *Hill v. Nat'l Collegiate Athletic*

7   *Assn.*, 7 Cal. 4th 1, 15 (1994).  These constitutional privacy rights are independent

8   of, but reflected in, numerous California statutes and Rules of Court that obligate

9   OCSC to protect the privacy rights of litigants and protect from public disclosure

10  certain types of complaints or information therein.  (SUF ¶¶ 7–8.)

11       California courts have an obligation to protect these privacy rights.  *See, e.g.*,

12  *Westbrook v. Cty. of Los Angeles*, 27 Cal. App. 4th 157, 165–66 (1994) (custodians

13  of judicial records "have a duty to resist attempts at unauthorized disclosure and the

14  person who is the subject of the record is entitled to expect that his right will be

15  thus asserted"); *Craig v. Municipal Court*, 100 Cal. App. 3d 69, 77 (1979) (same).

16  And there is no "logical" basis to compel OCSC to abrogate its watchguard role in

17  the confidentiality process by putting the responsibility of protecting confidential

18  information solely on the filer.

19       Many of the regimes described above are designed to protect the privacy

20  interests of the *defendant*, something the plaintiff may have no meaningful

21  incentive to safeguard.  And even if all plaintiffs could be trusted to abide by the

22  confidentiality restrictions with which they are aware, self-represented litigants—

23  who "often have difficulty preparing complete pleadings, [or] meeting procedural

24  requirements"—represent a "growing … portion" of the California state court

25  caseload.  Administrative Office of the Courts, *Handling Cases Involving Self-*

26  *Represented Litigants*, xi (Jan. 2007), http://www.courts.ca.gov/

27  documents/benchguide_self_rep_litigants.pdf.  In light of technological advances

28  that make a citizens' private information instantly available through electronic court

records, "[i]t is imperative that the courts … control [sensitive] information and develop the rules that will provide public access while protecting private information in its supervision and control," as OCSC has done here.  Lynn E. Sudbeck, *Placing Court Records Online: Balancing the Public & Private Interests*, 27 THE JUSTICE SYS. J. 268, 280 (2006), https://cdm16501.contentdm. oclc.org/digital/collection/tech/id/356; *cf. United States v. Doe*, 870 F.3d 991, 997 (9th Cir. 2017) (recognizing, in context of *Press-Enterprise* test, the privacy implications of fact that "electronic filing ha[s] … made court documents so easily accessible").

Here, no logical reason exists why the Court should grant the declaratory relief CNS seeks.  CNS maintains that the public ought to know when a party invokes a state court's authority and that even minimal delays can destroy the contemporary news value of information.  But even assuming all complaints filed in OCSC contain "newsworthy" content, it does not follow that the clerk must ensure publication by the end of each and every day.  As the Fifth Circuit explained in *United States v. Edwards*, the First Amendment right of access is designed to guarantee "a public watch to guard against arbitrary, overreaching, or even corrupt action by participants in judicial proceedings."  823 F.2d 111, 119 (5th Cir. 1987). "Any serious indication of such an impropriety, would … receive significant exposure in the media, even when such news is not reported contemporaneously with the suspect event."  *Id.*

### B.   In The Alternative, OCSC's Practices Are A Reasonable Time Restriction On Access.

Even if CNS had a First Amendment right to access civil complaints on the same day they are submitted—and it doesn't—OCSC may impose content-neutral restrictions on the time, place, or manner of protected speech (or in this case, access) so long as they are narrowly tailored to serve a significant government interests and leave open ample alternative channels for communication.  *Ward*, 491

1    U.S. at 791.  Assessed as a time restriction, OCSC's policy of reviewing complaints

2    for confidentiality before publication easily passes constitutional muster.

3        CNS has previously argued that OCSC's practices must be subjected to strict

4    scrutiny.  *See* ECF No. 11–1.  But the strict scrutiny test comes into play only after

5    the plaintiff has established that a qualified right of access exists, and the defendant

6    defends *closure* on a legitimate competing interest.  *See Phoenix Newspapers, Inc.*

7    *v. U.S. Dist. Court*, 156 F.3d 940, 946–49 (9th Cir. 1998).  Even if CNS could

8    establish that the public has a constitutional right to access civil complaints on the

9    same day they are filed, OCSC's practices and policies would not be subject to

10   strict scrutiny, because they do not amount to a blanket *denial* of access (*i.e.*,

11   "closure order[s]").  *Phoenix Newspapers*, 156 F.3d at 946–47; *see also United*

12   *States v. Guerrero*, 693 F.3d 990, 1002 (9th Cir. 2012); (reviewing when court may

13   "clos[e] a hearing"); *see also Leigh v. Salazar*, 677 F.3d 892, 895 (9th Cir. 2012)

14   (reviewing the BLM's decision to prevent public from watching the first day of a

15   horse gather, akin to closing a courtroom for one day of a trial).

16       There is no dispute that CNS may inspect civil complaints; the issue is

17   simply one of timing.  And, as many courts have recognized, a different test applies

18   to mere *delays* in access.  *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*,

19   457 U.S. 596, 607 n.17 (1982) ("Of course, limitations on the right of access that

20   resemble 'time, place, and manner' restrictions on protected speech, … would not

21   be subjected to such strict scrutiny."); *see also Richmond Newspapers*, 448 U.S. at

22   581 n.18; *see also United States v. Hastings*, 695 F.2d 1278, 1282 (11th Cir. 1983)

23   (rules limiting press access to the courtroom resembled time, place, or manner

24   restriction); *see also Barth v. City of Macedonia*, 187 F.3d 634, at *1 (6th Cir.

25   1999) ("The plaintiff erroneously argues that the First Amendment requires

26   'contemporaneous and immediate access to court records absent a case-by-case

27   finding of a compelling state interest using narrowly tailored means' …..  Content

28   neutral restrictions on access to court records are subject to a less rigorous standard

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1    of review.") (unpublished).  Indeed, *Planet I* expressly recognized that a delay in

2    making complaints available may "be analogous to a permissible 'reasonable

3    restriction[] on the time, place, or manner of protected speech.'"  750 F.3d at 793

4    n.9 (quoting *Ward*, 491 U.S. at 791).

5         Under this intermediate scrutiny test, a restriction on access is valid if it is

6    narrowly tailored to serve a substantial government interest, but it need not be the

7    least restrictive or least intrusive means of doing so.  *Ward*, 491 U.S. at 799.

8    "Rather, the requirement of narrow tailoring is satisfied 'so long as the …

9    regulation promotes a substantial government interest that would be achieved less

10   effectively absent the regulation.'"  *Id.* (citation and omitted).  The validity of a

11   time, place, and manner restriction "does not turn on a judge's agreement with the

12   responsible decisionmaker concerning the most appropriate method for promoting

13   significant government interests or the degree to which those interests should be

14   promoted."  *Id.* at 800 (citation and quotation marks omitted).  "So long as the

15   means chosen are not substantially broader than necessary to achieve the

16   government's interest, [] the regulation will not be invalid simply because a court

17   concludes that the government's interest could be adequately served by some less []

18   restrictive alternative."  *Id*.  OCSC's policy easily meets all three criteria:

19        **1.**  OCSC has a substantial interest in protecting the confidential information

20   of litigants, as mandated by California law.  In *Florida Bar v. Went for It, Inc.*, 515

21   U.S. 618 (1995), the Supreme Court upheld the Florida bar's restriction on sending

22   written communications to personal injury victims for the purpose of soliciting new

23   clients.  *Id.* at 634–35.  The Supreme Court "ha[d] little trouble crediting the Bar's

24   interest as substantial," based on previous decisions holding that "the protection of

25   potential clients' privacy is a substantial state interest."  *Id.* at 625 (citation and

26   quotation marks omitted).

27        Here, the privacy interests implicated are even more substantial than in *Went*

28   *for It*.  OCSC seeks to uphold California non-disclosure regimes designed to protect

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

some of the most vulnerable members of the population, including victims of sexual assault or stalking, and individuals accused of sexual assault against a minor before such allegations have been substantiated. These members of California civil society have a significant interest—and the government has a concomitant interest—in "control[ing] … information concerning his or her person." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989).

OCSC also has a significant governmental interest in not incurring the expense of hiring additional staff (or the disruption of diverting existing staff from other important tasks) simply to make complaints available a few hours earlier than they are currently. While CNS's quest for instantaneous access is important to it, its "quest for information cannot unduly interfere with the clerk's office's ability to perform its functions." *Barber v. Conradi*, 51 F. Supp. 2d 1257, 1267–68 (N.D. Ala. 1999) (holding that clerk's policy of imposing two-hour per-week limit on public's bulk record requests was a reasonable time, place, and manner restriction); *see also Connick v. Myers*, 461 U.S. 138, 154 (1983) (holding that efficient performance of governmental functions is an important interest; action that might "disrupt the office" trumped plaintiff's First Amendment interest); *see also United States v. Gurney*, 558 F.2d 1202, 1210 n.13 (5th Cir. 1977) (restricting press's access to court exhibits was reasonable where conditioned upon clerk's availability).

**2.** OCSC's practices are narrowly tailored. "A time, place, and manner restriction is narrowly tailored as long as the substantial governmental interest it serves would be achieved less effectively absent the regulation and the regulation achieves its ends without ... significantly restricting a substantial quantity of speech that does not create the same evils." *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Berch*, 773 F.3d 1037, 1047 (9th Cir. 2014) (quotation

marks and citation omitted).  Where, as here, the policy is content-neutral,[6] a policy may be narrowly tailored even though it is not the least restrictive means of pursuing the substantial governmental interest.  *Recycle for Change v. City of Oakland*, 856 F.3d 666, 675 (9th Cir. 2017).

OCSC's review policy serves important governmental interests unrelated to the suppression of protected speech.  Protecting the confidentiality of litigants' or witness' sensitive information is plainly promoted when experienced court staff review filings—including those by *pro se* litigants—to ensure that this information is not exposed.  Indeed, OCSC cannot ensure that legally-protected information will be kept confidential unless it reviews the complaint before posting it for public viewing.  (SUF ¶ 10.)

**3.**  OCSC's policy leaves open ample alternative channels of communication.  "[T]he First Amendment does not guarantee the right to communicate one's views *at all times* and places or in any manner that may be desired."  *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (emphasis added).  For example, the government can delay protected speech because "an alternative channel of communication does not have to be 'preferred' by the speaker."  *Sandefur v. Village of Hanover Park, Ill.*, 862 F. Supp. 2d 840, 849 (N.D. Ill. 2012) (intermediate scrutiny test satisfied where speaker's public statement delayed by two weeks); *see also Wilfong v. Morris Cty. Corr. Facility*, 2006 WL 3392938, at *5 (D.N.J. Nov. 21 2006) (alternative channels of communication existed where prisoner complained about 72-hour delays of non-legal mail); *see also Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1298 (9th Cir. 2015) (that an alternative channel of communication is "more expensive is not,

---

[6] CNS complains that "[t]he value of public access to [newsworthy] complaints is lost if access is delayed until after processing."  ECF No. 1 at ¶ 28.  But because OCSC conducts a content-neutral review of new complaints in the order received and without regard to the allegations or parties, it cannot give priority to so-called newsworthy complaints.  (SUF ¶¶ 15–16.)

1    by itself, sufficient to show that those alternative channels are inadequate.").

2            If the rule were different, local governments could not delay marches beyond

3    the minute protestors wanted to assemble; local governing boards could not ask the

4    public to hold their comments until the end of the board's agenda.  The time, place,

5    and manner test is not so draconian.  The government may reasonably delay

6    protected speech—or protected access—because a modest delay simply is not

7    comparable to a regulation that "foreclose[s] 'an entire medium of public

8    expression across the landscape of a particular community or setting.'"  *G.K. Ltd.*

9    *Travel v. City of Lake Oswego*, 436 F.3d 1064, 1074 (9th Cir. 2006) (citation

10   omitted); *see also Barth*, 187 F.3d at 634 (upholding policy of delaying access to

11   court records for 24 hours to permit confidentiality review as a reasonable time,

12   place, and manner restriction).  Where, as here, members of the public are ensured

13   access to civil complaints, a minor delay for confidentiality review and processing

14   "will not injure the values to be furthered by a searching press inquiry…."  *United*

15   *States v. Doherty*, 675 F. Supp. 719, 725 (D. Mass. 1987) (balancing public right of

16   access against jurors' privacy interests by delaying access to jurors' names and

17   addresses by one week).

18            **C.     OCSC's Practices Would Survive Even Strict Scrutiny.**

19            Finally, even assuming *arguendo* that CNS has a First Amendment right of

20   access to complaints on the same day submitted *and* the time, place, and manner

21   test used to assess delays in access is, for some reason, inapplicable here, summary

22   judgment still should be granted to OCSC.  In that case, OCSC's policy of

23   reviewing complaints for confidentiality before publication would still be

24   constitutional if OCSC demonstrates "an overriding interest based on findings that

25   closure is essential to preserve higher values and is narrowly tailored to serve that

26   interest." *Press-Enterprise*, 478 U.S. at 9.

27            Under this strict scrutiny test, the qualified right of First Amendment access

28   may be overcome if "(1) closure serves a compelling interest; (2) there is a

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *See Oregonian Pub. Co. v. U.S. Dist. Court,* 920 F.2d 1462, 1466 (9th Cir. 1990). Once again, all three criteria of the strict scrutiny test are satisfied.

**1.** OCSC has a compelling interest in protecting the privacy of information that California statutes require be maintained in confidence. The Supreme Court has long "recognized [a] privacy interest in keeping personal facts away from the public eye." *Reporters Comm. For Freedom of the Press*, 489 U.S. at 769. "If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975).

The information that OCSC seeks to keep confidential here is highly sensitive – presumably why the California Legislature has directed courts to maintain it in confidence. For example, OCSC conducts confidentiality reviews to ensure that the name of domestic violence and sexual assault victims are protected where mandated by statute. (SUF ¶ 8.) It is well accepted that the state has a "highly significant interest[]" in protecting the identities of sexual assault victims. *The Florida Star v. B.J.F.*, 491 U.S. 524, 537 (1989). Not only could disclosure of a sexual assault or domestic violence victim expose the individual to the unfortunate historical stigma attached to such crimes, but it could endanger the victim by providing the perpetrator with the victim's new identity.

Likewise, courts have recognized that the First Amendment right of access must bow when an individual is accused of criminal conduct but the judicial record is unaccompanied by sufficient facts providing a context for the allegation. *See Times Mirror Co. v. United States*, 873 F.2d 1210, 1216 (9th Cir. 1989). The same consideration likely influenced the California Legislature's decision to protect the name of any individual accused of sexual abuse of a minor, at least until there is a

showing of corroborative fact as to the charging allegations against that defendant. Cal. Civ. Proc. Code § 340.1(m).  CNS thus cannot seriously dispute that OCSC's practices serve a compelling state interest.

As the Supreme Court has "recognized," "*delaying* the release of documents is one method of striking an appropriate balance between" an overriding interest and the "media's right of access." *United States v. Cianci*, 175 F. Supp. 2d 194, 205 (D.R.I. 2001) (emphasis added) (citing *Gannett Co.*, 443 U.S. at 393).  In this case, unintentional publication of information that is supposed to be confidential would result in a total and permanent infringement of privacy rights; "[o]nce lost, the right cannot be restored." *Id.* at 204.  By contrast, to the extent that CNS's right of access is impaired by the court's confidentiality review, "such impairment will be more limited and transitory." *Id.* at 205.  Under the circumstances, OCSC's approach properly strikes the balance.

**2.**  There is a substantial probability that, in the absence of a confidentiality review, privacy interests would be lost.  From 2016 to present, OCSC has identified at least 18 cases in which filers failed to properly mark civil unlimited complaints as "confidential."  (SUF ¶ 21.)  In each instance, the clerk's review of the complaint was essential in identifying the information that dictated that confidential treatment was warranted.  Specifically, 16 of the 18 complaints contained requests in the "comments" field, entered at the time of filing, that the complaints be filed confidentially, and the other two complaints contained notes written on the caption page of the complaint requesting the same.  (Ochoa Decl. at ¶¶ 21–22; Exs. A–B.)

**3.**  Finally, OCSC's practices pass the strict scrutiny test because there are no alternatives that would adequately protect the privacy interests that OCSC currently safeguards.  The government is only required to choose an alternative means when it would be "at least as effective in achieving the legitimate purpose" of the challenged practice. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997).  Here, there are no equally effective alternatives to careful, if quick, clerk

DEFENDANT'S MSJ
Case No. 8:17-cv-00126 AG (KESx)

1   review that would ensure the privacy interests of litigants is protected.

2       CNS has proposed that OCSC could add a mandatory checkbox to the civil

3   unlimited e-filing submission form requiring e-filers to indicate whether the filing

4   includes a document that must be kept confidential.  *See* ECF No. 19 at 14:1–6.  To

5   begin, CNS has never explained how shifting to a system that puts the onus on

6   filers would comply with California law that requires *courts* to keep certain

7   information confidential.  *See, e.g.*, Cal. Civ. Proc. Code § 1277(b)(3); Cal. R. Ct.

8   2.571(e).

9       Regardless, and as explained above, the fact that certain courts have provided

10  filers with a "checkbox" does nothing to establish that a paradigm requiring filers to

11  be exclusively responsible for ensuring confidentiality works as well as the system

12  OCSC has adopted.  And there is good reason to doubt it.  According to audits

13  reviewed by the National Center for State Courts, where courts "put the redaction

14  function and resultant liability onto filers," compliance is "not very good" and that

15  compliance has dropped with an increase in "the proportion of court cases

16  involving self-represented litigants."  Nat'l Ctr. for State Courts, *Best Practices for*

17  *Court Privacy Policy Formulation*, 3 (July 2017), https://cdm16501.

18  contentdm.oclc.org/digital/collection/tech/id/876.  There is no reason to believe that

19  OCSC—where *pro se* filers make up approximately 26% of all filers, (SUF ¶ 19)—

20  would experience any different results.

21      In the final analysis, it does not matter whether OCSC's practice of

22  reviewing complaints for confidentiality and compliance is reviewed under

23  intermediate or strict scrutiny.  In either event, the constitution aligns with common

24  sense:  Court clerks are permitted to punctually review complaints for information

25  that should be kept confidential before electronically publishing their contents.

26  **V.   <u>CONCLUSION</u>**

27      For these reasons, the Court should grant OCSC's motion for summary

28  judgment.

1    Dated:  November 17, 2017.            JONES DAY

2
                                          By:  /s/ Robert A. Naeve
3                                              Robert A. Naeve

4                                         Attorneys for Defendant

5

6

7
     NAI-1503208721v1
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28