1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING

4    COURTHOUSE NEWS SERVICE,            )
                                         )
5                                        )
                                         )
6                        Plaintiff,      )
                                         )
7                                        )
                                         )
8         Vs.                            )   No. SACV17-00126-AG
                                         )
9                                        )
                                         )
10   DAVID YAMASAKI,                     )
                                         )
11                                       )
                                         )
12                       Defendant.      )
                                         )
13   _____   )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    MOTION HEARING

18               SANTA ANA, CALIFORNIA

19             THURSDAY, MARCH 1, 2018

20

21

22          MIRIAM V. BAIRD, CSR 11893, CCRA
         OFFICIAL U.S. DISTRICT COURT REPORTER
23         411 WEST FOURTH STREET, SUITE 1-053
                SANTA ANA, CALIFORNIA 92701
24                  MVB11893@aol.com

25

1                        **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFF,**        JOHN W. AMBERG
     **COURTHOUSE NEWS:**                   BRYAN CAVE LLP
4                                           120 BROADWAY SUITE 300
                                            SANTA MONICA, CA 90401-2386
5

6

7

8

     **IN BEHALF OF THE DEFENDANT,**        ROBERT A. NAEVE
9    **DAVID YAMASAKI:**                     CARY SULLIVAN
                                            JONES DAY
10                                          3161 MICHELSON DRIVE SUITE
                                            800
11                                          IRVINE, CA 92612-4408

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        SANTA ANA, CALIFORNIA; THURSDAY, MARCH 1, 2018; 10:00 A.M.

 2                              ---

 3

 4             THE CLERK:  Item one, SACV17-00126-AG, Courthouse

 5   News Service versus David Yamasaki.

 6             THE COURT:  Let's have appearances, please.

 7             MR. AMBERG:  Good morning, Your Honor.

 8             John Amberg from Bryan Cave on behalf of the

 9   plaintiff Courthouse News Service.

10             MR. NAEVE:  Good morning, Your Honor.

11             Robert Naeve and Cary Sullivan on behalf of

12   defendant Yamasaki and the Orange County Superior Court.

13             THE COURT:  Well --

14             MR. NAEVE:  May I sit, Your Honor, until we --

15             THE COURT:  Yes, you may.  I have to decide who is

16   going first.  I do believe I am going to let the plaintiff --

17   what?

18             MR. NAEVE:  Your Honor, I actually would like to

19   volunteer to go first on this one if I may?

20             THE COURT:  I'm not so sure about that.  What I was

21   about to announce is that I think we should have the

22   plaintiff go first, the defendant respond, and the plaintiff

23   rebut.  What is your position?

24             MR. NAEVE:  What I was going to suggest,

25   Your Honor, is that the first thing we need to discuss is the
```

```
 1   analytical framework by which this case should be evaluated.
 2   Mostly, because I think that then governs the rest of the
 3   conversation for obvious --
 4           THE COURT:  How long does that discussion take?
 5           MR. NAEVE:  Not very.
 6           THE COURT:  I need an answer.  How long does
 7   that --
 8           MR. NAEVE:  Five minutes.
 9           THE COURT:  I have no idea --
10           MR. NAEVE:  I'm not sure, Your Honor.  I'm five
11   minutes.  I don't have --
12           THE COURT:  Okay.  We'll give you five minutes.
13   I'm not sure -- not yet.  Not yet.  Not yet.  We'll give you
14   five minutes for this thing you want to do.  We'll give the
15   plaintiff five minutes -- we'll give the plaintiff however
16   long they want.  We'll give you an opposition time.  We'll
17   give the plaintiff a rebuttal time.
18           I now need to ask the defense, what's the total
19   amount of time they want?
20           MR. NAEVE:  Apart from that, Your Honor --
21           THE COURT:  No.  No, not apart from anything.  Let
22   me state it again.  What is the total amount of time the
23   defense wants?
24           MR. NAEVE:  15 minutes, Your Honor.
25           THE COURT:  What is the total amount of time the
```

1    plaintiff wants?

2              MR. AMBERG:  15 minutes.

3              THE COURT:  All right.  You have plenty more than

4    that, but we'll generally lean to that.

5              First to you, Mr. Naeve, for your five minutes of

6    such.

7              MR. NAEVE:  Your Honor, the issue that a wanted to

8    address is the role that the Press-Enterprise test plays in a

9    case like this.  Once the Court gets into the analysis of the

10   various factors, we have less to disagree with.  The question

11   is, how does the Press-Enterprise test work?  As we

12   understand the Court's opinion, the Court is defining --

13   essentially, is saying that the Press-Enterprise test defines

14   what access is not required.

15             Your Honor, if I could focus the Court -- I'm not

16   quite sure that's quite accurate.  I understand this case is

17   different.  I also understand that we have to deal with the

18   Planet decision.  The paradigm that Press-Enterprise sets out

19   is -- it's -- simply this, you look at the access, the right

20   that is provided, and the right that is claimed not provided.

21   The question is, does experience or logic grant a right of

22   access that is greater than what has already been provided?

23   The examples that we give you in the briefs, but they're

24   important to sort of talk about, the best one is the probably

25   the California First Amendment case because that has to do

```
 1   with the death penalty.  The State of California at the time
 2   granted review of -- at the time when -- when the -- after
 3   the prisoner was strapped down, and the press said, no we
 4   want to see it all.  So the question under Press-Enterprise
 5   was, is there a right of access greater than what the state
 6   currently provides?  That, seems to me, is what the question
 7   is here.
 8           I think we believe that the facts are undisputed as
 9   to what the Orange County Superior Court provides.  The
10   question is --
11           THE COURT:  I don't -- I think I spent a great deal
12   of time --
13           MR. NAEVE:  I'm with you on that.
14           THE COURT:  Hold on.  Let me finish, please.
15           I think I spent a great deal of time in my opinion
16   saying you don't agree on what they provide.
17           MR. NAEVE:  I understand, Your Honor.
18           THE COURT:  Go ahead.
19           MR. NAEVE:  I wanted to defer to that to my other
20   time, but I guess the point is if we tee up what the Court
21   provides, the question is, does the Press-Enterprise test
22   require us to provide greater access number one.  Number two,
23   in that vein, another suggestion that appears around pages
24   21, maybe 29 of the Court's opinion is that the time, place,
25   manner test defines timeliness.  And under the
```

1    Press-Enterprise test, that is not -- we wouldn't

2    characterize it quite that way because it's a defense that we

3    have a burden of showing, but that assumes that timeliness

4    under the first part hasn't been granted.  Even if it hasn't

5    been granted, you're still off the hook if you satisfied

6    those tests.

7              So that's showing we were proceeding on our

8    briefing.  I just wanted to make the point of clarifying how

9    we think these tests play because there's -- they are not

10   quite how the Court is described them in its very detailed

11   and, frankly, exhaustive opinion, otherwise.  So that was

12   my -- that was the point that I wanted to make and whether we

13   wanted to chat about that was my first issue.

14             THE COURT:  Well, the Court is aware of the

15   argument you're making.  I think I stand by the approach the

16   tentative has taken.  I believe you can make these arguments

17   during your response to what we are about to hear from the

18   plaintiff.  Thank you.

19             MR. NAEVE:  Thank you, Your Honor.

20             THE COURT:  Go ahead with the plaintiff.

21             MR. AMBERG:  Your Honor, if it pleases the Court, I

22   would like to simply go into my argument, if I may, and I

23   agree with the Court's suggestion that I think we're going to

24   cover the applicability of the Press-Enterprise test and the

25   other authorities that the Court is relying on.

1          THE COURT:  All right.  I'll note that Mr. Naeve

2    referenced particular pages.  You know, having, I think, this

3    is the second longest opinion I've ever issued.  Having done

4    that, it's always most helpful if you can refer to specific

5    mistakes of fact or law in the opinion, which you received

6    yesterday, which may not be enough time to fully review 47

7    pages -- 41 pages.

8          Go ahead.

9          MR. AMBERG:  Well, I agree with Mr. Naeve.  It was

10   detailed.  It was exhaustive.

11         THE COURT:  I'm never sure whether you're saying

12   exhaustive or exhausting.  Go ahead.

13         MR. AMBERG:  I was careful not to say exhausting.

14   Thank you, Your Honor.  It did provide guidance to us.  It

15   does give me some things I would like to address.  Briefly, I

16   would like to address the jurisdictional question, the first

17   issue that the Court addressed.  The same issues that the

18   Court is addressing itself to here are the issues that are

19   now currently before the Ninth Circuit Court of Appeal.  I

20   would like just without repeating our brief, because I don't

21   this it warrants that, just to respond to one argument that

22   we saw in the reply brief.

23         This is not a disguised motion for reconsideration.

24   We came before the Court last fall, made a motion to stay,

25   which the Court denied.  Subsequently -- and this was while

1    the interlocutory appeal was pending before the Ninth

2    Circuit -- the Orange County Court filed its answering brief.

3    We had asked that the two appeals, the Planet appeal and the

4    interlocutory appeal be consolidated and --

5              THE COURT:  I know that but why don't you address

6    our specific response as to why your argument doesn't work?

7    We were pretty specific distinguishing why a stay is not

8    appropriate here.  We cited cases.

9              MR. AMBERG:  Yes.

10             THE COURT:  We talked about the -- when I am

11   limited in further review of the case.  So it's the

12   application of those specific cases, not your recitation of

13   the facts leading up to the dispute.  Go ahead.

14             MR. AMBERG:  I -- I simply wanted to underscore

15   that we are faced with new facts here.  Since we were before

16   you with a motion to stay, the Ninth Circuit did, in fact,

17   consolidate the two appeals for oral argument.  We're now

18   waiting for the --

19             THE COURT:  I don't think that goes to the core of

20   why we ruled against you on that, but go ahead.

21             MR. AMBERG:  I want to make the Court aware of that

22   and that the -- the issue that the Court is left with in the

23   41-page decision, the tentative, namely, what is timely

24   access?  That is the question that is before the Ninth

25   Circuit.  So I will leave it there.

```
 1              Let me move into the --

 2              THE COURT:  Okay.  Well, I realize that.  By the

 3     way, in the analysis we provided in the tentative, that was

 4     the closest arena where a case is cited by you might lead to

 5     the result you want, and we attempted to say why.  And other

 6     than identifying the problem, you haven't convinced me that

 7     the analysis is wrong.  I'm just telling you.  You've

 8     identified the problem.  That's where the rubber meets the

 9     road.  We made our ruling.  You identified the problem, but

10     not told me why the analysis is wrong.

11              MR. AMBERG:  Well --

12              THE COURT:  I'm just saying.

13              MR. AMBERG:  I -- I understand.  I think for

14     purposes, though, of efficiency in this hearing, I would like

15     to move to the merits, if I may.

16              THE COURT:  Okay.  Good.

17              MR. AMBERG:  First of all, I would remind the

18     Court -- and I think the Court understands this, but just as

19     a predicate, Courthouse News is not suing for same-day

20     access.  We're suing for timely access.  It is our contention

21     that timely access can and should be same-day access, but we

22     recognize that there may be variables that come into play.

23     So it's very clear we're not suing for same-day or instant

24     access.

25              Now, we did present -- I -- so I take issue with
```

1    the Court's analysis of the evidence that we submitted

2    through the 34 declarations of various reporters, as well as

3    testimony from various witnesses who have been deposed in the

4    case, we believe that under the experience leg of test, we

5    established that there, in fact, is a historical tradition of

6    providing same-day access to newly filed complaints

7    throughout the country.

8            THE COURT:  That experience has to occur in how

9    many states?

10           MR. AMBERG:  Well, you said 25 wasn't enough.  Let

11   me just point out I don't believe that the -- that the

12   Court's authority specifies the number of states in which

13   this has to occur.  I don't think that 25 is an insignificant

14   number.  More --

15           THE COURT:  We didn't say it was insignificant.

16           MR. AMBERG:  And more importantly, I don't think it

17   has to be uniform.  It don't think it has to be universal.  I

18   don't think we have to show anything more than that there is

19   an historical --

20           THE COURT:  I don't think -- you know, the argument

21   is not helping me.  I didn't require uniformity.  I didn't

22   require universality.  I asked a specific question.  I am

23   waiting for an answer.

24           MR. AMBERG:  Well, let me speak to the evidence --

25           THE COURT:  The best answer may I say is, something

```
 1    less than what you've provided would be the best answer, but
 2    I haven't gotten a specific answer yet.  Go ahead.
 3            MR. AMBERG:  We thought that we had sufficiently
 4    shown that there was a tradition throughout the country.  We
 5    pointed to a number of different states.  Let me just say, I
 6    believe that the Court's tentative is in error because it
 7    cites for example, two states which it says we didn't submit
 8    any evidence on.  Those being Arizona and Colorado.  Those
 9    states, in fact, are covered in the declaration of Jamie
10    Ross.
11            THE COURT:  All right.  Just a moment.  Do you know
12    where you're talking about in the tentative?  If you don't,
13    I'll look it up.  You're saying Arizona and Colorado are
14    covered in the declaration of who?
15            MR. AMBERG:  Jamie, J-A-M-I-E, Ross, who is a
16    bureau chief for the states as well as others.
17            THE COURT:  Okay.  All right.
18            MR. AMBERG:  Also, the Court made reference to the
19    declaration of the reporter, I think, Mr. Lopez who talked
20    about his experience in the San Diego Court.  And in his
21    declaration, as in declarations of other of the witnesses,
22    which we had submitted, he talked about the fact -- and the
23    Court focusing on this -- that currently access is not what
24    CNS would like.  That we're not getting a high percentage of
25    same-day access.
```

1          But the point of the declaration in Mr. Lopez's

2    case and in the case of other courts that are described, is

3    that there was a history.  In prior times, we did get

4    same-day access.  We got much better access than we're

5    getting now.  What has happened is a degrading of access.

6    That is, in fact, what has led to the filing of this suit the

7    suit in New York, the Tingling case.  The suit in Texas, the

8    Jackson case.  The suit in Cook County, Illinois, the Brown

9    case.  Those courts, the New York Court, the Cook County

10   Court were courts that historically gave same-day access and

11   over time degraded.

12          So the point being made here is not only is there

13   currently a wide number of courts throughout the country that

14   do provide same-day access or near same-day access, and that

15   is supported by the declarations from the reporters, but that

16   the reporters' declarations also show what had been a

17   historic good practice, same-day access or near same-day

18   access has now degraded.  That's what we're trying to fight

19   here.  That's why we're here.

20          In fact, Mr. Girdner's declaration points out that

21   at least as recently as 2002, we did get near same-day access

22   in Orange County because we could go see the paper

23   complaints.  That were put in what they call the reporters'

24   bin.

25          THE COURT:  Okay.  In determining experience, are

```
1    you suggesting we need to look in the past even if it doesn't
2    exist today?  That seemed to be what you were saying about
3    San Diego.  Did I miss that?
4              MR. AMBERG:  Well, let me just point to -- I think
5    the Court quotes from cases that talk about a historical
6    tradition.  So the point is --
7              THE COURT:  Hold on.  You're not answering the
8    question.
9              MR. AMBERG:  Okay.
10             THE COURT:  Historical traditions can stop.  We had
11   a historical tradition of slavery in Alabama.  I don't think
12   it would be fair to say that slavery is now a factor that
13   meets the experience test because it's no longer there.  So
14   I'll go back to my question, as you bring up San Diego, do we
15   look at what is going on now or what went on in the past,
16   which is it?
17             MR. AMBERG:  Well, I think we can look at both
18   because there is helpful evidence in experience, both
19   current-day experience in courts like Fresno or Los Angeles,
20   which is an even bigger court than Orange County, that do
21   provide same-day access.  We can also look to the -- the
22   recent past where there was a tradition of providing same-day
23   access, but which has gone away.
24             THE COURT:  Okay.  Fine.  You haven't answered the
25   question.  It's okay, but you haven't answered the question
```

```
 1    about whether I can consider past experience if it's no
 2    longer the case in that jurisdiction.  You're --
 3              MR. AMBERG:  Well, I'm sorry.  I believe that you
 4    can.
 5              THE COURT:  Okay.  What authority do you have for
 6    doing that?
 7              MR. AMBERG:  Well --
 8              THE COURT:  It's not meant to be a tough question.
 9    I'm just trying to understand.  What authority do you have
10    for doing that?  We cited San Diego.  You rejected it saying
11    they used to do it.  I'm asking you, can I rely on what they
12    used to do if they're not doing it now?  Simple question.
13    Your obvious point is -- the simple answer is yes,
14    Your Honor, logic tells me that, not case law or anything
15    else.  I'm not even hearing that.  I'm just hearing yeah, you
16    think you should.
17              MR. AMBERG:  I haven't gotten to the logic test yet
18    either.
19              I do believe that the Court can consider what had
20    been the historical practice that reporters could go to the
21    courthouse, and on the same day of the complaints were filed,
22    they had easy access to the complaints.  They were either
23    provided to them in a bin.  You can see references to the
24    reporters' bin, or they could go behind the counter and look
25    at those complaints.  That is still going on in many courts.
```

1    Courts that remain on paper and courts that have gone to

2    electronic filing, nevertheless, provide same day-access.

3    The obvious example is the Pacer system used throughout the

4    United States by the federal courts.  We do refer to the

5    federal courts.  That's an example of a system that allows a

6    reporter, including the CNS reporters to have instant access

7    to filed complaints.

8              THE COURT:  Uh-huh.

9              MR. AMBERG:  I don't think it's irrelevant that

10   there is a history and a pattern and practice in the past or

11   that there is a new practice or current practice.  What has

12   happened is why is it relevant to consider both past and

13   future or past and present?  That's because there has been a

14   change in technology.  We recognize that.

15             Orange County in 2013 went to mandatory e-filing.

16   Many other courts have made that same transition.  The

17   federal courts did it without denying access.  What we saw

18   was in some courts where e-filing was implemented, we saw

19   delays.  We saw a barrier between the reporter and the newly

20   filed complaints.

21             That explains why historically it is important to

22   look at past practice and the current practice because it's

23   only technology.

24             THE COURT:  Okay.  I understand the argument.

25   Perhaps, it's an argument I would accept, but now I'm going

```
 1    to turn it on its face.  If I'm looking at experience, is
 2    your case more helped than hurt by someone who tried it the
 3    way you would like and then changed it.  In other words, that
 4    might be a more powerful argument against you than someone
 5    who just never tried it.
 6              MR. AMBERG:  If by try it --
 7              THE COURT:  Sort of like in religion.  Some
 8    religions are much harder on people who used to be X and
 9    decided they are not X than someone who was never X.
10              So what about that?  I mean, does it cut the other
11    way?
12              MR. AMBERG:  Well, I don't hear anybody saying, you
13    know, we're going to implement e-filing because we think it
14    was improper that reporters were able to see complaints the
15    same day they were filed.  In other words, obviously, the
16    march of technology has nothing to do with and isn't
17    motivated by what access the press gets, but the press got
18    forgotten in this process.
19              THE COURT:  Uh-huh.
20              MR. AMBERG:  Again, that's why we're here.  That's
21    why we were in New York and Chicago and the other places is
22    to remind the courts we have a tradition and an important
23    value we're upholding here.  Don't leave us out of the
24    process.  We need to have that same access that we
25    historically did enjoy.
```

1           THE COURT:  So you mention an important value.

2 Let's just drop a quick footnote.  In like two sentences, can

3 you tell me the important value?

4           MR. AMBERG:  Well, sure.  I think this goes to the

5 logic test.  I think the Court has taken a very narrow --

6 unnecessarily narrow view of what is intended to satisfy the

7 logic test, but as we've argued and supported by the amici

8 that we submitted or that was submitted, the brief that was

9 submitted by, among other people, the L.A. Times and the AP,

10 and Mcclatchy and Gannett and all of the other big news

11 organizations, we recognize and I think the Court does an

12 eloquent job of describing the value of press access to the

13 judicial process and, in particular, the important --

14           THE COURT:  Okay.  Let me just say that was quite a

15 throat clearing.  Let me ask, can you say in a sentence or

16 two the important value?

17           MR. AMBERG:  Yes.  I think the important value is

18 access -- public access to the operations of the government

19 specifically, the filing of new complaints in the courts of

20 this county.

21           THE COURT:  Why is that important?

22           MR. AMBERG:  Well, I think it's important for an

23 informed citizenry.  It's important that people understand

24 the workings of their government.  It's important because the

25 filing of the complaint is the first shot in the new lawsuit.

1     These are important facts.  I think the Court recognized that

2     in its opinion.

3          THE COURT:  Okay.  Well said.  I just wanted to

4     hear you say it.  You said it very well.

5          MR. AMBERG:  So yeah, I would say that goes to the

6     logic test.  I think the Court, if I understand the

7     tentative, construed the logic leg of test as somehow

8     providing support to the operation of the clerk or the

9     clerk's office that somehow access has to facilitate or

10    support the processing of the new complaints.  If I

11    misunderstood that, obviously, I stand corrected.  I -- I --

12    that is how I understood the Court was interpreting and

13    applying the logic test.  And, you know, with all due

14    respect, I don't think it is so narrowly construed.

15          I wouldn't say that public access to the filing of

16    new complaints is irrelevant to the function of the public

17    court in Orange County.  I think, in fact, it is an initial

18    part of that.

19          THE COURT:  I don't recall anyone saying it was

20    irrelevant.  I don't recall that.  I don't think I said that.

21    I don't think anyone would say that.  Go ahead.

22          MR. AMBERG:  Okay.

23          So I -- I think that first of all, we have provided

24    ample evidence to the Court under the experience test that

25    would establish there is a tradition and a history of

```
 1    same-day access to newly filed complaints here and elsewhere

 2    throughout the country.  Not only did we support that with

 3    declarations of the reporters based on their personal

 4    experience, but we also submitted through Mr. Fetterly's

 5    declaration.  He attached various deposition excerpts,

 6    testimony by Mr. Yamasaki himself.  I took Mr. Yamasaki's

 7    deposition before he was the chief executive officer for

 8    Orange County.  He filled that same function in Santa Clara

 9    County.

10         He talked to me about the fact that reporters in

11    Santa Clara County got same-day access to newly filed

12    complaints.  We reminisced about it together.  That wasn't --

13    that -- and it had been the practice, as Mr. Girdner's

14    declaration established, here in Orange County.  That has

15    changed.  Mr. Yamasaki acknowledged that that had been the

16    practice.

17         The other point I guess that I would simply add is

18    in the Planet case, Judge Otero received and considered the

19    same declarations that were submitted here.  If you know the

20    same --

21         THE COURT:  Certainly, the same declarations, but

22    an entirely different Court.

23         MR. AMBERG:  I understand.  The Court is free to do

24    with that evidence what it sees fit.

25         THE COURT:  You know, for the record, I don't
```

```
1    consider this opinion as contrary to Judge Otero, a judge who
2    happens to be a dear friend but also a respected colleague.
3    A good approach from you would be to tell me I shouldn't be
4    reversing Judge Otero, particularly aspects of him that were
5    affirmed on appeal.
6              MR. AMBERG:  Well, I want to be very careful about
7    drawing contrast or distinctions between the tentative and
8    Judge Otero's opinion.  I think Judge Otero did accept the
9    evidence.  I think he did find that there was --
10             THE COURT:  Hold on.  I'm sorry.  I hate to mince
11   words with you.  Are you suggesting we didn't accept the
12   evidence?
13             MR. AMBERG:  No.
14             THE COURT:  Okay.  Go ahead.  I just want to be
15   clear.  You know, there's a request for judicial notice and a
16   lot of stuff.  Okay.  Go ahead.
17             MR. AMBERG:  No.  But I do read the tentative as
18   saying that there either was a failure of proof or that it
19   was inadequate to establish on an experience test that
20   same-day access --
21             THE COURT:  Uh-huh.
22             MR. AMBERG:  -- had been established.
23             I believe that Judge Otero reached a different
24   conclusion.  I -- the point is that at this point in the --
25   in the analysis, the burden shifts.  The right -- there is a
```

```
 1    right of access.  There is a right of timely access.  I think
 2    that we've established that.  The burden shifts then to the
 3    government -- to the Orange County Court to justify its
 4    delay.  It can do so under either of the two tests that the
 5    Court has -- has discussed.
 6            The Court seems to believe that unless there's a
 7    complete closure or -- or -- or something analogous to
 8    closure, the strict scrutiny test doesn't apply -- the Court
 9    seems to believe that the strict scrutiny test doesn't apply
10    in this case unless it's a case of a closure or something
11    equivalent to closure.  Of course, we're talking about the
12    Leigh or Leigh versus Salazar.
13            THE COURT:  You're arguing in this case of access
14    strict scrutiny should apply?
15            MR. AMBERG:  We have taken that position, and we --
16    and so I disagree with the Court.  At least this is -- I want
17    to be careful about this because -- because I'm not sure
18    exactly how far the Court is going with this point, but the
19    Court seems to think that strict scrutiny didn't apply here
20    because that applies only to closure.  Yet, we know from
21    other cases that we've briefed and, in fact, from looking at
22    Salazar or Leigh versus Salazar -- let's talk about Lee
23    versus Salazar for a minute.  There a photographer was
24    seeking to photograph the rounding up of wild horses and
25    performing some public information function.  She wasn't
```

1      prevented from photographing the horses.  She wasn't

2      prevented from photographing the round-up.  There wasn't a

3      complete closure.  She was just told where she can go and

4      stand.  There were restrictions that were put on her access

5      to the event being photographed.

6            Lee versus Salazar applied the strict scrutiny

7      test.  We saw the strict scrutiny test likewise being applied

8      in the Brown case in Cook County and I think in the Jackson

9      case in Texas.  The point in the Brown case that was recently

10     decided by the District Court there was that delay can equal

11     closure or denial, just like we know that justice delayed can

12     be justice denied.  We've also submitted evidence and we've

13     argued and the -- and some courts have so recognized that

14     delays in access to newly-filed complaints means that they

15     lose their news value.  They are no longer newsworthy.  They

16     don't get reported on or they get buried.

17            THE COURT:  Is it also relevant that the most

18     important factor is the selection of an attorney to handle

19     the case?  Is that relevant for me to consider?  Is that a

20     First Amendment issue?  I do sometimes wonder, as you note

21     from past comments, that what is really going on is that

22     Sheppard Mullin needs this to contact general counsel before

23     Gibson Dunn contacts general counsel.  I do wonder how

24     much -- I'm a little frustrated because sometimes I think

25     that is really the motivating factor or the prime motivating

```
 1    factor.  Yet, we get lost in important -- very important
 2    discussions of First Amendment.
 3              So you just talked about newsworthiness.  Oh, my
 4    goodness I understand that.  I've seen enough movies about
 5    getting scoop and all of that.  My question here is not
 6    intended to be aggressive or whatever.  Should I consider
 7    that there is a First Amendment interest in making sure your
 8    subscriber finds out about a case, contacts general counsel,
 9    maybe it's their existing client; maybe a new client, and
10    gets hired quickly before someone else does?  Is that a
11    factor I should consider?  And I still have a question of how
12    much that is the motivation here.
13              Go ahead.
14              MR. AMBERG:  There clearly is a First Amendment
15    value.  There's a news value to reporting on the newly-filed
16    complaint and the relevant data.  And -- and, of course, what
17    we do is we write a summary.  We talk about what the issues
18    in the case are and so forth.
19              THE COURT:  CNS does a good job on that.  I had a
20    trial pending where I see CNS reports on it.
21              Your question did not ask how much the motivation
22    of this is for high callings of newsworthiness versus other
23    callings for contacting a competitor -- contacting a firm
24    before a competitor does.
25              MR. AMBERG:  I understand.  I was going to get to
```

```
 1   the question.

 2           THE COURT:  I'm sorry.

 3           MR. AMBERG:  I stood here last June in the

 4   scheduling conference.  You asked me essentially the same

 5   question.

 6           THE COURT:  Uh-huh.

 7           MR. AMBERG:  And as you know, we have briefed this

 8   question.  We've filed supplemental briefs in connection with

 9   a preliminary injunction motion a year ago.  I know it's come

10   up.  It isn't -- the Court -- I will say, as I read the

11   tentative, I don't see the Court focusing on the motives of

12   my client or the motives of its subscribers.  I think that

13   was a proper approach.

14           I don't think that the commercial motives or the

15   fact that my client sells a subscription or that many of its

16   subscribers happen to be lawyers or law firms who are

17   obviously in business, I don't think that that is relevant.

18           THE COURT:  Okay.  You don't think it's relevant.

19   I -- I understand.  Okay.  Go ahead.

20           MR. AMBERG:  So we have established a right of

21   timely access.  We think the evidence does support the notion

22   that there is a tradition of same-day access.  The burden

23   shifts, as I said, to the government, to the Orange County

24   Superior Court.

25           THE COURT:  Can I just ask one more reason -- one
```

| | |
|---|---|
| 1 | more question.  Would you agree that overwhelmingly your |
| 2 | subscribers are law firms? |
| 3 | MR. AMBERG:  Yes. |
| 4 | THE COURT:  All right.  Go ahead.  I understand |
| 5 | your position on that. |
| 6 | MR. AMBERG:  We've submitted the statistics on all |
| 7 | of that. |
| 8 | THE COURT:  Yes.  Go ahead. |
| 9 | MR. AMBERG:  And we were talking about the strict |
| 10 | scrutiny test.  I simply pointed out that Leigh versus |
| 11 | Salazar wasn't a closure case, but they applied the strict |
| 12 | scrutiny test.  I mentioned the Brown case, our case in Cook |
| 13 | County, Illinois. |
| 14 | THE COURT:  Leigh versus Salazar was the horse |
| 15 | case? |
| 16 | MR. AMBERG:  That's right.  That's right. |
| 17 | THE COURT:  Aren't the facts different there? |
| 18 | Isn't -- isn't there a denial of any access at all if they |
| 19 | don't see it as it's happening? |
| 20 | MR. AMBERG:  I think they were -- no.  As I recall |
| 21 | the facts of the case, she was allowed to photograph.  She |
| 22 | was just put in a safe place.  They said, we don't want you |
| 23 | to get trampled by the horses.  So we'll segregate you and |
| 24 | restrict your access over here.  You can photograph from over |
| 25 | here.  That's what she complained about. |

1          THE COURT:  Okay.  All right.

2          MR. AMBERG:  As I recall.

3          THE COURT:  Thank you for that answer.

4          MR. AMBERG:  The point is, I guess, there are other

5     cases dealing with the right of access not closure that

6     recognize that denying access or delaying access -- the delay

7     can amount to closure; therefore, on that basis, strict

8     scrutiny test does come into play.  It comes into play both

9     because factually it's applied in those kind of situations.

10    It applies if you are looking for closure because closure may

11    be the equivalent of delay.

12          So under that test, it's the burden of the Court to

13    show that they have narrowly tailored their policy and

14    practice to serve whatever overriding government interest

15    that they've identified.  Let me make it perfectly clear

16    because I think it really bears saying.  CNS is not attacking

17    anyone's interest in confidentiality.  We're not attacking

18    privacy.  We're not saying that those are not values.

19          THE COURT:  Well, you're minimizing it.  I mean, I

20    don't know if that's an attack, but...

21          MR. AMBERG:  No.  Let me explain if I may.  I think

22    this is an important point.  The Court has said that we must

23    process before providing access.  That in a nutshell is our

24    debate.  Process before access or access before process.  The

25    process, of course, is the administrative process that they

```
 1   use when they receive a new complaint.  That is what Judge

 2   Otero said.  You know, you haven't demonstrated that that is

 3   sufficient to justify the delay.

 4          Here, Orange County has articulated a particular

 5   interest, that's the interest in confidentiality.  They point

 6   to the fact that under a half dozen statutes in California,

 7   certain complaints are supposed to be filed confidentially.

 8   Let's also be clear -- I'm sorry.  I have to take a step

 9   back.  CNS does not report on sealed cases.  Never have.

10   We're not suing for it.  So that's not at issue here.

11          THE COURT:  I don't think I suggested it was.  It's

12   not an issue.  Understood.

13          MR. AMBERG:  Okay.  I mention it because the Court

14   included sealed cases when it was considering the statistics

15   and the frequency --

16          THE COURT:  Ah, hold on just a moment.  Okay.  I

17   understand your argument.  Go ahead.

18          MR. AMBERG:  So let's talk about confidentiality.

19   We don't minimize the value or the interest --

20          THE COURT:  I think -- I think we included the

21   sealed case because it was part of the review.  So I think

22   they needed to be included because it was part of the review.

23   It was not meant to suggest that you're asking to get the

24   sealed cases, but it is certainly something the Court has to

25   look at, indeed the most important thing for the Court to be
```

1    looking at.  That's why they were included.

2              MR. AMBERG:  The point is when cases are sealed or

3    filed with a motion for sealing, those are

4    automatically segregated; in other words --

5              THE COURT:  Okay.  Go ahead.

6              MR. AMBERG:  -- they're identified.

7              Consequently, not only are we not seeking them, but

8    they are easy for us to move past.

9              THE COURT:  Okay.

10             MR. AMBERG:  Because no one is going to look at

11   those.  What the Court says is, well, people are fallible, we

12   need to protect filers from themselves, because they'll make

13   mistakes.  They may file a complaint that falls within one of

14   these confidential categories.  Our staff need to review the

15   complaint and catch those.  We believe -- I would certainly

16   contend that the evidence that the Court has submitted --

17   that Orange County has submitted to meet their burden of

18   proof on the affirmative defense is I would say

19   underwhelming.

20             In other words, they don't point to very many

21   instances.  Many of the instances that they do offer -- and

22   they offer the declaration of Ms. Kruse, who is one of the

23   supervisors of the intake process.  When we take a closer

24   look at the examples that they offer where they say they

25   caught complaints that otherwise would have been released to

1    the public, well, there aren't too many of them.  In many

2    cases, they don't, in fact, relate to this case.

3         Let me give you an example.  So there was some

4    cases where they say, we saw the comments.  We caught it

5    because it was clear in the comments that the filer intended

6    for it to be confidential.  Well, once again, that is relying

7    on the filer.  The filer has to know that he's got to write

8    comments in the comments box to identify the confidential

9    nature of the case.  They also offer the example, I think,

10   maybe it was an amici did -- I think they briefed this

11   earlier.  Well, there was concern about the privacy rights of

12   defendant.  You have a complaint -- the plaintiff isn't going

13   to worry about the privacy rights of the defendant.  In a

14   landlord/tenant dispute, who is going to protect the privacy

15   rights of the defendant?

16        THE COURT:  Yes, indeed.  I think that was under

17   covered in the briefing.  I'm going to add to that.  The age

18   old practice of declaratory relief actions where the defense

19   files first.  So let's take a trade secret case.  I think I'm

20   going to get sued by Coca-Cola in Atlanta for stealing their

21   trade secret.  So I file a declaratory relief action in the

22   Orange County Superior Court saying I want a declaration that

23   I'm not following -- violating code -- the formula for Coke.

24   In my papers, I say here is my formula.  It happens to be the

25   Coca-Cola formula for Coke.

1              It is the defense that is hurt horribly if you

2      think the trade secret for Coke is significant, which they

3      sure do in Atlanta.  I think the papers excessively ignore

4      the defense interest, particularly let's say in a declaratory

5      relief action where the roles of the party are reversed.

6              MR. AMBERG:  We don't actually have any evidence of

7      what you're talking about.  I -- I recognize that potentially

8      there is a risk there, but we don't have any evidence.  No

9      evidence has been submitted.  The evidence that was submitted

10     was a landlord/tenant dispute.  That was a limited

11     jurisdiction case.  We're talking about unlimited civil

12     complaints.  That was completely irrelevant protecting the

13     privacy rights of the landlord.  That shouldn't -- yet, the

14     Court has picked that up and cited that in the tentative

15     opinion --

16             THE COURT:  I think regardless of whether -- are

17     you saying that only occurs in limited cases and not in

18     unlimited cases?  Surely you're not.  Surely, you see it

19     happens in a -- if it happens in a limited case, it surely

20     might happen in an unlimited case.  You're not debating that,

21     are you?

22             MR. AMBERG:  No.

23             THE COURT:  You're not debating that there could

24     possibly be trade secrets affecting the defense in a case,

25     particularly in, say, a declaratory relief case?  You're not

1    disputing that?  You're quibbling whether it's limited or

2    unlimited, but in the process are you actually debating that

3    possibility?

4              MR. AMBERG:  Let me take your example of the trade

5    secret case.  The clerk does not read the complaint.  They

6    testified to this.  They look at the cover page and they look

7    at the comments section.  That is the practice of Orange

8    County Superior Court.  They don't read the complaint.

9              THE COURT:  So they're trying to accommodate you?

10             MR. AMBERG:  In -- in your example, someone recites

11   the formula in the body of the complaint.  The Orange County

12   Superior Court Clerk's Office would not have found that,

13   would not have made a decision that that should be somehow

14   put under a confidential imprimatur.  That is exactly why we

15   do put responsibility on the filer.

16             The point is -- this is what I want to get to.

17   Under the test, they have to choose the -- the -- they have

18   to tailor the policy so that it doesn't infringe on this

19   right of access.  And under the alternative, time, place, and

20   manner test, because you consider both in the opinion, they

21   have to choose the least restrictive means.  Two comments

22   about that.

23             First, when I took the deposition of Mr. Yamasaki,

24   and I took the deposition of Mr. Wertheimer, the general

25   counsel.  I asked well, what alternatives have you

1    considered?  How -- what other ways have you considered

2    protecting the privacy or confidentiality of your cases?

3    Basically, the answer was none.  We're satisfied with what we

4    do.  So they haven't considered least restrictive means.

5              THE COURT:  Let's go back to the issue of a

6    declaratory relief action.  What if the caption mentions

7    trade secret on the front page?  That would be caught,

8    wouldn't it?

9              MR. AMBERG:  I don't know it would.

10             THE COURT:  By caption I mean the description --

11             MR. AMBERG:  Trade secret is not one of the legal

12   categories that they are instructed to look for.  It's not.

13             THE COURT:  Okay.  You are -- well beyond -- more

14   than doubled the 15 minutes.  It's funny how things take

15   longer than we hoped they would.  That was a little snarky.

16             MR. AMBERG:  It's all right.  I'm responding to the

17   Court's questions.

18             THE COURT:  You sure are.  How much longer do you

19   need?  I have a couple more questions.  Let me ask these

20   questions.

21             MR. AMBERG:  All right.

22             THE COURT:  You know, on the issue of -- what was

23   it -- you said that the declaration by -- by Jamie Ross --

24             MR. AMBERG:  Yes.

25             THE COURT:  -- references what, Colorado and

```
 1    Arizona?
 2              MR. AMBERG:  That's correct.
 3              THE COURT:  I don't think that was in the AMF, and
 4    I don't think you cited those declarations in your facts.  Do
 5    you have me rooting for truffles here, or what?
 6              MR. AMBERG:  Truffles are delicious, but I don't --
 7    I'm sorry.  I can't answer your question.  I apologize.
 8              THE COURT:  Here's another thing.  You asked for
 9    judicial notice of web pages; right?
10              MR. AMBERG:  Court web pages.
11              THE COURT:  Yes.  Why would you just not file a
12    declaration?
13              MR. AMBERG:  Well --
14              THE COURT:  --  saying, I, Andrew Guilford, declare
15    under penalty of perjury that I searched this web page at
16    this address maybe even on this date and attached is Exhibit
17    A is what I found.  Why turn it into judicial notice?  I must
18    say, Counsel, all attorneys do that.  It leads into
19    philosophical nuanced review of Rule of Evidence 201.  I keep
20    asking myself, just stick it as Exhibit A to your
21    declaration.  I don't know why people do that.  Footnote, I
22    know why they do it in 12(b)(6) motions because you can look
23    beyond the face of a complaint to items judicially noticed.
24    But in a summary judgement motion, I'm always perplexed by
25    requests for judicial notice when you could attach it to a
```

1    declaration.  Why didn't you do that?

2              MR. AMBERG:  I noted the Court's comment.

3              THE COURT:  Yeah.  I also wonder if some of those

4    web pages get to the point of citing a law.  I decided

5    ultimately, I couldn't say it's like citing a law.  You don't

6    need request for judicial notice to cite regulations and

7    court rules to me.  Okay.  Enough of that.

8              Continue.  I need to no how much longer?

9              MR. AMBERG:  Another five minutes.

10             THE COURT:  Go.

11             MR. AMBERG:  I've gotten to the point.  I'm trying

12   to walk through what I understand to be the analytical

13   framework.  Establishing through evidence that we do have, in

14   fact, a right of timely access that historically has been

15   same-day access.

16             Shifting the burden then to the moving party, to

17   the defendant, to the government to justify its delays as

18   either narrowly tailored to serve an overriding government

19   interest, which they've tried to identify here, or in the

20   alternative, applying the time, place, and manner test which

21   requires them to apply the least restrictive means.  The

22   point is that we've suggested a number of ways in which the

23   Court could both protect the privacy rights and

24   confidentiality requirements of the law and also provide

25   access to my client CNS on timely basis.

1        And -- and there is not any evidence that either of

2   those alternatives is either infeasible or too expensive.

3   There's just absolutely no basis for it.  They've testified

4   in their depositions -- and we've seen it in the written

5   discovery -- they didn't consider these alternatives.  They

6   haven't considered any alternatives.

7        So I would simply conclude by saying, Your Honor, I

8   don't believe that the moving party here is entitled to any

9   portion of the judgment as a matter of law.  I don't think

10  they've met their burden of proof.

11       Finally, I would just say, we're still --

12       THE COURT:  Oh, hold on.  Throw in their burden of

13  proof and their Celotex burden.  Two things.  They have both.

14  That was an argument in your favor; right?

15       MR. AMBERG:  Right --

16       THE COURT:  When people say burden of proof in

17  summary judgement, I mean, they've got both here; right?

18       MR. AMBERG:  Right.

19       THE COURT:  Good.  Go ahead.

20       MR. AMBERG:  I just would conclude we are, frankly,

21  still digesting the decision.  The fact that I may omit to

22  speak to every portion of the 41-page decision doesn't mean

23  that it isn't of interest to us, or that we don't have other

24  issues.  Let me just focus my last comments.

25       As I understand the Court's proposed ruling, it --

```
 1    I'm just going to -- sorry.  Turn to the last page so I'm
 2    looking at specifically at the Court's language.  I see the
 3    Court saying -- I'm just going to skip around in number two,
 4    the public doesn't have a right to access new civil
 5    complaints on the same day OCSC receives them.  We clearly do
 6    have a right to timely access.  I think that the Ninth
 7    Circuit said so in Planet I --
 8              THE COURT:  Oh, please.  Is there anything in this
 9    ruling that says you don't have a right to timely access?
10    You're saying things that are just not disputed.  It almost
11    suggests my opinion says you don't have a right to timely
12    access.
13              MR. AMBERG:  No.  I'm adopting what I believe the
14    Court has found following the Ninth Circuit.  My concern here
15    is it suggests -- number two suggests that the right to
16    timely access cannot mean, does not mean same day-access.  I
17    don't think that follows from the evidence that has been
18    placed before the Court.
19              THE COURT:  I totally understand that point.
20              MR. AMBERG:  Okay.  With that, I --
21              THE COURT:  Thanks for your argument.
22              MR. AMBERG:  Thank you very much.
23              THE COURT:  All right.  Mr. Naeve, we need to be
24    moving along.
25              MR. NAEVE:  I can move you along, Your Honor.
```

1          THE COURT:  Let me ask, in response to what you

2    said earlier, how would this opinion be different if we took

3    your analytic approach, particularly regarding

4    Press-Enterprise?  How would the result be different?

5          MR. NAEVE:  In our view, because -- ultimately,

6    Your Honor, I think we look at the facts differently, which

7    is a problem.  So I will acknowledge that upfront.  Our view

8    is that the parties say here are the numbers.  We all agree

9    about the underlying numbers.  The dispute between the

10    parties really is whether you count calendar days or business

11    days.  That's a dispute that needs to be resolved.  We got

12    testimony to that.  I mean, that's pretty much the issue.

13          So putting that aside, Your Honor, I understand

14    that you have questions.  That's what I want to get to.  You

15    would grant summary judgement on the first point because you

16    held that experience and logic don't require same-day access.

17    That's really what they're asking for.

18          We've got interrogatory responses that say that

19    their 30(b)(6) declarant -- I deposed their 30(b)(6),

20    Mr. Girdner, he says the same thing.  What they're looking

21    for is if it's electronic, give me in-box.  I get it

22    instantly.  You don't review.  If it's paper, by the end of

23    the day.  That's their standard.  So you would grant summary

24    judgement on the first point.  You would also grant summary

25    judgement on the second point for all of the reasons you've

1    explained in your opinion.

2              So that's how we see it come out.

3              THE COURT:  Understood.

4              MR. NAEVE:  Your Honor, whatever questions you have

5    about anything, I'm here to answer.  But could I, though,

6    move us ahead.  Honestly, the opinion, agree with it;

7    disagree with it, is lengthy and careful.  So rather than try

8    to pick that apart, I think the real question from my

9    standpoint is assuming the Court adheres to the tentative --

10   I would encourage the Court to look at how Press-Enterprise

11   works in the other cases we cited -- oh, I am sorry.  I will

12   do one more Press-Enterprise thing.  I apologize for getting

13   out of order.

14             Leigh versus Salazar and all of those cases, which

15   counsel cites as showing why strict scrutiny should apply,

16   showed in our view the exact opposite.  It is true that the

17   photographer Ms. Leigh, I guess, was allowed in certain

18   areas.  Then she was prohibited from attending -- watching

19   the horse gather in that case in other areas.  Just like the

20   reporters couldn't see how they put the needle in the arm of

21   the death penalty guy.

22             THE COURT:  Yes.  That was the thrust of my

23   question --

24             MR. NAEVE:  Yeah.

25             THE COURT:  -- to counsel.

1          MR. NAEVE:  Yeah.  I want to clarify that's why we

2     think this is not strict scrutiny.  These are not -- they get

3     the complaints.  It's a matter of when.

4          To get to the point, Your Honor, with respect to

5     what -- what the Court seems to be looking for is how do we

6     define what is timely past a day?  Is it a day?  Is it

7     18-hours?  Is it this time?  Is it that time?  Your Honor, I

8     think -- if I could make a suggestion just a step back and

9     observe how you would analyze this, there obviously is, you

10    know, two types of lawsuit.  One is a facial challenge to a

11    policy.  Even in the First Amendment context, the general

12    rule is that the burden is on the plaintiff to show that

13    the -- facially, the policy or practice is unconstitutional

14    in virtually all of cases.

15         That rule is modified in First Amendment cases to

16    require a substantial number.  I can give the Court cite to

17    the authorities.  It's not something that came up.  We didn't

18    anticipate we were going to go there.  The point is that in

19    First Amendment cases, the rule is relaxed a little bit, but

20    there still is a burden of proving that there has to be a

21    substantial number of actual cases where someone has been

22    harmed where there's been real delay.

23         So, on that basis, Your Honor, I'm not -- that is

24    really what this case is about.  They're saying Orange County

25    has this practice of processing and our First Amendment

```
 1    rights are violated.  This Court has said no rights of

 2    same-day access, but we want to now parse out which one is --

 3    what is timely and what is not.  I don't know how you do

 4    that.

 5                THE COURT:  I think we do that following the

 6    existing law that we need to follow.

 7                MR. NAEVE:  Well, Your Honor, that would be a

 8    case-by-case and as applied wouldn't it?  So I'm raising the

 9    question to Your Honor.  It may be something we think about

10    and do more briefing.  I apologize, but this is -- we were

11    working through this last night.

12                THE COURT:  No more briefing.

13                MR. NAEVE:  I understand.  If the Court can

14    perceive the difference between a facial challenge, which

15    goes to the practice which is what is being challenged here,

16    and an as-applied challenge, which would say okay, what is

17    the reason for the delay of this particular complaint?  Does

18    that meet constitutional muster?  That is not something that

19    is teed up by the complaint because the complaint seems to

20    enjoin all practices.

21                And the -- the -- the Court's -- so my ultimate

22    question, Your Honor, is from a -- from a standpoint going

23    forward, what facts does the Court need at trial to fully

24    adjudicate, you know, the answer to this case?  And -- I

25    would suggest that if you think about it from as applied
```

1    versus facial, this is a facial case.  You wouldn't get to

2    the level of -- I don't think you get to the level,

3    Your Honor, of -- of detail that some of your questions seem

4    to imply.

5            I'm not sure I understand what the Court is looking

6    for in terms of evidence going forward for trial.  So

7    that's -- that's really what I think we need to talk about.

8            THE COURT:  Are you finished?

9            MR. NAEVE:  Yes, Your Honor.  Unless the Court has

10   questions about it?  We understand what you wrote in your

11   brief -- in your order.

12           THE COURT:  All right.  I do have a question to

13   both sides.  We spent an unfortunate even ungodly amount on

14   evidentiary issues and requests for judicial notice, et

15   cetera.  Does anyone have any comment about that or want any

16   further elucidation about that?

17           MR. AMBERG:  No, Your Honor.

18           THE COURT:  Anything else?

19           MR. NAEVE:  No, Your Honor.

20           THE COURT:  Okay.  Thank you.

21           So --

22           MR. AMBERG:  Am I going to get my rebuttal?

23           THE COURT:  You do get a rebuttal.  How much time

24   do you need on rebuttal?

25           MR. AMBERG:  Two minutes.

1          THE COURT:  Please do so.

2          MR. AMBERG:  I'll try to be even briefer.  I want

3    to take you back to the first issue I touched on very

4    briefly.  That is jurisdiction.  I understand the Court's

5    view on that subject.  So I'm not going to reargue that.

6          I'm going to proposes the following, though,

7    because there is no question that the same issue that the

8    Court has identified here; namely, what is timely access?

9    That is the issue that it says is reserved for trial in this

10   case, which is scheduled currently for May 29th.  That same

11   issue is currently pending in the consolidated appeal.

12         I'm going to ask the Court for that reason and for

13   the reason that we have dates stretching out ahead of us.

14   I'm talking about the completion of fact discovery, expert

15   depositions, and most significantly for my client, CNS has a

16   deadline of March 19th to bring its own motion for summary

17   judgment.  That's only two-and-a-half weeks from now.

18         We have a 41-page tentative decision.  Good

19   comments by counsel on both sides, if I say so myself.

20   Things that we've questioned in the decision that will come

21   out, but I don't know precisely when.  The time is -- is --

22   is slipping away from us.  What I'm moving for the Court to

23   consider is to stay this case in an exercise of its

24   discretion, given the fact that the central issue that you

25   have identified is currently before the Ninth Circuit, and

1    because we have a lot of work and a lot of very expensive

2    work immediately coming up.  It would be a disservice to my

3    client, and, frankly, I think a disservice to the taxpayers

4    if we charged ahead and spent a lot of time and money getting

5    ready for motion summary judgement that is due on March 19th

6    and for trial.

7              THE COURT:  Okay.  Well, if you had addressed the

8    jurisdictional issue by comparing, you know, Plotkin,

9    P-l-o-t-k-i-n, with Griggs, G-r-i-g-g-s, and came to a

10   conclusion about that, it would have had more impact on me.

11   I told you my feelings on Griggs.  I told you my feelings on

12   the stay arguments you're making.  I didn't get anything

13   contrary to that.  What I'm telling you here is, as I did at

14   the beginning, I welcome it.

15             MR. AMBERG:  I'm moving past the jurisdiction

16   argument.  Now I am addressing myself to the Court's inherent

17   power and discretion to control proceedings in its court.  I

18   think the Court recognizes that this could very well amount

19   to a duplication of effort between the issues that are here

20   for litigation and the issues that are before the Ninth

21   Circuit.

22             It really is not very wise, very prudent for us to

23   be spending time and money in both courts on --

24             THE COURT:  When you say not wise or prudent, come

25   on.  Who filed the lawsuit in this Court?

```
 1              MR. AMBERG:  We did.

 2              THE COURT:  Who filed the interlocutory appeal?

 3              MR. AMBERG:  We did.

 4              THE COURT:  And are you an orphan crying for mercy

 5   because their parent is dead?

 6              MR. AMBERG:  No.  That was the point of my original

 7   argument.  This is not a motion for reconsideration because

 8   new facts, new issues --

 9              THE COURT:  I should say, because they murdered

10   their parent to get the thing straight.

11              MR. AMBERG:  I understand.

12              THE COURT:  Go ahead.

13              MR. AMBERG:  When Orange County filed its answering

14   brief, it raised the issues that this Court has now framed in

15   its tentative opinion.  That's the point at which the Ninth

16   Circuit agreed with us and consolidated the two cases for

17   oral argument.

18              Before that, the -- the interlocutory appeal raised

19   threshold issues concerning the test and the application of

20   the Court's standard for preliminary injunction.  That was

21   the issue that we took up on appeal.  It was the Orange

22   County Superior Court's answering brief that injected the

23   issues going to the merits, which is what we are contending

24   with here.

25              So no, we are not orphans who have murdered their
```

```
 1   parents.
 2              THE COURT:  Of course, you aren't.
 3              MR. AMBERG:  That wasn't what the point of the
 4   interlocutory appeal was all about.  That is what it has
 5   become.
 6              THE COURT:  Okay.  Let me tell you something that
 7   concerns the Court that you wouldn't know about.  That is
 8   stays in this day and age.  In the past, as a practicing
 9   attorney for 30 years then become judge, I'm sympathetic to
10   why attorneys request stays.  Saving money to their clients
11   and getting rulings from on far.  I must say in my early
12   years as a judge, I often granted stays, but then I ran into
13   very difficult situations.  Let's take certain issues of
14   arbitration.  Certain issues of wage-and-hour cases.  It
15   seemed to me half my time I was evaluating stays while the
16   Ninth Circuit heard something that goes to the California
17   Supreme Court on reference that comes back to the Ninth
18   Circuit that gets resolved and might be appealed on the
19   Supreme Court.
20              And I have sat around often waiting for decisions.
21   And numerous times after waiting two years, the decision I
22   get is a water sandwich that just didn't matter.  They
23   punted.  They waited for the Supreme Court.  By the Supreme
24   Court, that could be the California Supreme Court or the
25   United States Supreme Court, and their decision is unclear.
```

```
 1    And it -- it strikes me that in the past in controlling my

 2    docket, it's a tough situation when I start waiting for the

 3    Ninth Circuit to do something.

 4              So I would ask, when do you think the Ninth Circuit

 5    will rule on this?  Do you think there will be a writ of

 6    certiori.  It struck me it is just easier.  Even though 41

 7    pages isn't easier, it's just easier and perhaps more

 8    consistent with my requirement under the revamped Federal

 9    Rule of Civil Procedure 1 that when someone files in my

10    court, they'll get a decision from my court.

11              Now, that may not be totally consistent with all of

12    the stay law.  I do want to apply the stay law.  I do want to

13    consider all of the factors.  I'm just telling you this to

14    let you know in the past, I have come across a morass waiting

15    for the Ninth Circuit, their references to the California

16    Supreme Court, their possible certiori, et cetera.

17              Anything general to all of that?  Your best

18    argument is to say, Judge, apply the law as it exists on

19    stay, and don't be overly affected by past difficulties that

20    might arise.  I'm sure that -- I'll accept that as the

21    argument you just made.  It's a good argument.  It's a good

22    argument.  I just struggle.  I'm telling you I've waited --

23    I'd ask Ms. Bredahl to remind me how long it took two, three

24    years for a nothing decision.  I'm back at square one with,

25    by the way, witnesses older, memories receding, and all of
```

UNITED STATES DISTRICT COURT

1    that sort of thing.

2              How do you respond to that?

3              MR. AMBERG:  Well, you -- you harken back to your

4    career before you took the bench.  I've had a few years also

5    litigating.  I have to acknowledge what the Court is saying;

6    that stays are not often granted and sometimes they do have

7    unfortunate effects.  You can understand, of course, the very

8    reasons that on behalf of my client I'm asking for the stay.

9    I won't repeat those -- those remarks.  I understand what the

10   Court is -- is telling me.

11             I guess I'm -- I'm taking the Court's remarks

12   polite and helpful as they might be as a no that --

13             THE COURT:  No, no, no.  It's not a no.  I'm going

14   to think about it further now.  I'm going to think about it

15   further in light of what you just said.  I wish I had a

16   little more analysis of the Griggs situation, et cetera, et

17   cetera.  But I -- don't ever give up.  When I take under

18   submission, it's all under submission, including that.

19             MR. AMBERG:  All right.

20             THE COURT:  Okay.

21             MR. AMBERG:  I -- I am going to throw out one

22   alternative.  That is, should the Court decide to apply the

23   law bearing on stay and drawing on its own experience, and

24   should it deny the stay, then I would ask that the Court

25   consider amending its scheduling order and extending our

```
 1    deadline for filing the motion for summary judgement.

 2    Currently, our deadline is March 19th, I believe.

 3              THE COURT:  All right.  Let me ask.  Mr. Naeve,

 4    what do you think about extending March 19th?  Tomorrow being

 5    March 1st.

 6              MR. NAEVE:  Today being March 1st, which is also my

 7    birthday, Your Honor.  So happy birthday to me.  I beg your

 8    pardon.

 9              The answer is, any continuance we're hanging this

10    lawsuit over the Court and its operations.  We object to any

11    continuance for that reason.  There was no reason we -- we

12    filed our motion in November.  The -- on facts, as you know

13    now, that pretty much have been settled almost a year ago.

14    There was nothing that prevented Courthouse News from filing

15    a cross-motion so we could have heard it at once.

16              Frankly, I suspect that if the Court says no, you

17    will see a motion so will we on the day and time.  I don't

18    think there's a hardship to Courthouse News.  This is all

19    trying to delay this case.  What will happen is if the --

20    either we will get a judgment -- we hope we get a summary

21    judgement.  If we don't, we get a trial.  That goes up to the

22    Ninth Circuit.  That will give a complete record that it

23    doesn't really exist in the Planet case for the panel to

24    consider.  That, I think, Courthouse seeks to avoid because

25    the Planet record is not as complete as this one.
```

1          So there's a strategic -- at least our view is

2     there is a strategic reason for the continued request for

3     stay after stay after stay having less to do with cost and

4     more to do with we prefer that Planet be decided by itself

5     without being informed by other cases that are relevant.

6          THE COURT:  Oh, what about that?

7          MR. AMBERG:  Believe me, it's about cost.  It's --

8     this is -- this has been phenomenally expensive.  We have

9     submitted sworn statements from CNS's chief executive and

10    owner to that effect.  So this is very much about looking out

11    for the pocketbook of my client.

12         I really thought Mr. Naeve was going in the same

13    direction when he was --

14         THE COURT:  I thought so too, which is why I asked.

15         Go ahead.

16         MR. AMBERG:  Well, I thought, you know, he was

17    going to make my argument for me when he stood up and asked

18    the Court well, what are the issues?  What are the evidence

19    for trial?  That's the -- that's the problem that, frankly,

20    we're having.  This is a big decision -- big tentative

21    decision.  It's complicated.  It's detailed.  You know, it

22    just puts a further burden on the ability of my client to

23    meet the current schedule.

24         THE COURT:  Okay.  Well said by both.

25         MR. AMBERG:  Thank you.

```
 1              THE COURT:  Thank you for your presence here.  It
 2   is under submission, including that, but that's not good,
 3   because you've got St. Joseph's Day hanging over your head.
 4              All right.  I'm going to do this in deference to
 5   your life.  I'm not sure how long I'm going to have this
 6   tentative under submission.  You need to know right away.  So
 7   I will think about your request and let you know right away
 8   so you won't find out on the Ides of March --
 9              MR. AMBERG:  Thank you.
10              THE COURT:  -- that your St. Joseph's Day deadline
11   is still with us.  You'll find that out in the next day or
12   two.
13              MR. AMBERG:  I appreciate that.
14              MR. NAEVE:  Thank you, Your Honor.
15              (Proceedings concluded at 11:06 a.m.)
16                            CERTIFICATE
17   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
18   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN
19   THE ABOVE MATTER.
20   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE
21   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE
22   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.
23
24   /s/ Miriam V. Baird            03/02/2018
25   MIRIAM V. BAIRD                        DATE
     OFFICIAL REPORTER
```