1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION – SANTA ANA

**COURTHOUSE NEWS SERVICE,**

                    Plaintiff,

          v.

**DAVID YAMASAKI,**

                    Defendant.

Case No.
SACV 17-00126 AG (KESx)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
SUMMARY JUDGMENT MOTION**

1   "*Extra! Extra! Read all about it!*" This iconic news entreaty evokes images of a distant

2   past, before the internet, television, and radio, when the news was reported on pieces of

3   paper. These aptly called newspapers were printed by a set time each day. New stories that

4   broke after that time would generally appear in the next day's edition. But sometimes

5   newspapers would publish an extra edition because something so momentous or sensational

6   had happened that people would willingly buy a second paper to read all about it. Breaking

7   news in the digital age is a much looser concept than in the days of newspaper extras. If it

8   were still announced by street vendor clamors, the resulting cacophony would be intolerable.

9   In reality, since people can manage their notification updates, the noise is much easier to

10   ignore.

11   This case calls for a reflection on the meaning of news, both breaking and not, and the

12   obligations that the United States Constitution imposes on the government in society's ever

13   more demanding quest for news. It asks what burdens the justice system must bear and what

14   risks it must take to provide access to information in the name of "news." The importance of

15   this dispute is reflected in the rather voluminous extra documents that have been filed for the

16   pending summary judgment motion, including one *amici curiae* brief filed on behalf of the

17   Orange County Bar Association, National Association of Women Lawyers, Family Violence

18   Appellate Project, Legal Aid Society of Orange County, Public Law Center, and Veterans

19   Legal Institute, to support Defendant's position, and another one *amici curiae* brief filed on

20   behalf of the Reporters Committee for Freedom of the Press and 15 other media

21   organizations, to support Plaintiffs' position. (*See* Dkt. Nos. 82, 105; *see also* Dkt. No. 41-1.)

22   Plaintiff Courthouse News Service, or "CNS," sued Defendant David Yamasaki in his

23   official capacity as the Court Executive Officer/Clerk of the Orange County Superior Court,

24   or "OCSC," for injunctive and declaratory relief under 42 U.S.C. § 1983. CNS contends that

25   delays in public access to certain electronically filed civil complaints at OCSC violate its rights

26   under the First Amendment to the United States Constitution.

27   Last year, CNS moved for a preliminary injunction, which the Court denied. Now

28   OCSC moves for summary judgment. Having considered the numerous filings and extensive

oral arguments, the Court GRANTS IN PART and DENIES IN PART OCSC's motion for summary judgment. (Dkt. No. 75.)

**1. BACKGROUND**

This section provides context to the Court's analysis, where the Court will discuss relevant facts in more detail.

**1.1  CNS Reporting and Publications**

CNS is a news organization that specializes in civil litigation reports. CNS reporters write articles about legal news and create litigation reports. Some CNS original articles are freely available to the public on the organization's website, which also features a selection of non-legal news articles from the Associated Press. COURTHOUSE NEWS SERVICE, https://www.courthousenews.com/ (last visited May 7, 2018). On multiple occasions, other news organizations—including locally the Orange County Register and the Los Angeles Times—have credited CNS articles as their source.

CNS has over 2,000 subscribers nationwide. CNS subscribers include academic institutions, government agencies, and other media organizations, but overwhelmingly, they're law firms. CNS subscribers may receive "trackers," which provide updates about cases a subscriber is following, and "dingers," which alert subscribers about lawsuits filed against a specific party. CNS subscribers may also choose to receive monthly or daily publications, including one or several of CNS's 124 "New Litigation Reports." These reports supply daily updates about new civil litigation, excluding family law, filed in a specific geographical area. They include links to and original summaries of the complaints.

To provide this content, CNS employs reporters across the country. These reporters are assigned coverage of specific federal and state courthouses. One of their duties is to review new complaints and choose which ones to include in the daily New Litigation Reports.

Sixteen New Litigation Reports focus on California, covering new civil complaints in

the federal district courts, and new unlimited civil complaints (sometimes just called "complaints" in this order) in the superior courts. Under California law, unlimited civil cases are those where the amount in controversy exceeds $25,000 or where the plaintiff requests certain types of injunctive relief. Complaints filed at OCSC are covered in CNS's Orange County Report, which is "emailed each weekday evening to about 275 subscribers." (*See* Dkt. No. 85 at 6; Dkt. No. 86 at ¶ 7.) But CNS reporters at OCSC cannot always access new complaints on the same day that those complaints are submitted to the court. So CNS sued OCSC.

### 1.2 OCSC Practices

OCSC is one of the busiest state trial courts in the country. In the 2014–2015 fiscal year, it opened nearly half a million new cases. Judicial Council of California, 2016 Court Statistics Report app. G, tbl.1. Besides numerous criminal cases, it handles all sorts of civil matters. Civil cases are handled at one of four OCSC divisions. Two of those divisions, the Central Justice Center (or "CJC") and the Civil Complex Center, process all filings in unlimited civil cases. Unlimited civil cases cover, among other things, requests for civil restraining orders, name change petitions, and complex civil cases. It's undisputed that on average, OCSC receives 14,098 new unlimited civil complaints a year. (Dkt. No. 84 at 2 ¶ 3.) Meanwhile, and as widely acknowledged in the press, OCSC has faced increasingly challenging budgetary restrictions. One source explains that while it's "no secret that California's clogged courts are seriously underfunded" in general, "as a 'donor' court under the current, convoluted funding method," OCSC isn't receiving its "fair share of statewide funding." *See* Josh Newman & Jennifer Muir Beuthin, *Better Justice Through Local Funding Control*, ORANGE COUNTY REGISTER (updated Feb. 9, 2018, 10:12 AM), https://www.ocregister.com/2018/02/08/better-justice-through-local-funding-control/ [http://bit.ly/2oitH1B]. This has created problems unique to OCSC, which is for example "the only Superior Court in all of California to rely solely on part-time court reporters." *Id.* These problems then have a negative "domino effect." *Id.* And for the past several years,

OCSC's "volume has increased even as its budgets have shrunk." *Id.* Funding issues obviously create challenges to OCSC in seeking justice.

Most new complaints are submitted to OCSC electronically. (*See* Ochoa Decl., Dkt. No. 75-2 at ¶ 14.) Indeed OCSC implemented mandatory electronic filing (or "e-filing") in 2013, subject to very few exceptions. One of those exceptions is for filings submitted by litigants representing themselves, said to be acting *pro per* (counsel use the expression "*pro se*," which is less suitable for state court). Complaints may be submitted electronically 24 hours a day, even on weekends and court holidays. Manually filed complaints may be turned into the clerk's office between 8 a.m. and 5 p.m. on court business days.

When OCSC receives a new complaint, a Legal Processing Specialist (or "LPS") reviews and processes it before OCSC makes the complaint available to the public—*if* the complaint satisfies all the filing requirements and it's not protected by confidentiality or sealed. At the CJC, there are five LPSs whose assigned duty is to review and process new civil complaints. Review and processing at the Civil Complex Center is performed by one of the three LPSs who handle all new filings. LPSs perform administrative tasks, like checking for payment or assigning a case number associated with the complaint, and confidentiality and sealing review (referred to here as "privacy review" for short). For the privacy review, LPSs check the face of the complaint or petition, as well as the comment section that plaintiffs may fill out when submitting the document online. They look for words indicating that the plaintiff meant to ask for information to be kept private, and statutory references or claims that require confidential treatment by law. For example, under the Safe at Home program, confidential treatment is required for name change petitions submitted to avoid domestic violence, stalking, or sexual assault. Cal. Civ. Proc. Code § 1277(b)(2). OCSC has identified multiple instances where LPS review revealed requests for confidential treatment or sealing of complaints and petitions. (Ochoa Decl., Dkt. No. 75-2 at ¶¶ 21–22.)

It's this review and processing of new complaints that causes the delays at OCSC that CNS claims are unconstitutional.

### 1.3  Delays at Issue

The evidence and data submitted about delays in this case concern two periods: the last quarter of 2016 (October to December 2016), and the period from January 1, 2017 to October 18, 2017. The filings for this motion focus mainly on the 2017 period.

The statistics that CNS and OCSC have provided are for the most part representations of the same OCSC data. How they represent that data, though, differs greatly. According to OCSC, 95.97% of new unlimited civil complaints during the relevant 2017 period, and 89.2% of new unlimited civil complaints in the last quarter of 2016, were available within eight business hours. (Mot., Dkt. No. 75 at 7.) By contrast, according to CNS, during the relevant 2017 period, 56.9% of new unlimited civil complaints were delayed one to thirteen days, and during the last quarter of 2016, nearly half of the new unlimited civil complaints were delayed between one and nine days. (Opp'n, Dkt. No. 83 at 4.)

The main reason for the disparities in the parties' statistics is that OCSC and CNS disagree about the appropriate time unit to calculate delays. OCSC quantifies delays in business hours, reflecting its functional reality and the speed of LPS complaint review and processing. Meanwhile, CNS quantifies delays in terms of calendar days, reflecting its own business reality tied to newsworthiness. Then, the parties' views on how to count delays that begin or end before 8 a.m. or after 4 p.m. further separates each side's numbers. With OCSC's numbers, whether hours before 8 a.m. or after 4 p.m. count as business hours may depend on whether complaints were submitted or released during those hours. Indeed it's clear that the hour when a complaint is *released* always counts as a business hour, even if the complaint is released before 8 a.m. or after 4 p.m. But what's unclear is whether the hour when a complaint is *submitted* counts as the first business hour and starts the clock when the complaint is submitted between 4 and 5 p.m. As for CNS's numbers, they reflect CNS's position that when a complaint is released after 4 p.m. (including before 5 p.m.) on one day, access to that complaint is delayed until the following business day—which may be several calendar days later.

For the purpose of this motion, the Court won't adopt the time unit of one party or

the other, instead adapting its description of delay lengths to the arguments presented. So some basic reference points may be useful before moving on.

| OCSC Delay Description | CNS Equivalent |
|---|---|
| **Within 8 business hours** | 0 to 4 calendar days |
| **CNS Delay Description** | **OCSC Equivalent** |
| **0 calendar days, or same day** | Within 8 business hours |
| **1 calendar day** | Within 8 business hours, or within 24 business hours |

### 1.4  CNS Allegations and Lawsuits

CNS argues that the public has a First Amendment right of access to new civil complaints that attaches as soon as the complaints are submitted to or received by a court. The parties refer to that argument for short as a right of "access upon receipt," "same-day access," or "immediate access." The Court will use those expressions interchangeably. CNS further argues that the delays at OCSC are the product of what CNS calls OCSC's "process-first policy," and that they impermissibly restrict the public's First Amendment right of access.

Conversely, OCSC argues that the public's First Amendment right of access to new complaints doesn't attach as soon as a court receives a complaint and that at any rate, courts may take a reasonable amount of time to review and process complaints before making available to the public those complaints that may be released.

CNS filed this lawsuit on January 24, 2017. Before and since then, CNS has sued multiple state trial court clerks in federal district courts across the country, seemingly based on the same legal arguments it makes here. Each case apparently involves courts where CNS reporters have been unable to access newly submitted complaints on the same day that the

7

courts receive them, and where the clerks refused to change their practices when CNS asked them. In particular, before suing OCSC's Clerk, CNS sued the Clerk of the Ventura County Superior Court. *Courthouse News Service v. Planet*, CV 11-08083 SJO (FFMx). That lawsuit produced two Ninth Circuit opinions impacting the legal analysis in this case: *Courthouse News Service v. Planet* ("*Planet I*"), 750 F.3d 776 (9th Cir. 2014), and *Courthouse News Service v. Planet* ("*Planet II*"), 614 F. App'x 912 (9th Cir. 2015).

Mindful of those decisions, the Court denied CNS's motion for a preliminary injunction last year. (Dkt. No. 56.) Since then, CNS filed an interlocutory appeal of that denial with the Ninth Circuit. That appeal is still pending. And OCSC filed the pending motion for summary judgment with this Court. When the summary judgment motion, opposition, and reply were filed, the Court granted applications to file *amici curiae* briefs supporting each party, and requested supplemental briefing. (Dkt. No. 106.) Supplemental briefs and rebuttals were timely filed. (Dkt. Nos. 111, 112, 115, 116.) A special hearing date was set on the Court's calendar, separate from the regularly scheduled hearings, to give the parties extra time to present their arguments. Before the hearing, the Court issued a tentative order seeking to enhance oral arguments.

## 2. PRELIMINARY MATTERS

### 2.1 Jurisdiction

CNS's opposition to OCSC's motion for summary judgment opens on a claim that the Court lacks jurisdiction to rule on the motion because of CNS's interlocutory appeal. In its tentative order, the Court explained that CNS misinterpreted the relevant case law, and that the Court does have jurisdiction under *Plotkin v. Pacific Telephone & Telegraph Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982). After the hearing on this motion, CNS sought an urgent stay from the Ninth Circuit based on the same jurisdiction argument. (Dkt. No. 129.) The Ninth Circuit having likewise dismissed CNS's argument under *Plotkin*, the Court need not discuss this issue any further. (*See* Dkt. No. 132.) The Court has jurisdiction to rule on OCSC's summary

1    judgment motion. Justice is served here by the Court moving this case along.

2          **2.2  Evidence and Objections**

3          CNS mentioned in a footnote that it thought OCSC's motion was premature. (Opp'n,

4    Dkt. No. 83 at 5 n.4.) But CNS didn't follow the requirements of Federal Rule of Civil

5    Procedure 56(d), which allows a court to delay ruling on a summary judgment motion "[i]f a

6    nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present

7    facts essential to justify its opposition." And CNS has been collecting evidence on courts'

8    complaint access practices for some time. As CNS itself says, 36 of the declarations it

9    submitted here were first filed two years ago, on March 14, 2016, in one of the other similar

10   lawsuits initiated by CNS. (*See* Dkt. No. 12 at 1–5.) In any event, none of the Court's

11   dispositive rulings depend on information that CNS would have obtained through discovery.

12         The parties raised voluminous issues concerning the evidence and filings for this

13   motion. These issues were addressed in over seven pages of the Court's tentative order. At

14   the hearing, the parties did not wish to discuss the Court's rulings on those matters, which

15   remain in place. Now the Court will proceed directly to the merits, only occasionally

16   mentioning evidentiary issues when necessary.

17

18   **3. LEGAL STANDARD**

19         Summary judgment is appropriate where the record, read in the light most favorable

20   to the non-moving party, shows that "there is no genuine issue as to any material fact and . . .

21   the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex*

22   *Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those necessary to the proof or

23   defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby,*

24   *Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a

25   reasonable jury could return a verdict for the nonmoving party" based on the issue. *Id.* In

26   deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be

27   believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the

28

evidence of the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50.

The burden is first on the moving party to show an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party satisfies this burden either by showing an absence of evidence to support the nonmoving party's case when the nonmoving party bears the burden of proof at trial, or by introducing enough evidence to entitle the moving party to a directed verdict when the moving party bears the burden of proof at trial. *See Celotex*, 477 U.S. at 325; *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). If the moving party satisfies this initial requirement, the burden then shifts to the nonmoving party to designate specific facts, supported by evidence, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. If the nonmovant "fails to properly address another party's assertions of fact as required by Rule 56(c, the court may . . . consider the fact undisputed for the purposes of the motion [or] . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## 4. ANALYSIS

The Court's analysis will focus on binding law, ignoring any unhelpful and sometimes distasteful comments attempting to demean one party or the other or to pit courts against each other. For clarity, the Court's analysis will start with an overview of the substantive law, then address the parties' arguments under the three frameworks in their briefs, and finally summarize the conclusions of the analysis.

### 4.1  Free Speech and Qualified Right of Access Under the First Amendment

#### 4.1.1  U.S. Protection of Free Speech

Perhaps one of the most remarkable features of American government is its robust protection of free speech. By its very terms, the First Amendment is formidable. "Congress

shall make no law . . . abridging the freedom of speech, or of the press . . . ." U.S. Const. amend. I. While it's well settled that this "unconditional phrasing . . . was not intended to protect every utterance," *see Roth v. United States*, 354 U.S. 476, 483 (1957), First Amendment protection of speech and press is very powerful.

This is particularly true concerning political speech. "Speech concerning public affairs is more than self-expression; it is the essence of self-government." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (alterations omitted) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). "Accordingly, the [Supreme] Court has frequently reaffirmed that speech on public issues occupies the highest rung of the [hierarchy] of First Amendment values, and is entitled to special protection." *Id.* (internal quotation marks omitted) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). The Constitution thus allows only the most minimal interference with political speech. *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 256 (1964). When the interference takes the form of a "prior restraint" on speech—which refers to a court order prohibiting specific speech—the interference is even presumptively unconstitutional. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971).

Overall, freedom of speech and of the press under the U.S. Constitution is impressive in both its strength and its breadth. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (giving a brief overview of types of protected speech and levels of scrutiny); *see also Texas v. Johnson*, 491 U.S. 397, 406–07 (1989) (discussing protection of expressive conduct). Many restrictions on expressive rights that might be permissible elsewhere in the world would not be tolerated under the First Amendment. *See, e.g.*, *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisémitisme*, 433 F.3d 1199, 1234 (9th Cir. 2006) (observing that a "United States court constitutionally could not make" an order restricting speech like the French order at issue in that case, valid under French law); Jacob Foster, *The Use of Foreign Law in Constitutional Interpretation: Lessons from South Africa*, 45 U.S.F. L. REV. 79, 113 (2010) (noting that the Constitutional Court of South Africa expressly declined to adopt the actual malice standard from *New York Times v. Sullivan*, "because 'this decision represents the high-water mark of foreign jurisprudence protecting the freedom of speech and many jurisdictions

1  have declined to follow it."''). "For it is a prized American privilege to speak one's mind,

2  although not always with perfect good taste, on all public institutions." *Bridges v. California*,

3  314 U.S. 252, 270 (1941).

### 4.1.2  Qualified Rights of Access

5  An important corollary of the right to free speech is the right to receive information.

6  That right may be thought of as a shield, a negative right to be free from governmental

7  interference. Or it may be thought of a sword, a positive or affirmative right requiring the

8  government to act in some circumstances. The shield here protects the right of the intended

9  recipient of information to get that information. "Customarily, First Amendment "guarantees

10 are interposed to protect communication between speaker and listener." *Richmond Newspapers*

11 *v. Virginia*, 448 U.S. 555, 586–87 (1980) (Brennan, J., concurring in judgment). The sword

12 allows the public to obtain information from an otherwise potentially unwilling source. The

13 sword is the right of access. But that right is not coextensive with the First Amendment's

14 protection of free speech.

15 Nor does a right of access exist only under the First Amendment. It may exist under

16 one of at least three sources. Depending on the source, the scope and application of the

17 resulting right may differ. Different rights of access may overlap. But no right of access is

18 absolute. And all rights of access stem from some notion of public oversight over

19 governmental affairs.

20 First, there's a common law right of access, since "the courts of this country recognize

21 a general right to inspect and copy public records and documents, including judicial records

22 and documents." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978). That right derives from

23 the interest of the public and the press "to keep a watchful eye" on the workings of

24 government, but it must be balanced against other interests. *See id.* at 598–99, 602.

25 Second, there are statutory rights of access to government records and documents,

26 normally accompanied by exemptions. These rights may be found in both federal statutes

27 such as the Freedom of Information Act, originally enacted in 1966 and commonly called

28

1    "FOIA," and state statutes like the California Public Records Act, or "CPRA," originally

2    enacted in 1968. These statutory rights of access embody the same sort of concerns as the

3    common law right of access. "FOIA is often explained as a means for citizens to know what

4    their Government is up to," reflecting "a structural necessity in a real democracy." *Nat'l*

5    *Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004). Public access laws "permit[]

6    checks against the arbitrary exercise of official power and secrecy in the political process."

7    *City of San Jose v. Super. Ct.*, 2 Cal. 5th 608, 615 (2017) (discussing the CPRA.) But again, the

8    interest in public disclosure must be weighed against other privacy interests. *See Favish*, 541

9    U.S. at 171; *City of San Jose*, 2 Cal. 5th at 615–16.

10        Finally, there are constitutionally protected rights of access. For example, since the

11    passage of Proposition 59 in 2004, the California Constitution expressly protects "the right of

12    access to information concerning the conduct of the people's business." Cal. Const. art. I,

13    § 3, subdiv. (b)(1). And the United States Supreme Court also found a qualified right of

14    access implied in the First Amendment to the United States Constitution in *Richmond*

15    *Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) and its progeny. It's this First Amendment

16    right that CNS invokes here.

17              **4.1.3  Supreme Court Recognition of a First Amendment Right of Access**

18        The Supreme Court has generally been reluctant to find implied affirmative

19    constitutional rights, which may allow citizens to demand action by the government. For

20    example, the Supreme Court stressed the difference between affirmative and negative rights

21    in *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978). Analyzing its earlier cases, the Supreme Court

22    explained that "the Court was concerned with the freedom of the media to *communicate*

23    information once it is obtained; neither case intimated that the Constitution *compels* the

24    government to provide the media with information or access to it on demand." *Id.* (emphasis

25    in original); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989)

26    (discussing affirmative obligations under the Fifth and Fourteenth Amendments and

27    collecting cases); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35–38 (1973) (rejecting

28

claim to a positive right to public education under the First and Fourteenth Amendment).

It actually wasn't until 1980 that the Supreme Court recognized the existence of a constitutional right of access under the First Amendment in *Richmond Newspapers*, which Justice Stevens described as "a watershed case." 448 U.S. at 582 (Stevens, J., concurring in judgment). *Richmond Newspapers* stated "that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.'" *Id.* at 580 (Burger, C.J., plurality opinion) (citation omitted). Although seven of the eight Justices who participated in the decision agreed with the result, no majority opinion emerged. Chief Justice Burger wrote for a plurality of three Justices, but there were five concurring opinions, and one dissenting, as well.

Still, the foundation of the First Amendment right to access in the "popular, yet constitutionally novel, theory of self-government" was already apparent in the plurality opinion of Chief Justice Burger, and even more so in the concurring opinion of Justice Brennan, "which was subsequently to become the actual touchstone for the new doctrine of access." *See* Eugene Cerruti, *"Dancing in the Courthouse": The First Amendment Right of Access Opens a New Round*, 29 U. RICH. L. REV. 237, 271–72 (1995). Both opinions stressed the historical and practical importance of open criminal trials. In particular, they noted the tradition of open criminal trials going back to English common law, the positive effect of open trials on the administration and fairness of the trials themselves, the importance of open trials on the appearance of fairness and justice and the resulting confidence in the justice system. *See Richmond Newspapers*, 448 U.S. at 569–72 (Burger, C.J.); *id.* at 589–97 (Brennan, J., concurring in judgment). But Justice Brennan's opinion placed more emphasis on the ties between right of access and the concept of self-government. *Id.* at 593–95 (Brennan, J., concurring in judgment). And his opinion called for caution regarding the scope of the right of access.

> However, because "the stretch of this protection is theoretically endless," it must be invoked with discrimination and temperance. For so far as the

14

participating citizen's need for information is concerned, "[there] are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow."

*Id.* at 588 (citations omitted). The First Amendment qualified right of access, and its rationales laid out in the *Richmond Newspapers* opinions of Chief Justice Burger and Justice Brennan, have since repeatedly been confirmed in Supreme Court decisions with majority opinions. *See Press-Enterprise Co. v. Super. Ct.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"); *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 598 (1982).

All rights of access thus stem from notions of government legitimacy and informed citizen participation in and oversight of governmental affairs. *See Favish*, 541 U.S. at 171–72; *Nixon*, 435 U.S. at 598–99, 602; *Planet I*, 750 F.3d at 785; *City of San Jose*, 2 Cal. 5th at 615. Perhaps for this reason, even the First Amendment right of access covers only a specific fraction of the information that would be covered under the negative protections of the First Amendment rights to free speech and free press. The First Amendment thus still doesn't require access to all "government information or sources of information within the government's control." *Houchins,* 438 U.S. at 15. If it were otherwise, FOIA's exemptions would be impermissible statutory infringements on constitutionally protected rights.

So courts have determined whether a specific qualified right of access exists using the two-part test from *Press-Enterprise II*, commonly referred to as the "experience and logic test." *See United States v. Index Newspapers LLC*, 766 F.3d 1072, 1084 (9th Cir. 2014) (citing *Press-Enterprise II*, 478 U.S. at 8–9). This test will be discussed more later, but it draws on the same concepts of historical and practical importance mentioned in *Richmond Newspapers*. At bottom, it asks courts to determine whether a proposed right reflects a well developed tradition of access to a specific process, and whether it "plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8.

### 4.1.4  Development of the First Amendment Right of Access

The development of the First Amendment right of access has happened on a right-by-right basis. So far, the Supreme Court and the Ninth Circuit have found a First Amendment

15

right of access in the context of many criminal proceedings. *See Planet I*, 750 F.3d at 786 (collecting cases). Yet even in criminal matters, a right of access doesn't always attach. *See, e.g., Index Newspapers*, 766 F.3d at 1084 (no right of access to, among other things, filings and transcripts relating to motions to quash grand jury subpoenas); *Times Mirror Co. v. United States,* 873 F.2d 1210, 1217 (9th Cir.1989) (no right of access to pre-indictment warrants). The Ninth Circuit has also used the experience and logic test to analyze right of access claims in nonjudicial proceedings. *See Planet I*, 750 F.3d at 786 (citing *Cal–Almond, Inc. v. U.S. Dep't of Agric.,* 960 F.2d 105, 109 (9th Cir.1992)); *see also Leigh v. Salazar*, 677 F.3d 892, 901 (9th Cir. 2012) (remanding for the district court to perform the *Press-Enterprise II* test).

The specific issue of a qualified First Amendment right of access to civil complaints was first addressed in the Ninth Circuit by *Planet I*. Although the court acknowledged that the Ninth Circuit had "not expressly held that the First Amendment right of access encompasses civil cases," it found that CNS had "alleged a cognizable injury" under the First Amendment caused by a "denial of timely access to newly filed complaints." *See* 750 F.3d at 786, 788. *Planet I* thus established that there is a qualified First Amendment right to "timely" access to new complaints. *Id.*

### 4.1.5  Qualified Right to "Timely" Access Complaints

The *Planet I* panel didn't define "timely," instead remanding the case for the district court to make that determination in the first instance. *Planet I*, 750 F.3d at 793; *see also Planet II*, 614 F. App'x at 914. But the *Planet I* court did provide a framework for analyzing restrictions imposed on the right of timely access. *See Planet I*, 750 F.3d at 793 n.9; *Planet II*, 614 F. App'x at 914. Specifically, that right of access may be "overcome by an 'overriding [governmental] interest based on findings that closure is essential to preserve higher values.'" 750 F.3d at 793 n.9 (alterations in original) (citing *Leigh,* 677 F.3d at 898); *see also United States v. Doe*, 870 F.3d 991, 997 (9th Cir. 2017) (citing *Times Mirror*, 873 F.2d at 1211 n.1) (the recognition of a First Amendment right of access creates a strong presumption of openness, although the public may "be denied access if closure 'is necessitated by a compelling

1  governmental interest, and is narrowly tailored to serve that interest.'"). And the "delay in

2  making the complaints available may also be analogous to a permissible 'reasonable

3  restriction[] on the time, place, or manner of protected speech.'" *Id.* (alterations in original)

4  (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)).

5       To decide whether there's a genuine issue of material fact about the constitutionality

6  of the delays in complaint access at OCSC, the Court's first task is therefore to determine the

7  definition of "timely" access, within the framework laid out in *Planet I*. The parties urge the

8  Court to determine the meaning of timeliness from one of three tests: (1) the experience and

9  logic test from *Press-Enterprise II*, (2) the strict scrutiny test from *Leigh*, or (3) the time, place,

10  and manner regulation from *Ward*. Yet although courts applying these tests have sometimes

11  mentioned delays they found acceptable or unacceptable, the Court isn't aware of any binding

12  case that applies any of the three tests to define "timely" access. Nor have the parties cited

13  any. At the hearing, OCSC strongly argued that the *Press-Enterprise II* test was the appropriate

14  framework for the Court's analysis, relying on *California First Amendment Coalition v. Woodford*,

15  299 F.3d 868, 871 (9th Cir. 2002). OCSC counsel said that the issue in that case and in this

16  case was the same: Was the government required to provide access sooner than it already

17  did? As appealing as that comparison may seem, it's not ultimately convincing for multiple

18  reasons, including the fact that the access at issue in *California First Amendment Coalition*

19  involved distinct phases of the execution process, while the access at issue here concerns the

20  same documents, just at different times.

21       Accordingly, the Court discusses the application and limitations of each test in the

22  next sections. The Court's analysis is briefly summarized as follows. When a right of access

23  attaches under *Press-Enterprise II*, a presumption of openness applies. *Doe*, 870 F.3d at 997.

24  But that presumption may be overcome if restrictions on access satisfy strict scrutiny. *Id.*

25  Thus, if the Court were able to determine the meaning of "timely" using the *Press-Enterprise II*

26  analysis, access denials beyond the point of timeliness would be valid only if they satisfy strict

27  scrutiny. Here, though, the Court determines that the experience and logic test sufficiently

28  establishes only what the definition of timely is *not*. And neither side has proposed a suitable

definition. Next, because the experience and logic test doesn't resolve the meaning of timeliness, and because the Court concludes that delays in access to new complaints aren't automatically a denial of access to new complaints, strict scrutiny isn't the appropriate framework to assess the delays in this case. Finally, the Court finds that the time, place, and manner test is helpful to evaluate the delays in this case. But issues of material fact prevent the Court from fully applying that test, and generally, from finding precisely when delays may be too great to satisfy the right of timely access.

Before going further, one more observation is in order. When imposing affirmative obligations on the government in the First Amendment context, costs become more relevant in a way not sufficiently reviewed in the extensive history of defensive First Amendment rights. The relatively new right of access case law has yet to fully articulate the balance between costs and access. Still, how much it costs to provide access that didn't previously exist is a relevant consideration. *See, e.g.*, *Barber v. Conradi*, 51 F. Supp. 2d 1257, 1267–68 (N.D. Ala. 1999); *State ex rel. Williston Herald, Inc. v. O'Connell*, 151 N.W.2d 758 (N.D. 1967); *DeShaney*, 489 U.S. at 196 (explaining that the government has no affirmative obligation to fund the exercise of Fourteenth Amendment rights and collecting cases). In the same vein, the budgetary restrictions and caseload of a court may factor into the analysis. Since none of these considerations are necessary to the Court's analysis on this motion, the Court puts aside these underdeveloped issues, focusing for now on the purported benefits of access rather than on the corresponding burdens.

## 4.2  The Experience and Logic of Timely Access to New Complaints

### 4.2.1  The Experience and Logic Test

Chief Justice Burger's majority opinion in *Press-Enterprise II*, bearing clear marks of both his and Justice Brennan's opinions in *Richmond Newspapers*, laid out a test to determine whether a qualified right of access attaches under the First Amendment. That test considers two distinct but interrelated elements.

First, because a tradition of accessibility implies the favorable judgment of experiences, we have considered whether the place and process have historically been open to the press and general public . . . . Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.

478 U.S. at 8. Over time, the Ninth Circuit has adopted a more flexible approach to experience and logic. While courts generally still assess both prongs of the *Press-Enterprise II* test, the Ninth Circuit has also been willing to find a right of access based on the logic prong alone. *See In re Copley Press, Inc.*, 518 F.3d 1022, 1026 (9th Cir. 2008); *Seattle Times Co. v. U.S. Dist. Court,* 845 F.2d 1513, 1516–17 (9th Cir. 1988); *Phoenix Newspapers, Inc. v. U.S. Dist. Court,* 156 F.3d 940, 948 (9th Cir. 1998). Relying on dicta from a footnote in *Copley Press*, CNS contends that, in the same way, a tradition of accessibility is enough to find a First Amendment right of access in this Circuit. (Opp'n, Dkt. No. 83 at 12.) The Court disagrees. Since no Ninth Circuit court has found a right of access based on tradition alone, CNS's contention reflects at best its opinion regarding how Ninth Circuit jurisprudence might evolve. Meanwhile, more recent dicta from an October 2017 decision suggests that tradition may actually have a smaller role to play with the right of access to e-filings.

There are substantial similarities between the documents at issue in this case and the documents to which a qualified First Amendment right of access attaches pursuant to our holdings in *CBS* [*Inc. v. United States Dist. Court for Cent. Dist.*, 765 F.2d 823 (9th Cir. 1985)] and *Copley Press*. On the other hand, when we decided *CBS* and *Copley Press*, electronic filing had not made court documents so easily accessible, nor had the CCACM [Committee on Court Administration and Case Management of the Judicial Conference of the United States] released its report finding that new inmates are often required by other prisoners to produce copies of their case dockets to prove they did not cooperate with the government . . . .

The CCACM Report highlights the grave threats faced by defendants who cooperate with the government in the era of remote electronic access to court files . . . .

*Doe*, 870 F.3d at 997, 1002 (9th Cir. 2017). Regardless, the scope of the First Amendment right of access is a question of law. *Id.* at 996 (citing *Index Newspapers*, 766 F.3d at 1081). And the Court finds that, under any conceivable version of the experience and logic test, timely

1   access to new complaints neither requires access upon receipt nor allows indefinite

2   processing by the clerk's office.

### 4.2.2  Insufficient Experience of Same-Day Access to New Complaints

4      The "experience" prong of the *Press-Enterprise II* test requires a strong tradition over

5   time and throughout the country. Following the relevant case law, the Court uses

6   "experience" and "tradition" interchangeably. The Supreme Court has taken a firm position

7   regarding the geographical scope of experience, reminding courts to "not look to the

8   particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of

9   hearing *throughout* the United States." *El Vocero de P.R. v. Puerto Rico*, 508 U.S. 147, 150 (1993)

10  (third emphasis added) (citation omitted). And while courts don't require a minimum time of

11  experience, the notion of tradition inherently requires a historically lasting practice. *See Del.*

12  *Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 515 (3d Cir. 2013) (considering whether there's

13  a "strong" tradition showing that proceedings have "historically been open"); *Detroit Free Press*

14  *v. Ashcroft*, 303 F.3d 681, 701 (6th Cir. 2002) (requiring a "historical tradition of at least some

15  duration"). But however long it takes for a tradition to be born, the Court concludes that

16  there isn't enough evidence of a widespread practice of granting immediate access to new

17  complaints throughout the United States.

18      To start, CNS's evidence doesn't concern practices *throughout* the United States. CNS's

19  argument about the extent of same-day access in the nation relies on its "Additional Material

20  Facts" (or "AMFs") 226 through 230. (Opp'n, Dkt. No. 83 at 9.) Those material facts, in

21  turn, cite CNS reporter declarations. (Dkt. No. 85 at 64–66; *see also* Dkt. Nos. 12–12-3.) By

22  the Court's count, the evidence CNS cites concerns only 25 states. (*See* Dkt. No. 85 at 64–66.)

23  CNS thus hasn't submitted any evidence regarding the other *half* of the states in the Union,

24  such as Arizona, Colorado, Delaware, Florida, Indiana, Maryland, Mississippi, North

25  Carolina, South Carolina. Nor does CNS's evidence cover the District of Columbia or any

26  territories. For the 25 states CNS does mention, CNS submits evidence about only a handful

27  of any state's courts of first instance. Further, CNS's evidence concerns only federal courts in

28

1  three states, and only state courts in four others.

2        What's missing from CNS's evidence is particularly telling here. After all, CNS itself

3  publicly claims that it "provides coverage of more than 2,000 courts around the country,

4  spanning all 50 states." *About Us*, COURTHOUSE NEWS,

5  https://www.courthousenews.com/about-us/ [https://bit.ly/2nYP4EZ] (last visited May 7,

6  2018). (*See also* Girdner Decl., Dkt. No. 86 at ¶ 5.) Evidence of a nationwide practice, if it

7  existed, should therefore be readily available to CNS.

8        In fact, a closer look at CNS reporter declarations reveals a mixed experience of

9  access to new complaints. Two examples illustrate this point well. First, CNS reporter Sergio

10  Lopez, describing his experience at the San Diego Superior Court, stated that, "the great

11  majority of complaints that I see are at least one day old, and a substantial number of

12  complaints are two days old or older. On average, I receive same-day access to only about

13  one-quarter of new civil unlimited jurisdiction complaints." (Ex. 9, Dkt. No. 12 at ¶ 16.)

14  Second, another CNS reporter, David Lee, said that in the six months before his declaration,

15  he had only "been able to see approximately half of the new civil petitions on the same day

16  they are received by the court for filing" at the Dallas State Court. (Ex. 18, Dkt. No. 12-1 at

17  ¶ 16.) AMFs 226 through 230 don't cite to these portions of the declarations. And Texas is

18  actually one of the three states whose federal courts, but not state courts, CNS relies on to

19  support its experience argument. (*See* AMF 226, Dkt. No. 85 at 64; AMF 230, Dkt. No. 85 at

20  66.) So aside from highlighting the limits of the experience CNS discusses, these two

21  examples further suggest that the omissions in CNS's court survey were deliberate, and that

22  over half the country doesn't provide the type of access CNS seeks. The Court therefore

23  finds no tradition of same-day access to new complaints.

24                    **4.2.3  Unconvincing "Logic" of Same-Day Access to New Complaints**

25        Moving on to the next prong of the *Press-Enterprise II* test, CNS's claimed logic of

26  access upon receipt is easily dismissed. Indeed CNS seems to disregard, or at least fails to

27  acknowledge, the fact that the term "logic" is a shorthand for the issue of "whether public

28

1  access plays a significant positive role in the functioning of the particular process in

2  question." *See Index Newspapers LLC*, 766 F.3d at 1084 (citing *Press-Enterprise II*, 478 U.S. at 8–

3  9). More importantly, CNS hasn't presented evidence or made arguments to show that access

4  to complaints upon receipt plays a significant positive role in the functioning of *any* aspect of

5  the judicial process. Nor is any such role apparent to the Court. The Court's analysis could

6  therefore end here.

7      But, mindful of the interest in openness central to this case, the Court will say a few

8  words about the arguments that CNS does make in its logic section. In CNS's view, three

9  interests justify access to new complaints upon receipt: (1) newsworthiness, (2) accuracy of

10  reporting, and (3) informed public discussion about potentially important complaints. (*See*

11  Opp'n, Dkt. No. 83 at 13–14; AMFs 33–37, Dkt. No. 85 at 16–18.)

12      **First**, CNS's main argument for a right of access upon receipt concerns the

13  newsworthiness of stories about new complaints. (*See* Dkt. No. 83 at 13–14; Dkt. No. 112 at

14  2–3, 7.) But newsworthiness has no effect on whether or when a right of access attaches.

15  CNS cites some opinions that mention both a right of access and the value of timely

16  reporting, but those opinions consider the interests of the public and the press in

17  contemporaneous access only *after* determining that a right of access attaches. *See, e.g., Co. Doe*

18  *v. Pub. Citizen*, 749 F.3d 246, 272 (4th Cir. 2014); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 126 (2d

19  Cir. 2006); *Cal. First Amendment Coal.*, 299 F.3d at 871, 877; *Grove Fresh Distribs. v. Everfresh Juice*

20  *Co.*, 24 F.3d 893, 896–97 (7th Cir. 1994). Other authority cited doesn't involve the First

21  Amendment right of access at all. For example, CNS's *amici* cite cases involving First

22  Amendment negative rights, like *Elrod v. Burns*, 427 U.S. 347, 373 (1976). (Brief for The

23  Reporters Committee for Freedom of the Press et al. as Amici Curiae Supporting Plaintiff,

24  Dkt. No 41-1 at 8–9) (hereinafter RCFP Amici Br.) Even more distinguishable from the

25  present case, some of CNS's authority enshrines the value of timely reporting in the context

26  of prior restraints imposed on the press. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 609 (1976)

27  (Brennan, J., concurring). But as already explained, First Amendment negative rights are

28  much broader than the affirmative right of access, and nowhere are they broader than where

1    prior restraints are involved. Indeed, while Justice Brennan recognized sweeping protections

2    to the rights of the press in *Nebraska Press*, it was also he who called for restraint in evaluating

3    the existence of a right of access in *Richmond Newspapers*. *Compare Richmond Newspapers*, 448

4    U.S. at 588, *with Neb. Press Ass'n*, 427 U.S. at 609. Further, while newsworthiness is an

5    important interest for the First Amendment's protection of the free press as a shield, it's not

6    inherently relevant to the functioning of civil lawsuits, especially before there are ongoing

7    proceedings. And neither CNS nor its *amici* have shown that newsworthiness is relevant to

8    the functioning of civil lawsuits here. In fact, CNS and its *amici* haven't shown that there's a

9    strong sense of urgency in reporting about complaints at all. But more on that later.

10       **Second**, CNS mentions accuracy of reporting as an interest to support its position.

11    (Opp'n, Dkt. No. 83 at 13.) This asserted interest is further developed in CNS's *amici* brief

12    and additional material facts. (*See* RCFP Amici Br., Dkt. No 41-1 at 9–10; AMFs 33 & 36,

13    Dkt. No. 85 at 16–17.) Like newsworthiness, accuracy of reporting is insufficient to recognize

14    the existence of a right of access. Still, the Court naturally agrees that information directly

15    from the source is more reliable than second-hand information. (*See* RCFP Amici Br., Dkt.

16    No 41-1 at 9–10.) But when the source is a complaint, the Court isn't convinced that the

17    source itself is necessarily very reliable. The fact that "complaints are at least bound by rules

18    of civil procedure" and the hope that they're "confined to the factual and legal issues

19    involved" does little to improve the trustworthiness of complaints, as the Court knows only

20    too well. (*See* Drechsel Decl., Dkt. No. 12, Ex. 8 at ¶ 27.) Just as unpersuasive is the argument

21    that, "Immediately [sic] knowledge of a complaint also means a journalist will have the

22    opportunity to seek out a response from the defendant even before any legal answer is filed,

23    adding vital balance and completeness from the outset." (*See id.*) Even if raw reactions of

24    defendants that just heard they're being sued might bring "balance" to public discussions,

25    they could just as easily inject unnecessary confusion or animosity into those discussions.

26       It also hasn't escaped the Court's attention that there's nothing to support CNS's

27    asserted concerns about accuracy, information manipulation, or bias. (*See, e.g.*, Girdner Decl.,

28    Dkt. No. 86 at ¶¶ 55–56, 59; Drechsel Decl., Dkt. No. 12, Ex. 8 at ¶¶ 27–28.) To the

contrary, all that CNS's evidence on this matter shows is discontent with not being the first to report, with missing an exclusive, or with receiving subscriber complaints. (*See, e.g.*, Girdner Decl., Dkt. No. 86 at ¶¶ 51, 56–58 & Exs. 4–6; Frez Decl., Dkt. No. 12, Ex. 9 at ¶ 17.) For example, CNS relies heavily on the *Miller* lawsuit against Knott's Berry Farm over the safety of its log water ride. (*See* Girdner Decl., Dkt. No. 86 at ¶ 57 & Ex. 4.) Let's assume for now that the statements in the Girdner declaration about that lawsuit were entirely admissible. Still, CNS's own evidence shows that CNS's problem with the coverage of the *Miller* lawsuit is really that the Los Angeles Times "beat its rival of old" (the Orange County Register) and CNS itself to the story. (*See id.* at ¶ 58 & Exs. 4–6.) In the same vein, CNS reporter Sergio Frez's declaration brings up the delays CNS experienced accessing a complaint tied to the suicide of a professional football player. (Frez Decl., Dkt. No. 12, Ex. 9 at ¶ 17.) Again, let's assume that Frez's declaration is entirely admissible for now. In it, Frez laments that, "Although the complaint was received for filing on January 23, 2013 at 3:27 p.m., it was not made available by San Diego Superior for media review until about noon the next day, January 24, after it had already been reported by local television and radio stations." (*Id.*) All in all, lack of same-day access to new complaints hasn't had any verifiable impact on accuracy in reporting—although it may affect a "lawyer's ability to advise clients about new litigation in a timely manner." (*See* Girdner Decl., Dkt. No. 86 at ¶ 55.)

**Third**, CNS contends that a right of access on receipt promotes informed public discussion about potentially important complaints. The First Amendment right of access unquestionably serves to protect the "free discussion of governmental affairs," and reporting on complaints may assist in the "informed public discussion of ongoing judicial proceedings." *See Planet I*, 750 F.3d at 787. But what's not apparent is how immediate reporting on complaints benefits the judicial process or the discussion of governmental affairs.

To start, a complaint is not in itself a judicial proceeding. CNS asserts that "the filing of new complaints have [sic] long been treated as a 'judicial proceeding,'" relying on *Campbell v. N.Y. Evening Post, Inc.*, 245 N.Y. 320 (1927). (Dkt. No. 112 at 6.) But the position of the

court in *Campbell* was actually too nuanced to support CNS's assertion. The *Campbell* court explained that when pleadings are filed, "they become public *documents*," because a "law suit from beginning to end is in the nature of a judicial proceeding." 245 N.Y. at 326 (emphasis added). The court thus upheld a claim of privilege "on the ground that the filing of a pleading is a public and official act in the course of judicial proceedings." *Id.* at 328. But judicial proceedings are ultimately proceedings that actively involve the courts.

Yet when a complaint is first submitted, courts have no immediate role to play unless the complaint is accompanied by some specific request, like a temporary restraining order. Put differently, the courts aren't acting as "umpires," let alone "lawmakers" in "a coordinate branch of *government*" upon submission of a complaint. *See Richmond Newspapers*, 448 U.S. at 595 (Brennan, J., concurring in judgment) (emphasis in original). At that point, there therefore aren't really any "governmental affairs" to discuss. *See Planet I*, 750 F.3d at 787 (citing *Globe Newspaper Co.,* 457 U.S. at 604). Complaints may deal with important issues like health, safety, or indeed, government. And the public may have a legitimate interest in learning about the allegations in those complaints as soon as possible. But the public's interest doesn't transform a complaint into a judicial proceeding. After all, a quick glance at the wide variety of publications by the checkout register at any supermarket is enough to show that the public's interest may be boundless. And as will be discussed more later, the Court isn't convinced that access to complaints is imperative for the public to learn about important claims anyway.

Still, complaints are critical to the judicial process in many ways. Whether a complaint serves as the impetus for important litigation or is voluntarily dismissed before any real action occurs, there is important information to learn from complaints. But the significance of a complaint develops *after* its submission. Thus the interest in "informed public discussion of ongoing judicial proceedings" isn't triggered by the mere submission of a complaint to a court. *See Planet I*, 750 F.3d at 787.

Overall, the most effective way to illustrate the weakness of CNS's third argument is likely with CNS's Orange County Reports. After all, those reports, which are "emailed each

1  weekday evening to about 275 subscribers," are where CNS features its daily coverage of new

2  OCSC complaints. (*See* Dkt. No. 85 at 6; Dkt. No. 86 at ¶ 7.) And CNS has conveniently

3  submitted "[t]rue and correct copies of representative examples of Orange County Reports

4  from 2017." (Mendoza Decl., Dkt. No. 88 at ¶ 4 & Ex. 1) The reports begin with an

5  introductory paragraph mentioning the readers' "firm," confirming that CNS's audience is

6  lawyers rather than the public at large. More importantly, the reports lack much of the

7  information required for informed discussion of ongoing judicial proceedings among any

8  members of public, even lawyers. Each entry includes the parties' name, the date of filing, the

9  case number, and counsel's name if any. But the descriptions of the cases are often very

10  short, sometimes so short that it's unclear what reading the complaint contributed to the

11  report. The most detailed entries describe a case in a few lines, sometimes even with a link to

12  the complaint. But others look more like this case description: "Collections. Defendants owe

13  $692,000 for goods." (Mendoza Decl., Dkt. No. 88, Ex. 1 at 24.) And often, the case

14  description is just a word or two: "car collision," "unlawful detainer," or "employment." (*See,*

15  *e.g.*, *id.* at 24–25, 30, 42–43, 52.) So it's hard to see CNS's lofty First Amendment arguments

16  in its Orange County Reports. What's apparent is something else.

17        Lawyers in private firms are likely very familiar with reports like the Orange County

18  Reports, and know that their firms don't subscribe to them to foster an "informed public

19  discussion of ongoing judicial proceedings." *See Planet I*, 750 F.3d at 787. They subscribe to

20  find out who's being sued so they can get new clients. It's a very profitable business, but it's

21  also time-sensitive. The first contact with the new defendant often has the advantage. It is of

22  course beyond dispute that the profit motives of a news organization don't diminish its

23  positive First Amendment rights. *See, e.g.*, *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657,

24  667 (1989); *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376, 385 (1973);

25  *Sullivan*, 376 U.S. at 265–66. Right of access cases likewise are clear that the right is the same

26  for the general public and the press, despite any profit motive in reporting on judicial

27  proceedings. "By reporting about the government, the media are '*surrogates for the*

28  *public.*'" *Leigh*, 677 F.3d at 900 (emphasis added) (quoting *Richmond Newspapers*, 448 U.S. at

573). Does it matter, then, if an organization seeks a right of access not to disseminate information on the functioning of government to the general public, but to share revenue-generating data with a select few? The answer is probably no—unless, as here, there's no evidence that the right of access sought also meaningfully promotes the free discussion of governmental affairs. *See Planet I*, 750 F.3d at 787. At heart, the "logic" prong of the *Press-Enterprise II* test and the right of access itself are decidedly about the benefits of public involvement in government.

To sum up, access to new complaints upon receipt doesn't play a significant positive role in civil proceedings. Some members of the public could undoubtedly personally benefit from learning about complaints immediately. And any resulting public discussion about new complaints would likely be entitled to sturdy protection as political speech. But the right of access exists to protect specific interests, and same-day access to new complaints doesn't involve those interests.

### 4.2.4  Meaningless Experience and Logic of Access to New Complaints After Undefined Time for Review

OCSC argues extensively that there's no experience and logic of same-day access to new complaints—an argument that the Court agrees with—but OCSC doesn't present a coherent argument of its own about experience and logic of timely access to new complaints. Regarding experience, OCSC contends that many states only provide access within several business days in compliance with "a 'reasonable' or 'as promptly as practical' guideline," or within a timeline that court clerks may set in their discretion. (Mot., Dkt. No. 75 at 12, 14.) As for logic, OCSC essentially argues that access should occur after the time required to protect the privacy interests of the litigants. (*See id.* at 15–17.)

None of OCSC's arguments help determine what timely access to complaints affirmatively means. For one thing, the extent of the experience that OCSC mentions here is no more compelling than the experience CNS discussed. But more importantly, because of all the variations in the standards OCSC mentions, the Court can only conclude from those

1    standards that access to new complaints delayed for more than several business days would

2    likely not be timely. That's at best minimally useful to the Court's analysis. And at any rate, it

3    doesn't answer the question: What does timely access mean?

### 4.2.5  Significance of the Experience and Logic Analysis

5    To summarize, the experience and logic analysis confirms the conclusion implied in

6    *Planet I*—that the public has a right of access to complaints submitted to the courts. *See* 750

7    F.3d at 788; *see also id.* at 785 ("[A]ccess to public proceedings and records is an indispensable

8    predicate to free expression about the workings of government.") The combined evidence of

9    OCSC and CNS shows as much. But this analysis only partially defines the public's right of

10   timely access.

11   On the one hand, the experience and logic test shows that the public doesn't have a

12   First Amendment right to access new civil complaints on the same day they are submitted to

13   the courts. Strict scrutiny isn't triggered just because access to complaints is delayed beyond

14   the day the complaints are submitted. Quite the opposite, timely access is provided—at a

15   minimum—when complaints are released the calendar day after they're submitted.

16   On the other hand, the experience and logic test establishes that courts don't have a

17   discretionary right to keep complaints from the public until such a time as the court clerk is

18   ready or willing to release them. So courts aren't necessarily immune from liability until the

19   time they decide to release complaints to public access either. And the question of how long

20   delays can last while still being constitutional remains.

21   To continue exploring this question, the Court must turn to the tests used for

22   restrictions on First Amendment rights. Under the applicable case law, strict scrutiny is the

23   applicable test for denials of First Amendment rights, while the time, place, and manner

24   framework is appropriate for mere delays. *See Planet I*, 750 F.3d at 793 n.9.

### 4.3  Delays Versus Denials of First Amendment Rights

27   CNS contends that even if "timely" access doesn't require same-day access under

28

28

*Press-Enterprise II*, strict scrutiny still applies to one-day delays because *all* delays in accessing new complaints act as "blanket access denials," even if those denials are "limited in time." (*See* Opp'n, Dkt. No. 83 at 17.) Indeed CNS claims that, in the Ninth Circuit, delays of only 48 hours under *Associated Press v. U.S. Dist. Court*, 705 F.2d 1143 (9th Cir. 1983), or even delays of just 24 hours under *United States v. Brooklier*, 685 F.2d 1162 (9th Cir. 1982), effectively deny access and trigger strict scrutiny. (Dkt. No. 83 at 17; *see also* Dkt. No. 112 at 6.) Not so.

A closer look at the two cases that CNS relies on reveals deep flaws in CNS's reasoning. *Associated Press* involved criminal proceedings that were already highly publicized when the district court issued a blanket order requiring all documents to be filed under seal. 705 F.2d at 1144. Under the court's order, any time a document was submitted, the parties would have 48 hours to submit written comments "regarding the propriety of sealing the subject document," and after those 48 hours, the court would "promptly" decide whether to unseal the document. *Id.* at 1145. The Ninth Circuit ruled that the order impermissibly restricted the right of access to pretrial documents in criminal proceedings. *Id.* at 1145–46. *Brooklier* also involved criminal proceedings of considerable public interest. *See* 685 F.2d at 1165. Several defendants, allegedly members of "La Cosa Nostra," had been charged with violations of the Racketeer Influenced and Corrupt Organizations Act, including murder. *Id.* The district court ordered that three discrete parts of the pretrial proceedings and trial be closed to the public. *Id.* at 1166. In particular, the district court held a closed hearing on a motion to suppress, filed under seal, regarding "a statement given by the defendant to the FBI." *Id.* at 1166, 1169. Then, the court denied the motion. *Id.* On the day of the hearing, after the jury was sworn but before opening statements, a reporter who had learned about the motion to suppress presented in open court a motion of his own, asking the court to hold an open suppression hearing. *Id.* at 1170. The court denied the reporter's motion, noting among other things that "transcripts of closed proceedings would be made available after the court had ruled—probably within 24 hours." *Id.* Yet later, the court refused to release the transcript of the suppression hearing, determining that it should at least wait until the jury could hear

the testimony. *Id.* at 1173. The reporter and other members of the media filed an emergency petition for a writ of mandamus in the Ninth Circuit. *Id.* at 1165. The Ninth Circuit held that the public has a right of access to suppression hearings, whether the hearings are held before or during trial, and that the court's findings insufficiently supported closing the hearing. *Id.* at 1171. The Ninth Circuit likewise ruled that the district court's findings supporting its ultimate decision not to release the transcript of the suppression hearing were deficient, especially since "much of the transcript of the suppression hearing could have been made available without disclosing the contents of defendant's statement." *Id.* at 1173.

Reviewing these cases shows that *Associated Press* didn't really involve a delay of 48 hours and *Brooklier* didn't involve delayed access to the suppression hearing at all. In both cases, the public was categorically cut off from ongoing judicial proceedings—even though a different right of access could be exercised at a later time in *Brooklier*, and delayed access to parts of the proceedings may have been a possibility in *Associated Press*. The 24 hours mentioned in *Brooklier* didn't represent a delay in access to the suppression hearing, just an ultimately inaccurate estimate of the delay for the release of the hearing transcript. But a hearing is a live event. The public cannot attend a hearing after it's over. And a written transcript isn't a perfect substitute, nor is it meant to be. Even if the hearing transcript had been released within 24 hours as planned, it wouldn't have enabled the public to, among other things, see facial expressions or hear tone. So since the hearing was closed to the public, access to the hearing was necessarily denied, not delayed. *Associated Press*, on the other hand, did involve the possibility of delayed access to certain documents. But as the *Associated Press* court stressed, those delays weren't relevant to its analysis. 705 F.2d at 1147. The district court order violated the First Amendment right of access because it closed all proceedings in a developing trial that was already highly publicized. *Id.* at 1145–47. Worse, that violation affected documents of special interest to the public. For example, the Ninth Circuit remarked that "pretrial documents, such as those dealing with the question whether [Defendant] DeLorean should be incarcerated prior to trial and those containing allegations by DeLorean of government misconduct, are often important to a full understanding of the way in which

30

the judicial process and the government as a whole are functioning." *Id.* at 1145 (internal quotation marks omitted). So, the *Associated Press* court explained, the violation caused by the district court order was not remedied because "some" documents "might" only remain sealed "for, at a minimum, 48 hours." *See id.* at 1147. In a nutshell, CNS's assertion that "the Ninth Circuit applies strict scrutiny to delays in access of '24 hours' . . . or '48 hours'" is incorrect. (*See* Opp'n, Dkt. No. 83 at 17.)

Besides proposing dubious interpretations of case law, CNS—using its words—argues that all delays in releasing complaints "deny" access because the "filing" of a complaint is a "contemporaneous event" such that there are no adequate alternatives channels to access the information in a complaint submitted to a court. (*See* Dkt. No. 83 at 24; Dkt. No. 112 at 6.) The Court will address those arguments in a later section. Suffice to say for now that the Court finds them unconvincing.

To the contrary, the Court sees nothing here to equate any delays in complaint access with access denials. So the Court concludes that strict scrutiny doesn't apply to all delays between a complaint's submission and its release to the public. The Court's analysis here, following the parties' arguments, has focused on very short delays. But to be completely clear, the Court makes no determination regarding whether longer delays could *ever* act as an access denial.

**4.4  Time, Place, and Manner Restrictions on Access to New Complaints**

**4.4.1  The Time, Place, and Manner Test**

The First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Even protected speech is subject to reasonable time, place, and manner restrictions if (1) the restrictions are content neutral, (2) they are "narrowly tailored to serve a significant governmental interest," and (3) they "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791.

1   The ultimate burden of proving the constitutionality of time, place, and manner restrictions

2   rests with the restricting party. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,

3   657 F.3d 936, 944 (9th Cir. 2011). Courts analyzing time, place, and manner restrictions may

4   turn to the "substantially similar" framework for commercial speech for guidance. *See*

5   *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001); *see also Comite de Jornaleros*, 657 F.3d at

6   950 (commercial speech analysis is "analogous" to the time, place, and manner restrictions

7   analysis). On the other hand, the Court isn't aware of any binding authority analyzing

8   restrictions on a First Amendment right of access within the time, place, and manner

9   framework. But applying as closely as possible the rules regarding time, place, and manner

10  restrictions of speech—and when necessary, rules regarding commercial speech—the Court

11  finds that a court delaying access to new civil complaints bears the ultimate burden of

12  showing that the delays meet the requirements listed in the three paragraphs that follow.

13      First, the delays must not be the product of a content-based practice, and the extent

14  of the delays must not have been set by the court based on the content of complaints. *See*

15  *Ward*, 491 U.S. at 791. Delays that are the product of content-based treatment of complaints

16  must satisfy strict scrutiny. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).

17      Second, the existence of the delays must stem from narrowly tailored efforts to serve a

18  significant government interest. *See Ward*, 491 U.S. at 791. The asserted government interest

19  must involve real harms, even if the interest itself is important in the abstract. *See Turner*, 512

20  U.S. at 664; *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). And the court's practice that

21  creates the delays must actually alleviate those harms to a material degree. *Edenfield*, 507 U.S.

22  at 770–71. The delay-causing practice "need not be the least restrictive or least intrusive

23  means of" protecting the court's interest. *See Comite de Jornaleros*, 657 F.3d at 947 (citing *Ward*,

24  491 U.S. at 798–99). Rather, the "requirement of narrow tailoring is satisfied so long as the

25  [practice] promotes a substantial government interest that would be achieved less effectively

26  absent the [practice]." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 675 (9th Cir.), cert.

27  denied *sub nom. Recycle for Change v. City of Oakland, Cal.*, 138 S. Ct. 557 (2017) (citing *Ward*, 491

28  U.S. at 799–800). But the practice will be invalid if less restrictive practices are "readily

available" to the court, or if it burdens "substantially more" access "than is necessary." *See Comite de Jornaleros*, 657 F.3d at 947 (citation omitted). In short, there must be a reasonable "fit" between the government's interest and its practice. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993).

Finally, ample alternative channels must remain available to obtain the information in new complaints during the delays. *See Ward*, 491 U.S. at 791. But the alternative channels need not be perfectly equivalent to accessing the complaints themselves. *See Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1298–99 (9th Cir. 2015); *see also Sandefur v. Village of Hanover Park*, 862 F. Supp. 2d 840, 849 (N.D. Ill. 2012).

The following sections address the parties' arguments under these rules. Overall, the Court finds that material issues prevent the Court from determining if all of the relevant delays satisfy the time, place, and manner rules.

### 4.4.2  Content-Neutral Practice

Nothing suggests (and CNS doesn't make the argument) that OCSC sets the length of delays in each case depending on the contents of a complaint. But CNS does say that complaint access at OCSC during the relevant 2017 period "were longer for the most significant cases," meaning for "complex cases." (Opp'n, Dkt. No. 83 at 4.) Putting aside the parties' different methods for calculating delays, greater delays in complex cases doesn't mean that the delays are the product of a content-based policy. "A law is content-based rather than content-neutral if 'the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face.'" *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1024 (9th Cir. 2009) (citing *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006)); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015). Therefore, that OCSC's uniform policy may impact complaints differently depending on their content doesn't make it content-based. Quite the opposite, since OCSC's privacy review practice appears consistent for all types of complaints, and since there's no evidence that it's intended to favor or disadvantage certain complaints, the Court concludes

1    OCSC's practice is content-neutral.

2              **4.4.3  OCSC's Significant Interest in Protecting Litigant Privacy**

3              That protecting privacy is an important government interest is beyond debate. It's

4    even enshrined in the California Constitution. "All people . . . have inalienable rights. Among

5    these are . . . privacy." Cal. Const. art. I, § 1. It's also well established that there may be

6    sensitive information in court records, which can cause "real" harm if in the wrong hands. *See*

7    *Edenfield*, 507 U.S. at 770. For example, in 2003, seven co-conspirators were indicted on

8    identity theft charges after obtaining personal information from court records using the

9    federal courts' online database system, PACER. Lynn E. Sudbeck, *Placing Court Records Online:*

10   *Balancing Judicial Accountability with Public Trust and Confidence – An Analysis of State Court*

11   *Electronic Access Policies and A Proposal for South Dakota Court Records*, 51 S.D. L. REV. 81, 83 n.1

12   (2006). Even worse, in name change cases under the Safe at Home program—which is

13   designed to protect plaintiffs from domestic violence, sexual assault, and stalking—it may

14   well be the litigants' physical safety that's at risk. This risk is illustrated in a sadly famous

15   example. California enacted the first criminal anti-stalking statute in the United States in 1990

16   "as a response to the shooting of actress Rebecca Schaeffer and the murders, within a month

17   and a half, of four Southern California women. Each of the four women 'had obtained a

18   temporary restraining order and [had] communicated to her family, friends, and police that

19   she thought she was going to be killed.'" *People v. Carron*, 37 Cal. App. 4th 1230, 1237 (1995)

20   (citation omitted); *see also* Fed. Trade Comm'n, Individual Reference Services – A Report to

21   Congress, 1997 WL 784156, at *18 (1997). More recently, OCSC has experienced first-hand

22   people ignoring restraining orders against them in domestic violence cases and coming to

23   court while the people they abused are there. (Wertheimer Dep., Dkt. No. 91, Ex. 19 at

24   201:16–25.)

25              Still, CNS has made several comments questioning OCSC's interest in protecting

26   privacy. In general, CNS doesn't seem convinced that courts should be concerned with

27   protecting private information in complaints, stating that "filers are responsible to protect

28

confidential information," and that the risks that confidential complaints may be inadvertently disclosed "inhere in our open court system." (Opp'n, Dkt. No. 83 at 13 n.17, 20.) Regarding OCSC specifically, CNS remarks that OCSC hasn't produced any evidence to show that inadvertent disclosures have in fact caused harm or violated privacy. But none of these arguments detract from OCSC's strong interest in protecting privacy.

Before explaining why, the Court will summarily address several other statements in CNS's papers that read as thinly veiled attempts to cast doubt on whether privacy concerns are behind the delays at OCSC at all. (*See* Opp'n, Dkt. No. 83 at 3–5.) Since it's undisputed that OCSC LPSs perform a privacy review of all complaints submitted, any argument that privacy concerns aren't really involved here is absurd, and insinuations to support that argument are unhelpful at best. With that out of the way, the Court turns back to the arguments that CNS properly raised.

First, even if the ultimate responsibility for protecting confidential information lies with the filers, courts have a general responsibility to enforce the law. After all, "filers are human and often simply make mistakes." Tom Clarke, *A Contrarian View of Two Key Issues in Court Records Privacy & Access*, TRENDS IN STATE COURTS 2016, 56, http://www.ncsc.org/~/media/Microsites/Files/Trends%202016/Contrarian-View-Trends-2016.ashx. *Pro per* litigants, who generally have no legal training, are even more likely to make mistakes. *Id.* Indeed, even the most experienced lawyers sometimes fail to follow the rules. For example, the filings from both sides for this motion didn't all comply with the Local Rules, despite being submitted by lawyers from leading law firms. *See* C.D. Cal. L.R. 5-4.5 (requiring mandatory chambers copies); C.D. Cal. L.R. 11-5.3 (requiring that exhibits be tabbed). During the relevant 2017 period, 26% of all new civil unlimited complaints at OCSC were filed by *pro per* litigants. What's more, "the privacy interests of *defendants*—like tenants in eviction proceedings— are at risk too and should not be entrusted solely to the care of plaintiffs." (Brief for Orange County Bar Association et al. as Amici Curiae for Defendant, Dkt. No. 105 at 25) (hereinafter OCBA Amici Br.) (emphasis in original.) This point is particularly salient here, since unlawful detainers feature regularly in CNS's Orange County

1    Reports. (Mendoza Decl., Dkt. No. 88, Ex. 1 at 24–25, 42, 57.) So all things considered,

2    OCSC has in fact a particularly strong interest in protecting privacy in new complaints.

3           Second, the inevitability of a risk is no reason not to try to minimize it. It's certainly

4    not a sensible reason for the government to abandon efforts to prevent the realization of that

5    risk when the risk carries irreversible consequences and the government is the last line of

6    defense. The inadvertent release of private information in court documents is just such a risk,

7    which only the courts can effectively prevent. "Secrecy is a one-way street: Once information

8    is published, it cannot be made secret again." *Doe*, 870 F.3d at 1002 (citing *Copley Press*, 518

9    F.3d at 1025). And the press may not be held liable "for truthfully publishing information

10   released to the public in official court records." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496

11   (1975). "Once the government has placed [private] information in the public domain,

12   'reliance must rest upon the judgment of those who decide what to publish or broadcast.'"

13   *Fla. Star v. B. J. F.*, 491 U.S. 524, 538 (1989) (citing *Cox*, 420 U.S. at 496). The Supreme Court

14   has thus acknowledged that state governments are best placed to protect the private

15   information entrusted to them and decide how, potentially even by imposing liability on

16   themselves. "If there are privacy interests to be protected in judicial proceedings, the States

17   must respond by means which avoid public documentation or other exposure of private

18   information." *Cox*, 420 U.S. at 496. "[H]opes for restitution must rest upon the willingness of

19   the government to compensate victims for their loss of privacy and to protect them from the

20   other consequences of its mishandling of the information which these victims provided in

21   confidence." *Fla. Star*, 491 U.S. at 538. OCSC's efforts to protect its litigants' privacy by

22   ensuring compliance with the law are therefore warranted.

23          Finally, CNS's argument about the lack of evidence of harm due to pre-review access

24   is puzzling. As mentioned, the risks associated with access to certain information are well

25   established. In some respects, those risks are particularly acute at OCSC. For example, of 58

26   California counties, Orange County has the second highest number of participants in the Safe

27   at Home Program. SECRETARY OF STATE CALIFORNIA CONFIDENTIAL ADDRESS PROGRAM

28   (SAFE AT HOME), 2016 ANNUAL REPORT (2017),

http://admin.cdn.sos.ca.gov/reports/2016/sah-annual-report.pdf. And OCSC has shown that its privacy review prevented the disclosure of confidential information in several cases. (*See* Dkt. No. 75-2 at Exs. A–B.)

To meet its burden, OCSC must show a risk of real harm that it alleviates to a material degree, not that OCSC itself contributed to actual harm. Therefore, the only plausible explanation for CNS's argument is that it believes that OCSC *previously* allowed access to complaints without any privacy screening. The declaration of CNS editor and publisher William Girder would at least suggest as much. (*See* Girdner Decl., Dkt. No. 86 at ¶¶ 25, 37–38.) But Girdner has no personal knowledge of the procedures that used to be in place at OCSC. And even if there were competent evidence that, around 23 years ago, the public could access complaints at OCSC before privacy review, it wouldn't necessarily follow that OCSC wouldn't be justified in refusing access until privacy review is done *today*, when "electronic filing [has] made court documents so easily accessible." *See Doe*, 870 F.3d at 997.

The Court therefore finds that OCSC's interest in protecting private information in complaints is significant, and that there's a reasonable "fit" between that interest and OCSC's privacy review. *See Discovery Network*, 507 U.S. at 417 n.13.

### 4.4.4  Readily Available Alternatives

While OCSC need not adopt the least restrictive means to protect litigant privacy, "it may not select an option that unnecessarily imposes significant burdens" on access to new complaints when "readily available," less restrictive alternatives exist. *See Comite de Jornaleros*, 657 F.3d at 947.  At the same time, OCSC need not adopt alternative practices, even those that are readily available, if they would "less effectively" achieve OCSC's interest. *See Recycle for Change*, 856 F.3d at 675.

Here, OCSC has determined that human review of newly filed complaints effectively achieves its interests in protecting litigant privacy. OCSC has explained that the reason for its current review practice is that plaintiffs don't always follow established procedures, particularly *pro per* litigants, whose complaints represented 26% of all new civil unlimited

complaints in the relevant 2017 period. *See also* Tom Clarke, *A Contrarian View of Two Key Issues in Court Records Privacy & Access*, TRENDS IN STATE COURTS 2016, 56, http://www.ncsc.org/~/media/Microsites/Files/Trends%202016/Contrarian-View-Trends-2016.ashx. Further supporting OCSC's point, OCSC has shown that in fact numerous plaintiffs since January 2016 didn't know how to seek confidentiality or sealing. (*See* Dkt. No. 75-2 at Exs. A–B.) Finally, as already mentioned, "the privacy interests of *defendants*—like tenants in eviction proceedings— are at risk too and should not be entrusted solely to the care of plaintiffs." (OCBA Amici Br., Dkt. No. 105 at 25) (emphasis in original.)

Considering OCSC's concerns and objectives, CNS hasn't shown that OCSC has chosen to ignore adequate, readily available alternatives. The alternatives CNS suggests are either that OCSC create and adopt a new filing system, or that it require that confidential complaints be submitted manually. (Dkt. No. 116 at 5.) Yet there's no evidence that either alternative would achieve OCSC's interests as effectively as OCSC's existing practice. In fact, both options still rely on plaintiffs to know the proper procedure for filing a confidential complaint, which is what OCSC seeks to avoid. What's more, as OCSC correctly points out, the "creation and adoption of an entirely new filing system can hardly be characterized as 'readily available.'" (Reply, Dkt. No. 97 at 18.)

CNS's arguments and supposed evidence don't compel a different conclusion. For example, CNS relies on different filing systems adopted by other courts and asserts those systems adequately protect confidential complaints. (Opp'n, Dkt. No. 83 at 21.) But as already mentioned, whether all of those systems effectively protect private information has been questioned. *See Doe*, 870 F.3d at 997 (9th Cir. 2017); Lynn E. Sudbeck, *Placing Court Records Online: Balancing Judicial Accountability with Public Trust and Confidence – An Analysis of State Court Electronic Access Policies and A Proposal for South Dakota Court Records*, 51 S.D. L. REV. 81, 83 n.1 (2006). And CNS has no apparent first-hand knowledge of the way other courts balanced various interests to choose which filing and privacy review systems to adopt. For these reasons among others, CNS's reliance on the practices in some other courts doesn't carry much weight.

The same is true of CNS's arguments based on the purported expert declaration by Craig Rosenberg, Ph.D. To start, most of that declaration is inadmissible. OCSC objected on multiple grounds to essentially every part of Rosenberg's declaration that supposedly offered an expert opinion. (Dkt. No. 100, Objections Nos. 46–52.) As explained in the tentative order, the Court sustained all of those objections except one (Dkt. No. 100, Objections Nos. 46–47, 49–52), either because Rosenberg failed to establish a sufficient foundation for his opinion (*see* Rosenberg Decl., Dkt. No. 89 at ¶¶ 5, 9, 11), or because Rosenberg didn't sufficiently establish his expertise in the relevant area of programming (*see id.* at ¶¶ 1–3 & Ex. 1). The only objection that the Court overruled concerns paragraph 8 of the declaration, where Rosenberg discusses the flaws that he perceives with OCSC's current review system from a "human factors" perspective. (*Id.* at ¶ 8; Dkt. No. 100, Objection No. 48.) So considering the small admissible portion of Rosenberg's declaration, CNS has produced some evidence to support the position that OCSC's review system isn't perfect. But it hasn't shown that there are alternative systems that *are* perfect, or even any that are at least as effective as OCSC's current system. Therefore, OCSC cannot be said to ignore readily available alternatives.

### 4.4.5  Extent of the Burden on the Right of Access

CNS contends that OCSC may not delay access to over 14,000 complaints a year when so few cases raise privacy concerns. (*See* Dkt. No. 116 at 5 n.6.) Evaluating that argument and assessing the extent of the burden imposed by OCSC's privacy review practice requires the Court to answer two related questions: (1) How much access does the practice actually restrict? (2) Does the practice restrict substantially more access than necessary?

The answer to the first question turns on the notion of access restriction—or untimely access. Two observations are therefore in order. First, the fact that all new complaints at OCSC are subject to privacy review doesn't mean that access to all new complaints is untimely. And second, only untimely delays in complaint access create access restrictions.

So at the outset, OCSC doesn't restrict access to all 14,000 or so complaints it receives

1    each year. As the Court already explained, the *Press-Enterprise II* experience and logic analysis

2    showed that the public doesn't have a right of access to complaints on the same day that they

3    are filed. This means that, whether or not delays of more than one day may ultimately be

4    considered access restrictions, the Court must begin by separating delays of no more than

5    one day from longer delays. Yet the Court cannot complete this preliminary step. Looking

6    only at the statistics CNS presented, 43.1% of all new complaints are made available on the

7    same day that they are submitted, and 88.9% of complaints are made available within one

8    day. (*See* Mendoza Decl., Dkt. No. 88 at ¶ 25.) But there's a significant problem with CNS's

9    statistics, which the Court mentioned early on: they treat access to complaints released after 4

10   p.m. on one day as delayed until the next calendar day.

11           The statistical importance of the delays in accessing complaints released between 4

12   and 5 p.m. is nonnegligible. The parties agree that OCSC made 1,473 unlimited civil

13   complaints available to the public between 4 and 5 p.m. during the relevant period, from

14   January 1, 2017 to October 18, 2017. (*See, e.g.*, Girdner Decl., Dkt. No. 86 at ¶ 124; OCSC

15   Reply to AMF at 32.) So at least 10% of the delays here turn on the issue of access between 4

16   and 5 p.m.

17           With that in mind, the issue with the way that CNS statistics treat complaints released

18   after 4 p.m. as delayed until the next day is that CNS hasn't made any argument to justify that

19   treatment in its brief. CNS appears to draw an arbitrary line at 4 p.m. because it cannot access

20   the free terminals inside the clerk's office between 4 and 5 p.m., so it would have to use

21   OCSC's paying online services to see those complaints before the next day. But time, place,

22   and manner cases explain that access that's more expensive than what the public wants may

23   be acceptable. *See Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1298–99. And CNS isn't

24   entitled to special, free 24-hour access as a member of the press since the press doesn't have

25   a greater right of access than the general public. *See Houchins*, 438 U.S. at 16; *Cal. First*

26   *Amendment Coal.*, 299 F.3d at 873 n.2. Considering the applicable law and the undisputed

27   facts, the Court in fact determines that access to complaints released after 4 p.m. on OCSC's

28   public website cannot be deemed delayed or denied after the complaints' release online. *See*

40

1    Fed. R. Civ. P. 56(g).

2          And since this determination affects the foundation of CNS's statistical delay data,

3    that data is flawed and unreliable. Meanwhile, the Court can't find numbers beyond dispute

4    about one day delays in OCSC's statistics. Using OCSC's methods, a one day delay might be

5    counted in the "within 8 business hours" or "within 24 business hours" categories, while

6    complaints released "within 8 business hours" may be released up to several calendar days

7    after submission.

8          In short, the parties' statistics present material issues of fact regarding how much

9    access to new complaints is restricted by OCSC's privacy review. The first question raised in

10   this section must therefore remain unanswered for now. And the Court's analysis of the

11   extent of the burden imposed by OCSC's practice will end here.

12                    **4.4.6  Ample Alternative Channels**

13         Finally, the Court turns to the issue of whether sufficient alternative channels exist to

14   obtain information in new complaints during the delays that may occur at OCSC. CNS argues

15   that there cannot be any alternative channels of access while access to the actual complaints is

16   delayed. (Opp'n, Dkt. No. 83 at 24–25.) The Court disagrees with this categorical position.

17         CNS makes two arguments to support its position. One, access to new complaints

18   enables CNS "to engage in '[i]mmediate speech . . . on immediate issues,'" with the

19   immediate issues being "the day's new civil actions." (Opp'n, Dkt. No. 83 at 24.) And two,

20   the submission of a new complaint is a "contemporaneous event." (CNS Suppl. Br., Dkt. No.

21   112 at 6.)

22         The first argument is unconvincing for many reasons already mentioned at other

23   points in this order, including the improper conflation of free speech and right of access law.

24   Here in particular, CNS relies on the type of free speech rules that makes little sense in the

25   context of access to documents. For example, CNS quotes strong language from *NAACP v.*

26   *City of Richmond*, 743 F.2d 1346 (9th Cir. 1984). (Opp'n, Dkt. No. 83 at 24.) But that language

27   can only reasonably be understood in the factual context of *City of Richmond*, which involved a

28

                                          41

political march (referred to in the opinion as a "parade"). And while CNS attempts to paint the facts of this case as analogous to those in *City of Richmond*, the two sets of facts actually have very little in common.

> Parades are public events. Participatory enthusiasm is vital to their success. The size of a crowd and its enthusiasm for a cause may generate sufficient passion to sway the undecided. Thus, simple delay may permanently vitiate the expressive content of a demonstration. A spontaneous parade expressing a viewpoint on a topical issue will almost inevitably attract more participants and more press attention, and generate more emotion, than the "same" parade 20 days later. The later parade can never be the same. Where spontaneity is part of the message, dissemination delayed is dissemination denied.

*City of Richmond*, 743 F.2d at 1356. CNS reproduced several choice expressions from this quote out of context in its opposition. (Dkt. No. 83 at 24.) Yet almost every sentence just quoted distinguishes *City of Richmond* from this case. Putting aside convoluted legal arguments, common sense dictates that neither accessing nor discussing new complaints is a "public event" where "spontaneity is part of the message." *See id.* So this case doesn't involve the same degree of urgency as *City of Richmond*. And therefore here, access delayed is not access denied. *See id.*

As for CNS's second argument, the submission of a complaint to a court is no more a "contemporaneous event" than is the submission of any other document to any other branch of government. CNS's attempt to make complaint submissions seem more "eventful" than the submission of other official documents ignores the important role that administrative documents, for example, may play in public affairs. (*See* Dkt. No. 112 at 6; Dkt. No. 115 at 4–6.) At any rate, unlike the submission of any document, a contemporaneous event is inherently fleeting *independently* from the fleeting value of the news story covering the event. To use examples from cases already discussed, delays may change the nature or message of an event, like in *City of Richmond*, *see* 743 F.2d at 1356, or delays may cause the event to end without it ever being accessible, like the hearing in *Brookier*, *see* 685 F.2d at 1166, 1169–71. Here, the information in a complaint will not lose its meaning or risk disappearing if the complaint cannot be read immediately. To the contrary, CNS's evidence shows that

1  information about new complaints has effectively spread even when access to new

2  complaints has been denied—although CNS may have preferred that the information be

3  spread differently. (*See, e.g.*, Girdner Decl., Dkt. No. 86 at ¶¶ 51, 56–58 & Exs. 4–6; Frez

4  Decl., Dkt. No. 12, Ex. 9 at ¶ 17.)

5          Still, the Court cannot conclusively say on this motion that adequate alternative

6  channels to receive information in new complaints exist no matter how long delays last. The

7  Court is mindful of sadly famous controversies, like those surrounding the confidential

8  settlements in the Firestone tire cases and clergy sexual misconduct cases, where defendants

9  determined to keep certain lawsuits from the public sought to quickly settle all new cases with

10  a protective order before any word of the lawsuits got out. *See* Walter W. Heiser, *Public Access*

11  *to Confidential Discovery: The California Perspective*, 35 W. ST. U. L. REV. 55, 55–57 (2007); Mike

12  France, *The Hidden Culprit: The U.S. Legal System*, BUSINESSWEEK 42 (Sept. 18, 2000). These

13  notorious examples are one reminder among others that courts should not be too quick to

14  dismiss concerns about parties using privacy protections to cheat or abuse the judicial system.

15  But considering the state of the evidence on this issue, the Court cannot decide now whether

16  those concerns have any bearing on this case.

17

18      **4.5  Conclusion**

19          Considering all the relevant tests, the Court thus reaches the four conclusions that

20  follow.

21      **1.** The public doesn't have a right to access new civil complaints on the same day

22  OCSC receives them.

23      **2.** When a complaint is released to the public on OCSC's website, access to that

24  complaint is neither delayed nor denied, even if the public no longer has access to OCSC's

25  free terminals.

26      **3.** Issues of material fact prevent the Court from determining if or when delays longer

27  than one day may violate the First Amendment right of access.

28

**4.** Issues of material fact prevent the Court from determining that no delay involved in this case violates the First Amendment right of access.

**5. DISPOSITION**

The Court GRANTS IN PART and DENIES IN PART OCSC's motion for summary judgment as previously explained. (Dkt. No. 75.)

It is so ORDERED.

Dated May 9, 2018

_____
Hon. Andrew J. Guilford
United States District Judge

44