**JS-6**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| **COURTHOUSE NEWS SERVICE,**<br><br>Plaintiff,<br><br>v.<br><br>**DAVID YAMASAKI,** in his official capacity as Court Executive Officer/Clerk of the Orange County Superior Court,<br><br>Defendant. | Case No.<br>SACV 17-00126 AG (KESx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff Courthouse News Service, or "CNS," sued Defendant David Yamasaki in his official capacity as the Court Executive Officer/Clerk of the Orange County Superior Court, or "OCSC," for injunctive and declaratory relief under 42 U.S.C. § 1983. CNS contends that delays in public access to certain electronically filed civil complaints at OCSC violate its rights under the First Amendment to the United States Constitution.

The parties "waived their rights to a full, live trial" and submitted to a summary bench trial on a stipulated written record, with a final hearing for the parties to answer the Court's questions and present oral closing arguments. (Joint Req. for Summ. Bench Trial, Dkt. No. 152; Modified Order Granting Joint Req. for Summ. Bench Trial, Dkt. No. 156.) The Court has reviewed the stipulated record and considered all arguments and evidence presented, including at the hearing, on the issues that remained for trial. The Court's findings of fact and conclusions of law follow two sections addressing preliminary matters and the procedural history of this case. *See* Fed. R. Civ. P. 52(a).

**1. PRELIMINARY MATTERS**

**1.1 Terminology**

This action concerns access at OCSC to new "civil unlimited complaints." (*See generally* Compl., Dkt. No. 1.) Under California law, civil cases are referred to as "unlimited" where the amount in controversy exceeds $25,000, where the plaintiff requests certain types of injunctive or declaratory relief, or where the plaintiff seeks a determination of title to real property. *See* Cal. Civ. Proc. Code §§ 85(a), 88, 580(b). Other civil cases are treated as "limited" civil cases. *See id.*

For improved reading, the Court may sometimes just say "complaints" when referring to unlimited civil complaints. So where the Court uses the terms "complaint" or "new complaint" without any other qualifier, it's referring to unlimited civil complaints.

**1.2 Judicial Notice**

The Court, on its own, has taken judicial notice of the following facts: (1) the dates of OCSC court holidays in 2017 and 2018 stated on the current and an archived version of

OCSC's website; and (2) the dates of OCSC court holidays in 2017 and 2018 stated on the current and an archived version of OCSC's website. *See* Fed. R. Evid. 201(b)(2); Fed. R. Evid. 201(c)(1); Fed. R. Evid. 201(d). At the final hearing, the Court asked CNS and OCSC if they objected to the Court taking judicial of those facts. Both parties said they had no objection.

**1.3 Evidentiary Objections**

Each party has filed objections to the additional evidence submitted by the other side for trial. These objections are perplexing since the parties themselves asked for a summary bench trial on a stipulated, written record after their May 14, 2018 Final Pretrial Conference. And the Court granted their request relying on representations made at the Final Pretrial Conference that the parties could agree to a settled record.

The Court has considered arguments properly raised about the weight to be given to any evidence, but the parties' objections are OVERRULED.

**2. PROCEDURAL HISTORY**

CNS filed this lawsuit on January 24, 2017, seeking two forms of relief. First, CNS sought preliminary and permanent injunctions prohibiting OCSC "from continuing [its] policies that deny CNS timely access to new civil unlimited complaints once they are received by the court for filing, including, inter alia, [its] practice of denying access to complaints until after processing." (Prayer for Relief, Dkt. No. 1 at 14: ¶ 1.) And second, CNS sought a judgment declaring OCSC's "policies and practices that delay access to newly filed unlimited civil complaints are unconstitutional under the First and Fourteenth Amendments to the United States Constitution because these policies and practices constitute an effective denial of timely public access to documents that become public court records when received for filing." (*Id.* at 14: ¶ 2.)

Early on, CNS moved for a preliminary injunction, which the Court denied. (Prelim. Inj. Mot., Dkt. No. 11; Prelim. Inj. Order, Dkt. No. 56.) CNS filed an interlocutory appeal of the order denying its request for a preliminary injunction. (Dkt. No. 58.) It later sought an urgent stay from the Ninth Circuit, arguing that this Court lacked jurisdiction to proceed with

the case because of CNS's interlocutory appeal. (Dkt. No. 129.) The Ninth Circuit denied CNS's motion to stay. (Dkt. No. 132.) CNS's interlocutory appeal is still pending. (*See* Ninth Circuit Order Vacating Submission, Dkt. No. 177) (Jun. 29, 2018.)

OCSC moved for summary judgment after the Court's preliminary injunction ruling. (Dkt. No. 75.) When CNS, OCSC, and each side's *amici curiae* had submitted extensive briefing and evidence regarding the summary judgment motion, the Court held a lengthy hearing where the parties presented their arguments orally. (*See* Summ. J. Order, Dkt. No. 149 at 8–9; Mins. of Mot. for Summ. J. Hr'g, Dkt. No. 133; Hr'g Tr., Dkt. No. 126.) On May 9, 2018, the Court issued an order granting in part and denying in part OCSC's summary judgment motion. (Dkt. No. 149.)

In that order, the Court reached several conclusions. (Dkt. No. 149 at 43–44.) First, the undisputed evidence established that the public's First Amendment rights are not infringed when OCSC does not provide same-day access to new complaints. Second, CNS could not base its calculations on an argument—which went beyond the scope of CNS's complaint and which CNS neither explicitly raised nor supported—that complaints released after 4 p.m. should be deemed made available the next day. And finally, since the extent of the delays was actually unclear from the evidence the parties had submitted, whether and to what extent delays in access to new complaints at OCSC violate the First Amendment were not issues that could be decided on summary judgment.

Following the Court's summary judgment ruling, the parties submitted a joint request for a summary bench trial on a stipulated, written record. (Dkt. No. 152.) The Court granted their request. (Dkt. No. 156.) And the Court granted their next stipulation asking the Court to continue the final hearing. (Dkt. Nos. 157, 158.) Both sides timely submitted their trial briefs, their proposed findings of facts and conclusions of law, and the stipulated record. (*See* Dkt. Nos. 159–76.) At the lengthy final hearing, each side presented closing arguments and proposed answers to the Court's questions. (*See* Mins. of Final Hr'g, Dkt. No. 178; Order Granting Joint Req. for a Summ. Bench Trial, Dkt. No. 156.)

## 3. FINDINGS OF FACTS

The Court makes the following findings of fact, including any findings of fact found in the Conclusions of Law.

### 3.1 Delays in Access to New Complaints at OCSC

*Delays Caused by OCSC's Privacy Review.* The Court's findings regarding OCSC's privacy review practice, established in its summary judgment order, apply here.

*Delay Assessment.* The parties' most recent statistics present numbers that are far more similar to each other than the numbers they used in earlier stages of litigation. Even though the Court stressed the importance of the overlap in the parties' statistics to properly understand the facts underlying this dispute, each side consistently resisted discussing delays using the other's time standard. Still, with the evidence submitted for trial, the Court was able to compare the CNS and OCSC statistics itself. Appendix 1 attached to this order shows the results of that comparison in detail, and the most salient results are mentioned in this section.

*Same Day Access.* The Court's comparison reveals that the parties now agree on the proportion of complaints that OCSC made available on the day it received them. On average, OCSC made 58.66% of complaints available on the day it received them. This proportion reflects that only complaints that were both received and made available on a business day have been counted as made available on the day of receipt. The Court makes this determination based on its review of the thousands of pages of data, referred to as "turnaround reports" and produced from OCSC's records, which are the basis for both parties' statistics here. The turnaround reports show the time and date when OCSC received each of the 18,697 new civil unlimited complaints submitted to OCSC between January 2017 and March 2018, and the time and date when OCSC made the complaint available or rejected it.

*One Day Delay.* On average, OCSC provided access to 97.52% of new complaints within one *court* day, and to 88.75% of new complaints within one *calendar* day. This difference of nearly nine points can be attributed almost entirely to weekends and court

5

holidays that fall immediately before or after a weekend. Attributing discrepancies to weekends and court holidays comports not only with the comparison of the parties' statistics, but also with the basic difference between business days and calendar days.

*Effect of Weekends and Holidays Overall.* It's hardly surprising that weekends create differences between delays of one calendar day and delays of one court day. What's more significant is that the evidence shows weekends cause most of the longer delays calculated by CNS as well. To start, this relation is indicated by the comparison of, on the one hand, OCSC's delays of one business day, and on the other hand, CNS's delays of three or four calendar days (depending on whether a given month has a court holiday immediately before or after a weekend). This is shown in Appendices 2 and 3 to this order. On average, there's about a one point difference between OCSC's delays of one business day and CNS's delays of three or four calendar days. The statistical impact of weekends on delays of three and four calendar days is further supported by the Court's review of the turnaround reports. In March 2018 for example, the vast majority of three-day delays were delays between Friday and Monday, and the vast majority of four-day delays were between the Thursday before Cesar Chavez Day (observed on March 30, 2018), and the following Monday.

*Significance of the Delays.* The areas of overlap discussed in this section explain the lines that the parties draw in their analyses: OCSC at one business day, and CNS at three calendar days or more. (*See* CNS Trial Br. Exs. B–D., Dkt. Nos. 166-2 to 166-4; OCSC Trial Br., Dkt. No. 176 at 2, 11.) And as shown in OCSC's numbers, OCSC makes new complaints available within one court day of receipt in about 95% to 99% of cases.

### 3.2 CNS Injuries Caused by OCSC Delays

*Violation of Constitutional Rights.* At the final hearing, CNS asserted that its injury was the violation of its First Amendment rights. But that's a legal conclusion and whether it's correct depends on the outcome of this case.

*Evidence of Injury.* There's almost no evidence of CNS suffering any tangible injury because of access delays at OCSC. Putting aside abstract and ultimately unsupported claims

6

about newsworthiness, CNS only even arguably asserts one concrete injury, though not in any brief. According to CNS, "[d]elays in access to civil complaints beyond one calendar day diminish the value of CNS's reports to its subscribers, leading to a loss of goodwill." (CNS Proposed Findings, Dkt. No. 167-1 at ¶ 12.) But, in the thousands of pages of record, the only evidence the Court found that relates to goodwill problems is one paragraph in the declaration of CNS editor, William Girdner.

> I have fielded complaints from our subscribers about late reporting, asking why a new complaint was reported late. When complaints from subscribers come to my attention, I respond directly because I believe the reputation of CNS is at stake. I will investigate the reason for the delayed reporting and give the subscriber an explanation, which is sometimes the fault of a reporter or a technical problem on the side of CNS, but more often is due to a clerk's policy or practice of withholding access.

(Girdner Decl., Dkt. No. 86 at ¶ 51.) And that paragraph alone doesn't sufficiently show a loss of goodwill. Among other things, it doesn't state how many complaints were received, how many of them were about and because of OCSC, or under what circumstances the complaints were made. Without any corroborating evidence, that's not enough.

*No Effect of Longer Delays.* The Court also notes that CNS has offered neither argument nor evidence that longer delays in access to complaints at OCSC affects any injury supposedly at issue.

**4. CONCLUSIONS OF LAW**

The Court makes these conclusions of law, including any conclusions of law found in the Findings of Fact.

**4.1 General Legal Setting**

The Supreme Court has generally been reluctant to find implied affirmative constitutional rights, which may allow citizens to demand action by the government. For example, the Supreme Court stressed the difference between affirmative and negative rights

7

in *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978). Analyzing its earlier cases, the Supreme Court explained that "the Court was concerned with the freedom of the media to *communicate* information once it is obtained; neither case intimated that the Constitution *compels* the government to provide the media with information or access to it on demand." *Id.* (emphasis in original); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) (discussing affirmative obligations under the Fifth and Fourteenth Amendments and collecting cases); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35–38 (1973) (rejecting claim to a positive right to public education under the First and Fourteenth Amendment).

When imposing affirmative obligations on the government in the First Amendment context, costs become more relevant in a way not sufficiently reviewed in the extensive history of defensive First Amendment rights. The relatively new right of access case law has yet to fully articulate the balance between costs and access. Still, how much it costs to provide access that didn't previously exist is a relevant consideration. *See, e.g.*, *Barber v. Conradi*, 51 F. Supp. 2d 1257, 1267–68 (N.D. Ala. 1999); *State ex rel. Williston Herald, Inc. v. O'Connell*, 151 N.W.2d 758 (N.D. 1967); *DeShaney*, 489 U.S. at 196 (explaining that the government has no affirmative obligation to fund the exercise of Fourteenth Amendment rights and collecting cases). In the same vein, the budgetary restrictions and caseload of a court may factor into the analysis.

**4.2  Appropriate Legal Framework**

The so-called "experience and logic" test from *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) ("*Press-Enterprise II*") does not control here. On summary judgment, the Court explained that it was unable to determine the meaning of "timely" access to new complaints, as required by *Courthouse News Service v. Planet* ("*Planet I*"), 750 F.3d 776, 788 (9th Cir. 2014), by using the experience and logic test. (Dkt. No. 149 at 28.) Relying on the same evidence it cited at summary judgment, at trial CNS asked the Court to apply the *Press-Enterprise II* test once more, but this time considering a different length of delays.

The Court finds that CNS's experience and logic arguments present the same deficiencies as they did on summary judgment. The Court now confirms that the delays in this dispute are better analyzed as "analogous to a permissible 'reasonable restriction on the time, place, or manner of protected speech.'" *See Planet I*, 750 F.3d at 793 n.9 (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)). Here, the Court therefore applies the time, place, and manner regulation test from *Ward*.

This framework is unaffected by the parties' recent dispute over whether CNS has brought a facial or as-applied challenge to OCSC's complaint review. To bring a facial challenge, CNS would have to show that OCSC's practice can never be constitutional or that it is "'substantially' overbroad." *See N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 11 (1988). Only the second option is available to CNS at this point. (*See* Dkt. No. 149 at 43.) And not being "substantially" overbroad is, in any event, also one of the requirements of the time, place, and manner test. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 947 (9th Cir. 2011).

### 4.3 Time, Place, and Manner Analysis

The Court explained the time, place, and manner test in detail in its summary judgment order. (Dkt. No. 149 at 31–33.) It's enough to say here that, for the Court to find that OCSC delays are constitutional time, place, and manner restrictions, the burden is on OCSC to show that its review practice (1) is content neutral, (2) is narrowly tailored to serve a significant governmental interest, and (3) leaves open ample alternative channels. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994); *Ward*, 491 U.S. at 791.

On summary judgment, the Court determined that OCSC had met its burden for the first element, content neutrality. (Dkt. No. 149 at 33–34.)

Regarding narrow tailoring to serve a significant governmental interest, the Court found that OCSC has a significant interest in protecting litigant privacy, which the complaint review practice helps, and that OCSC isn't ignoring less restrictive practices that are "readily available." (*Id.* at 34–39) (citing *Comite de Jornaleros*, 657 F.3d at 947.) The Court didn't decide

9

if OCSC's privacy review burdens "substantially more" access "than is necessary" because of the parties' opaque characterization of the delays. (*Id.* at 39–41) (citing same.) Considering the Court's findings here, which show that 95% to 99% of new complaints are made available within one business day of receipt, the Court now finds that OCSC's privacy review does not burden substantially more access than necessary. OCSC has met the second element of the time, place, and manner test.

This leaves only the issue of ample alternative channels. The Court already rejected on summary judgment CNS's argument that there cannot be any alternative channels of access while access to complaints is delayed. (Dkt. No. 149 at 41–42.) But, unable to determine the full extent of the delays involved, the Court didn't reach a definitive conclusion about alternative channels in this case. (*Id.* at 42.) Now though, the Court finds that this last element of the time, place, and manner test is satisfied here for all the reasons explained in the summary judgment order. (*Id.* at 41–42.)

OCSC has shown that its privacy review is a reasonable time, place, and manner restriction on the First Amendment right of access. It follows that OCSC's practice is constitutional and CNS's First Amendment rights have not been violated.

## **DISPOSITION**

OCSC's complaint review policies and practices doesn't violate the First Amendment right of access. OCSC is therefore entitled to final judgment. The Court reaches this result after reviewing all arguments in the parties' papers and holding oral closing arguments. Any arguments not specifically addressed were either unpersuasive or not necessary to reach considering the Court's holdings.

OCSC's counsel is directed to prepare the judgment and promptly file and serve it on CNS. CNS shall have shall have 14 days from the date of service of the proposed judgment to file any objections to the proposed judgment. If no objections are received within 14 days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will

apply on entry of the judgment.

Dated August 10, 2018

                                                  Hon. Andrew J. Guilford
                                                  United States District Judge

**Appendix 1. Availability of New Unlimited Civil Complaints (Jan. 2017 – Mar. 2018) in Court and Calendar Days.**

| Filing Period (number of new complaints) | Number of Days Between Receipt and Public Availability | | | | | | (Day Standard) |
|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5+ | |
| Jan. 2017 (1,088) | 62.68% | 32.08% | 2.39% | 1.29% | 0.92% | 0.64% | (Court) |
| | | 25.37% | 1.56% | 4.23% | 4.04% | 2.11% | (Calendar) |
| Feb. 2017 (1,118) | 52.59% | 44.36% | 1.7% | 0.36% | 0.36% | 0.63% | (Court) |
| | | 34.88% | 1.88% | 3.85% | 5.55% | 1.25% | (Calendar) |
| Mar. 2017 (1,397) | 56.62% | 40.73% | 1.5% | 0.72% | 0.07% | 0.36% | (Court) |
| | | 29.42% | 1% | 8.8% | 2.79% | 1.36% | (Calendar) |
| Apr. 2017 (1,216) | 64.97% | 32.24% | 1.81% | 0.82% | 0.08% | 0.08% | (Court) |
| | | 24.84% | 1.4% | 7.15% | 0.9% | 0.74% | (Calendar) |
| May 2017 (1,325) | 73.96% | 24.91% | 0.83% | 0.15% | 0% | 0.15% | (Court) |
| | | 20.45% | 1.06% | 3.09% | 0.98% | 0.45% | (Calendar) |
| Jun. 2017 (1,330) | 49.1% | 48.5% | 1.73% | 0.53% | 0.15% | 0% | (Court) |
| | | 36.84% | 1.28% | 11.58% | 0.6% | 0.6% | (Calendar) |
| Jul. 2017 (1,126) | 40.5% | 57.55% | 1.6% | 0.09% | 0% | 0.27% | (Court) |
| | | 44.23% | 1.6% | 12.79% | 0.62% | 0.27% | (Calendar) |
| Aug. 2017 (1,420) | 60.56% | 38.38% | 0.63% | 0.21% | 0% | 0.21% | (Court) |
| | | 33.1% | 0.92% | 5.35% | 0% | 0.07% | (Calendar) |
| Sep. 2017 (1,236) | 62.7% | 36.57% | 0.65% | 0.08% | 0% | 0% | (Court) |
| | | 28.07% | 0.65% | 7.04% | 1.46% | 0.08% | (Calendar) |
| Oct. 2017 (1,234) | 64.26% | 33.47% | 1.46% | 0.65% | 0.08% | 0.08% | (Court) |
| | | 28.36% | 1.54% | 4.05% | 1.05% | 0.73% | (Calendar) |
| Nov. 2017 (1,204) | 62.79% | 36.63% | 0.42% | 0.08% | 0.08% | 0% | (Court) |
| | | 26.25% | 0.42% | 5.98% | 3.32% | 1.25% | (Calendar) |
| Dec. 2017 (1,158) | 64.34% | 33.33% | 1.38% | 0.69% | 0.26% | 0% | (Court) |
| | | 24.7% | 1.12% | 5.18% | 3.8% | 0.86% | (Calendar) |
| Jan. 2018 (1,228) | 64.98% | 31.98% | 1.71% | 0.81% | 0.41% | 0.41% | (Court) |
| | | 25.65% | 2.2% | 3.75% | 1.87% | 1.55% | (Calendar) |
| Feb. 2018 (1,223) | 61.41% | 34.59% | 2.53% | 1.31% | 0.16% | 0% | (Court) |
| | | 27.56% | 2.37% | 3.6% | 3.35% | 1.72% | (Calendar) |
| Mar. 2018 (1,394) | 38.45% | 57.46% | 2.22% | 1.22% | 0.50% | 0.14% | (Court) |
| | | 41.61% | 1.43% | 12.7% | 4.16% | 1.65% | (Calendar) |

**Appendix 2. Comparison of Delays of 1 Business Day and Delays of 3 Calendar Days in Months with No Court Holidays Adjacent to a Weekend.**

|           | Within 1 business day | Within 3 calendar days |
|-----------|-----------------------|------------------------|
| Apr. 2017 | 97.21%                | 98.36%                 |
| Jun. 2017 | 97.6%                 | 98.8%                  |
| Jul. 2017 | 98.05%                | 99.11%                 |
| Aug. 2017 | 98.95%                | 99.3%                  |
| **Average** | **97.95%**          | **98.89%**             |

**Appendix 3. Comparison of Delays of 1 Business Day and Delays of 4 Calendar Days in Months with a Court Holiday Adjacent to a Weekend.**

|           | Within 1 business day | Within 4 calendar days |
|-----------|-----------------------|------------------------|
| Jan. 2017 | 94.76%                | 97.88%                 |
| Feb. 2017 | 96.95%                | 98.75%                 |
| Mar. 2017 | 97.35%                | 98.63%                 |
| May 2017  | 98.87%                | 99.54%                 |
| Sep. 2017 | 99.27%                | 99.92%                 |
| Oct. 2017 | 97.73%                | 99.26%                 |
| Nov. 2017 | 99.42%                | 98.76%                 |
| Dec. 2017 | 97.67%                | 99.14%                 |
| Jan. 2018 | 96.66%                | 98.45%                 |
| Feb. 2018 | 96%                   | 98.29%                 |
| Mar. 2018 | 95.91%                | 98.35%                 |
| **Average** | **97.33%**          | **98.82%**             |